## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **IN RE: DAVOL, INC./C.R. BARD, INC., POLYPROPYLENE HERNIA MESH PRODUCTS LIABILITY LITIGATION** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No.: 2:18-md-2846**<br><br>**CHIEF JUDGE EDMUND A. SARGUS**<br>**Magistrate Judge Kimberly A. Jolson** |
| **This document relates to:**<br>**ALL ACTIONS: MELISSA A. WOODS** | | |

## <u>COMPLAINT</u>

Plaintiff Melissa A. Woods files this Complaint pursuant to Case Management Order 2 and are to be bound by the rights, protections, and privileges and obligations of that Order.

Plaintiff Melissa A. Woods, by and through undersigned counsel, brings this Complaint for damages against Defendants and in support states the following:

1.     This products liability action is brought on behalf of the above-named Plaintiff, arising out of the failure of Defendants' hernia mesh product, the Ventrio hernia patch (hereinafter referred to as "Bard Hernia Mesh"). As a result, Plaintiff suffered permanent injuries and significant pain and suffering, emotional distress, lost wages and earning capacity, and diminished quality of life. Plaintiff respectfully seeks all damages to which she may be legally entitled.

## <u>STATEMENT OF PARTIES</u>

2.      Plaintiff is, and was, at all relevant times, a citizen and resident of Louisiana and the United States.

3.      Defendant Davol, Inc. ("Davol") is a subsidiary of Defendant C.R. Bard, Inc. ("Bard"). The Bard subsidiary is incorporated in Delaware and has its principal place of business in Rhode Island. Davol is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices, including a hernia mesh patch composed of an absorbable polydioxanone (PDO) recoil ring concealed between two layers of polypropylene mesh, and an expanded polytetrafluoroethylene (ePTFE) sheet, which is attached to one side of the polypropylene mesh.

4.      Defendant Bard is incorporated and based in New Jersey, and is the corporate parent/stockholder of Davol. It is a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices. Bard controls the largest market share of the U.S. hernia mesh market, and participates in the manufacture and distribution of Bard Hernia Mesh. It also manufactures and supplies Davol with material forming part of Bard Hernia Mesh.

5.      Bard was at all material times responsible for the actions of Davol. It exercised control over Davol's functions specific to the oversight and compliance with applicable safety standards relating to and including Bard Hernia Mesh sold in the U.S. In such capacity, Bard committed or allowed to be committed tortious and wrongful acts, including the violation of numerous safety standards relating to manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Bard's misfeasance and malfeasance caused Plaintiff to suffer injury and damages.

6.      Bard/Davol are individually, jointly and severally liable to Plaintiff for damages she suffered arising from their design, manufacture, marketing, labeling, distribution, sale and

placement of Bard Hernia Mesh, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

7.      Bard/Davol are vicariously liable for the acts and/or omissions of their employees and/or agents who were at all material times acting on their behalf and within the scope of their employment or agency.

## VENUE AND JURISDICTION

8.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and all Defendants. The amount in controversy exceeds $75,000.

9.      Defendants continue to conduct substantial business in the State of Ohio and in this District, distribute Bard Hernia Mesh in this District, receive substantial compensation and profits from sales of Bard Hernia Mesh in this District, and material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

10.     Plaintiff designates the District of Rhode Island, as the presumptive place of remand, pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to Plaintiff's claims, i.e, the design and manufacture of the Bard Hernia Mesh product at issue in this case, occurred in this District.

## FACTS COMMON TO ALL COUNTS

11.     On or about October 19, 2012, plaintiff Melissa M. Woods underwent repair of a ventral incisional hernia by Dr. William Moss at  Lake Charles Memorial Hospital in Lake

Charles, Louisiana. An 11 cm x 14 cm Ventrio patch, Ref. No. 0010215, Lot No. HUWE0662, was implanted in Ms. Woods during this repair.

12.     Defendants manufactured, sold, and/or distributed the Bard Hernia Mesh to Ms. Woods through her doctors, to be used for treatment of hernia repair.

13.     On or about November 21, 2015, Ms. Woods was experiencing extreme abdominal pain and a recurrent hernia. She had to undergo surgical intervention to remove the defective Bard Hernia Mesh, which was found to have been infected and to have caused extensive necrotizing abdominal soft tissue infection, feculent peritonitis, and small bowel enterocutaneous fistula.

14.     Ms. Woods continued to experience complications related to the Bard Hernia Mesh, including having to undergo six separate surgical washouts of the infected area where the mesh had been implanted, and ongoing abdominal pain.

15.     Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of Bard Hernia Mesh, including the warnings and instructions concerning the product.

16.     Among the intended purposes for which Defendants designed, manufactured and sold Bard Hernia Mesh was use by surgeons for hernia repair surgeries, the purpose for which the product was implanted in Plaintiff.

17.     The Bard Hernia Mesh at issue is composed of the following layers:

    i)      ePTFE sheet;

    ii)     Polypropylene mesh;

    iii)    PDO absorbable recoil ring

18.     The polypropylene side of the Bard Hernia Mesh was intended to promote incorporation (scarring into the abdominal wall), while the ePTFE side was intended to prevent adhesion formation from the polypropylene's exposure to underlying organs. But the utilization of ePTFE results in the product being highly prone to infection, while the utilization of polypropylene results in the product being extremely difficult to remove once the Bard Hernia Mesh becomes infected.

19.     For decades, the medical community has had concerns about severe complications if a foreign object, such as a mesh, was placed too close to the bowel or other underlying organs, due to inflammation in the presence of sensitive organs and the formation of dense adhesions to the device.

20.     Defendants represented to Ms. Woods and her physicians that Bard Hernia Mesh was a safe and effective product for hernia repair.

## THE FDA'S 510(k) CLEARANCE PROCESS

21.     The "510(k) clearance process" refers to Section 510(k) of the Medical Device Amendments of 1976 (MDA) of the Federal Food, Drug and Cosmetic Act. Under this process, manufacturers are only required to notify the FDA at least 90 days before they market a device claimed to be "substantially equivalent" to a device the FDA had approved for sale before 1976, when the MDA was enacted.

22.     No clinical testing is required under this process.

23.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA, 510(k)-cleared devices.

24.     Therefore, devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices that the FDA had approved for sale before 1976 could be sold to patients in 90 days without clinical testing.

25.     Clearance for sale under the 510(k) process does not equate to FDA approval of the cleared device.

26.     In 2012, at the FDA's request, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, coming to the following major conclusion:

> **The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.**

27.     The NIH explained: "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH pointed out that the classification of predicate devices approved for sale before the 1976 MDA "did not include any evaluation of the safety and effectiveness of individual medical devices . . . Thus it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

28.     Defendants cleared Bard Hernia Mesh and its related components under the 510(k) Premarket Notification. Under Section 510(k), it did not undergo clinical study to gain FDA approval. Instead, it was supposed to demonstrate substantial equivalence to a predicate medical device.

## ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS

6

29.     Defendants are estopped from relying on any statutes of limitations or repose by virtue of their acts of fraudulent concealment, which include intentional concealment from plaintiff Ms. Woods and the general public that the Bard Hernia Mesh is defective, while continually marketing the product with the effects described in this Complaint.

30.     Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects—information over which Defendants had exclusive control—and because Plaintiff could not reasonably have known the Bard Hernia Mesh was defective, Defendants are estopped from relying on any statutes of limitations that might otherwise be applicable to the claims asserted in this Complaint.

## COUNT I: STRICT LIABILITY – MANUFACTURING DEFECT

31.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

32.     Defendants expected and intended Bard Hernia Mesh to reach users such as Plaintiff in the condition in which the product was sold.

33.     The implantation of Bard Hernia Mesh in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when they designed, manufactured and sold the product.

34.     When the Bard Hernia Mesh was implanted in Plaintiff's body it was defectively manufactured.

35.     Defendants' poor quality control and general non-compliance resulted in the non-conformance of the Bard Hernia Mesh implanted in Plaintiff. The implanted product did not conform to Defendants' intended manufacturing and design specifications.

36.     Upon information and belief, Defendants utilized substandard and adulterated polypropylene and raw materials used to make Bard Hernia Mesh, which deviated from Defendants' material and supply specifications.

37.     As a direct and proximate result of the defective manufacture of the Bard Hernia Mesh, Plaintiff Melissa M. Woods suffered injuries and damages as summarized in this Complaint.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

38.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

39.     Bard Hernia Mesh was defectively designed and/or manufactured, and was not reasonably safe for its intended use in hernia repair; and the risks of the design outweighed any potential benefits associated with it. As a result of the defective design and/or manufacture of the Bard Hernia Mesh, there was an unreasonable risk of severe adverse reactions to the mesh or its components including: chronic infections; chronic pain; recurrence of hernia; foreign body response; rejection; infection; scarification; improper wound healing; excessive and chronic inflammation; allergic reaction; adhesions to internal organs; erosion; abscess; fistula formation; granulomatous response; seroma formation; nerve damage; tumor formation, cancer, tissue damage and/or death; and other complications.

40.     When affixed to the body's tissue, the impermeable ePTFE layer in Bard Hernia Mesh prevents fluid escape, which leads to seroma formation, and which in turn can cause infection or abscess formation and other complications.

41.     The smooth surface of the ePTFE layer provides an ideal bacteria breeding ground in which the bacteria cannot be eliminated by the body's immune response, thus allowing bacteria to lie dormant and infection to eventually proliferate.

42.     Bard Hernia Mesh is defective in its design in part due to a material mismatch. ePTFE shrinks at a significantly faster rate than polypropylene. This material mismatch results in the Bard Hernia Mesh curling after implantation, just as it did in Plaintiff.

43.     ePTFE contracts due to the body's inflammatory and foreign body response. Polypropylene incites a greater inflammatory and foreign body response than ePTFE alone. Defendants' ePTFE and polypropylene combination design results in the ePTFE layer shrinking faster than ePTFE would if not in the presence of polypropylene.

44.     Defendants utilize Ethylene Oxide ("ETO"), an effective disinfectant, in an attempt to sterilize Bard Hernia Mesh.  But dry spores are highly resistant to ETO. Moisture must be present to eliminate spores using ETO. Presoaking the product to be sterilized is most desirable, but high levels of humidity during the ETO process can also be effective in eliminating spores. Bard Hernia Mesh implanted with spores will eventually result in an infection. The spores can remain dormant for extended periods of time, resulting in infections months or years after implantation. The following non-exhaustive literature discusses the necessity of moisture during ETO sterilization:

> A. In January of 1989, a review on sterilization methods of medical devices was published in the Journal of Biomaterials Applications. ETO was among the sterilization methods reviewed. **ETO was noted to be highly resistant to dry spores, moisture must be present; presoaking most desirable. Experiments demonstrated the importance of the state of humidification of organisms at the time of their exposure to ETO. Desiccation of the spores prior to ETO exposure produces a small but significant percentage of organisms which are highly resistant to the sterilization process. Similar resistance to destruction by ETO occurs in desiccated staphylococcus aureus. Rehumidification of such organisms can require prolonged exposure to an atmosphere having a 50 to 90 percent relative humidity. Moisture has been found to be a critical factor in achieving sterility with gaseous ETO. No gas sterilizer can effectively kill desiccated spores.**

Dempsey, D.J. and Thirucote, R.R., *Sterilization of medical devices: A Review*. Journal of Biomaterials Applications, 3(3), pp. 454-523 (1988). DOI: 10.1177/088532828800300303

45.     The multi-layer design of Bard Hernia Mesh results in ineffective sterilization more often than single layer mesh.

46.     Bard Hernia Mesh is cytotoxic, immunogenic, and not biocompatible, which causes or contributes to complications such as delayed wound healing, inflammation, foreign body response, rejection, infection, and other complications.

47.     The solid, flat, relatively smooth and continuous surface of the Bard Hernia Mesh inhibits the body's ability to clear toxins.

48.     These manufacturing and design defects associated with the product were directly and proximately related to the injuries Plaintiff suffered.

49.     Neither Plaintiff nor her implanting physician was adequately warned or informed by Defendants of the defective and dangerous nature of the product. Moreover, neither Plaintiff nor her implanting physician was adequately warned or informed by Defendants of the risks associated with Bard Hernia Mesh.

50.     The product implanted in Plaintiff failed to reasonably perform as intended. It caused serious injury and had to be revised via invasive surgery, and necessitated additional invasive surgery to repair the hernia that the product was initially implanted to treat.

51.     When the Bard Hernia Mesh was implanted in Plaintiff's body, it was defectively designed. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Defendants failed to design against such dangers, and failed to provide adequate warnings and instructions concerning the product's risks.

52.     Defendants expected and intended the product to reach users such as Plaintiff in the condition in which the product was sold.

53.     The implantation of the Bard Hernia Mesh in Plaintiff's body was medically reasonable, and was a type of use that Defendants intended and foresaw when they designed, manufactured and sold the product.

54.     The risks of the product significantly outweigh any benefits that Defendants contend could be associated with it. Bard Hernia Mesh incites an intense inflammatory response, leading to encapsulation, deformation, scarification and contraction, migration, erosion and rejection. The impermeable ePTFE layer leads to seroma formation, provides a breeding ground for infection, and protects bacteria from being eliminated by the body's natural immune response.

55.     The polypropylene mesh patch was in itself dangerous and defective, particularly when used in the manner intended by Defendants.  The polypropylene material used in Bard Hernia Mesh was substandard, adulterated and non-medical grade, and was unreasonably subject to oxidative degradation within the body, further exacerbating the adverse reactions caused by the product. As the ePTFE layer quickly contracts, the Bard Hernia Mesh curls, exposing the underlying polypropylene. When implanted adjacent to the bowel and other internal organs, as Defendants intended for Bard Hernia Mesh, polypropylene mesh is unreasonably susceptible to adhesion, bowel perforation or erosion, fistula formation and bowel strangulation or hernia incarceration, and other injuries.

56.     Bacterial adherence is increased due to the interstitial porosity, surface tension, and electronegativity of ePTFE.

11

57.    ePTFE undergoes irreversible structural changes in the presence of microorganisms. The structural changes ePTFE undergoes provide protection to the microorganisms, allowing them to flourish and necessitating the total removal of the Bard Hernia Mesh product.

58.    The appropriate treatment for complications associated with Bard Hernia Mesh involves additional invasive surgery in an attempt to remove the mesh from the body, thus eliminating any purported benefit that the product was intended to provide to the patient.

59.    Bard Hernia Mesh was designed and intended for intraperitoneal implantation, which required the product to be placed in contact with internal organs, thereby unnecessarily increasing the risks of adhesion, erosion, fistula formation, and other injuries.

60.    When the Bard Hernia Mesh was implanted in Plaintiff, there were safer feasible alternative designs for hernia mesh products were available, including a flat, non-coated, light-weight, large-pore, single-layer mesh placed away from the bowel.

61.    The Bard Hernia Mesh product cost significantly more than competitive products because of its unique design, even though it provided no benefit to consumers over other mesh types, and increased the risks to patients implanted with these devices.

62.    The Bard Hernia Mesh has a solid, flat, relatively smooth and continuous surface. Medical devices utilizing this design greatly increase the risk of tumor and cancer formation via the "Oppenheimer Effect":

> A. In 1958, a study supported by a research grant from the National Cancer Institute titled The Latent Period in Carcinogenesis by Plastics in Rats and its Relation to the Presarcomatous Stage was published in the Journal of Cancer. **The presence of polymer in a sheet form appears to be of primary importance, as shown by the manifold increase in the percentage of tumors induced by this form, as opposed to textiles, sponges, powders, etc. This may act in some way as a block to the free interchange of tissue constituents,**

> **subjecting some cells to an altered environment and changing their pattern of growth. Whether the primary cause is lack of nutrients or oxygen, or the accumulation of products of metabolism, or even a freeing of the cell from some hormonal control, is not a present clear, but undoubtedly the cell is placed under conditions that are favorable to autonomous, unregulated growth. Plastics embedded subcutaneously in rodents in film or sheet form induce malignant tumors in significant numbers (up to 50%), but embedded in other forms, such as textiles, sponges, or powders, they induce tumors only rarely.**

Oppenheimer, B.S. et al, *The Latent Period in Carcinogenesis by Plastics in Rats and its Relations to the Presarcomatous Stage*. Journal of Cancer 1(11). 204 – 213 (1958).

> B. In 1999, the World Health Organization's International Agency for Research on Cancer published *Surgical implants and Other Foreign Bodies*, which evaluated the carcinogenic risks of various surgical implants in humans. **Polymeric implants prepared as thin smooth films are possibly carcinogenic to humans.**

*Surgical Implants and Other Foreign Bodies*. IARC Monogr Eval Carcinog Risks Hum 74:1-409 (1999).

63. Plaintiff was implanted with Bard Hernia Mesh, which also includes an inner ring of PDO, to aid in the short-term memory and stability of the device. The inner PDO ring is called SorbaFlex Memory Technology.

64. The PDO ring breaks down via hydrolysis over a period of at least 6 to 8 months once implanted. The PDO ring elicits an intense inflammatory response during absorption.

65. The product is vulnerable to buckling, folding, and/or migrating once the PDO ring has absorbed.

66. The numerous layers utilized to create the Bard Hernia Mesh increase the intensity and duration of inflammation and foreign body response.

67. The Bard Hernia Mesh product implanted in Plaintiff failed to reasonably perform as intended, and had to be surgically removed. Thus, further invasive surgery was necessary to repair the very problem that the product was intended to repair, providing no benefit to him.

68.    As a direct and proximate result of the defective and unreasonably dangerous condition of the product, Plaintiff suffered injuries and damages as summarized in this Complaint.

**COUNT III: STRICT LIABILITY – FAILURE TO WARN**

69.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

70.    When the Bard Hernia Mesh was implanted in Plaintiff's body, the warnings and instructions provided by Defendant for the product were inadequate and defective. As described above, there was an unreasonable risk that the product would not perform safely and effectively for the purposes for which it was intended. Defendants failed to design and/or manufacture against such dangers, and failed to provide adequate warnings and instructions concerning these risks.

71.    Defendants expected and intended the product to reach users such as Plaintiff in the condition in which it was sold.

72.    Plaintiff and her physicians were unaware of the defects and dangers of the Bard Hernia Mesh, and were unaware of the frequency, severity and duration of the risks associated with the product.

73.    Defendants' Instructions for Use provided with the product expressly understate and misstate the risks known to be associated specifically with it. The Instructions for Use represents the complications associated with the product, such as inflammation, as "*possible* complications." But Bard Hernia Mesh will always incite severe inflammation once implanted. The inflammation caused is chronic in nature and systemic—not acute and localized. Defendants provided no warning to physicians about the risks or increased risks specifically associated with the unique design of Bard Hernia Mesh.

14

74.     Defendants' Instructions for Use failed to adequately warn Plaintiff's physicians of numerous risks, which Defendants knew or should have known were associated with Bard Hernia Mesh, including the following: immunologic response, infection, pain, dehiscence, encapsulation, rejection, migration, scarification, contraction, erosion through adjacent tissue and viscera, bowel obstruction, and tumor or cancer formation.

75.     Defendants' Instructions for Use also failed to instruct physicians how much larger than the hernia defect the product needed to be for an effective repair.

76.     As well, the Instructions for Use failed to disclose the extent Bard Hernia Mesh would shrink, or that it would even shrink at all.

77.     Defendants failed to adequately warn Plaintiff or her physicians about the need for invasive surgical intervention in the event of complications, or inform them of the treatment for such complications when they occurred.

78.     Defendants failed to adequately warn Plaintiff or her physicians that the surgical removal of the Bard Hernia Mesh, in the event of complications, would leave the hernia unrepaired and the resulting hernia would be much larger than the original. Thus, more complicated medical treatment would be needed to attempt to repair the same hernia that the failed product was intended to treat.

79.     Defendants failed to adequately warn Plaintiff or her physicians that in the event of complications, the product is more difficult to fully remove than other feasible hernia meshes that have been available at all material times.

80.     Defendants failed to warn Plaintiff or her physicians that as a result of being implanted with the Bard Hernia Mesh, she would be at a higher risk of infection for the remainder of her life.

15

81.     With respect to the complications listed in Defendants' warnings, they provided no information or warning regarding the frequency, severity and duration of those complications, even though the complications associated with Bard Hernia Mesh were more frequent, more severe and longer lasting than those with safer feasible alternative hernia repair treatments.

82.     If Plaintiff or her physicians had been properly warned of the defects and dangers of Bard Hernia Mesh, and of the frequency, severity and duration of the risks associated with the product, she would not have consented to allow the product to be implanted, and her physicians would not have implanted it.

83.     As a direct and proximate result of the inadequate and defective warnings and instructions, Plaintiff suffered injuries and damages as summarized in this Complaint.

## COUNT IV: NEGLIGENCE

84.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

85.     Defendants had a duty to use reasonable care in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for Bard Hernia Mesh, but failed to do so.

86.     Defendants knew, or in the exercise of reasonable care should have known, that the product was defectively and unreasonably designed and/or manufactured, and was unreasonably dangerous and likely to injure patients in whom it was implanted. Defendants knew or should have known that Plaintiff and her physicians were unaware of the dangers and defects inherent in the product.

87.     Defendants knew or should have known that the MSDS for the polypropylene used to manufacturer Bard Hernia Mesh prohibited permanently implanting the polypropylene into the human body.

88.     Defendants utilized non-medical grade polypropylene.

89.     Defendants knew or should have known that the polypropylene component is not inert and would degrade, flake, chip, and disperse throughout the body once implanted.

90.     Defendants knew or should have known that polypropylene incites a severe inflammatory response once implanted and continues to incite a severe inflammatory response indefinitely or until removed.

91.     Defendants knew or should have known that every piece of polypropylene that flakes off and migrates throughout the body also incites its own chronic inflammatory response wherever it embeds.

92.     Defendants knew or should have known that the ePTFE component is associated with high rates of severe, chronic infections.

93.     Defendants knew or should have known that ePTFE degrades in the presence of bacteria.

94.     Defendants knew or should have known that once ePTFE is infected, it is nearly impossible to permanently rid the infection and salvage the mesh.

95.     Defendants knew or should have known that ePTFE is not inert and would degrade, flake, chip, and disperse throughout the body once implanted.

96.     Defendants knew or should have known that implanting a solid, flat, relatively smooth and continuous disc shaped object would increase the rate of tumor formation and other adverse events.

97.     Defendants knew or should have known that all subsequent operations carry a greater risk of infection after the patient has been implanted with Bard Hernia Mesh.

98.     As a direct and proximate result of Defendants' negligence in designing, testing, inspecting, manufacturing, packaging, labeling, marketing, distributing, and preparing written instructions and warnings for the product, Plaintiff suffered injuries and damages as summarized in this Complaint.

## COUNT V: BREACH OF IMPLIED WARRANTY

99.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

100.    At all material times, Defendants manufactured, distributed, advertised, promoted, and sold their Bard Hernia Mesh product.

101.    At all material times, Defendants intended for their product to be implanted for the purposes and in the manner that Plaintiff and her implanting physician in fact used it; and Defendants impliedly warranted that the product and its component parts was of merchantable quality, safe and fit for such use, and adequately tested.

102.    Defendants were aware that consumers, including Plaintiff or her physician, would implant their product as directed by the Instructions for Use. Therefore, Plaintiff was a foreseeable user of Defendants' Bard Hernia Mesh.

103.    Defendants' Bard Hernia Mesh was expected to reach, and did in fact reach consumers, including Plaintiff and her physician, without substantial change in the condition in which it was manufactured and sold by Defendants.

104.    Defendants breached various implied warranties with respect to Bard Hernia Mesh, including the following:

A.      Defendants represented to Plaintiff and her physician and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory

18

submissions that their product was safe. But at the same time they fraudulently withheld and concealed information about the substantial risks of serious injury associated with using the product;

B.     Defendants represented to Plaintiff and her physician and healthcare providers that their product was safe and/or safer than other alternative procedures and devices. But at the same time they fraudulently concealed information demonstrating that the product was not safer than alternatives available on the market; and

C.     Defendants represented to Plaintiff and her physician and healthcare providers that their product was more efficacious than alternative procedures and/or devices. But at the same time they fraudulently concealed information regarding the true efficacy of the Bard Hernia Mesh.

105.     In reliance upon Defendants' implied warranties, Plaintiff individually, and/or by and through her physician, used the Bard Hernia Mesh as prescribed, and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

106.     Defendants breached their implied warranties to Plaintiff in that their product was not of merchantable quality, nor was it safe and fit for its intended use or adequately tested.

107.     As a direct and proximate result of Defendants' breaches of the aforementioned implied warranties, Plaintiff was caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including obligations for medical services and expenses, impairment of personal relationships, and other damages.

## COUNT VI: VIOLATION OF CONSUMER PROTECTION LAWS

108.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

109.     Plaintiff purchased and used Bard Hernia Mesh primarily for personal use, and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

110.     Had Defendants not engaged in the deceptive conduct described in this Complaint, Plaintiff would not have purchased and/or paid for the product, and would not have incurred related medical costs and injury.

111.     Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiff for the Bard Hernia Mesh, which would not have been paid but for Defendants' unfair and deceptive conduct.

112.     Unfair methods of competition or deceptive acts or practices proscribed by law include the following:

A)  Representing that goods or services have characteristics, ingredients, uses, benefits or qualities that they do not have;
B)  advertising goods or services with the intent not to sell them as advertised; and
C)  engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

113.     Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct, directed at patients, physicians and consumers, was to create demand for and sell Bard Hernia Mesh. Each aspect of Defendants' conduct combined to artificially create sales of the product.

20

114.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Bard Hernia Mesh.

115.    Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the product, and would not have incurred related medical costs.

116.    Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed.

117.    Defendants' actions constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes.

118.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations:

- 15 U.S.C. §§ 2301-2312 (1982).

- RI Gen. L. §6-13.1-1 *et. seq.* (2014)

119.    The statutes listed above were enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. Defendants are the suppliers, manufacturers, advertisers, and sellers, subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

120.    Defendants violated the statutes enacted to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that Bard Hernia Mesh was fit to be used for the purpose for

which it was intended, when in fact it was defective and dangerous; and by other acts alleged in this Complaint. These representations were made in marketing and promotional materials.

121.     Defendants' actions and omissions are uncured or incurable deceptive acts under the consumer protection statutes.

122.     Defendants had actual knowledge of the defective and dangerous conditions of Bard Hernia Mesh, but failed to take any action to cure those conditions.

123.     Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which product and/or procedure to undergo and/or perform (if any).

124.     Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

125.     By reason of the unlawful acts in which Defendants engaged, and as a direct and proximate result, Plaintiff has suffered ascertainable losses and damages.

126.     As a direct and proximate result of Defendants' violations of the consumer protection laws, Plaintiff has sustained economic losses and other damages, and is entitled to statutory and compensatory damages in an amount to be proven at trial.

**COUNT VII: GROSS NEGLIGENCE**

127.     Plaintiff incorporates by reference the allegations in all prior paragraphs.

128.     Defendants' wrongs were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff, for which the law would allow, and for which Plaintiff will seek at the appropriate time, the imposition of exemplary damages. That is because Defendants' conduct, including the failure to comply with applicable

22

federal standards was specifically intended to cause substantial injury to Plaintiff. Their conduct, when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and Defendants were actually, subjectively aware of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or included Defendants' false material representations, with their knowledge that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that Plaintiff would act upon their representation.

129.    Plaintiff relied on the representation and suffered injury as a proximate result of this reliance.

130.    Plaintiff therefore will seek to assert claims for exemplary damages at the appropriate time, in an amount within the jurisdictional limits of the Court.

131.    Plaintiff also alleges that Defendants' acts and omissions, whether taken singularly or in combination with others, constitute gross negligence, proximately causing Plaintiff's injuries. In that regard, she will seek exemplary damages in an amount to punish Defendants for their conduct, and to deter other manufacturers from engaging in such misconduct in the future.

### COUNT VIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

132.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

133.    Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold Bard Hernia Mesh to Plaintiff.

134.    Defendants carelessly and negligently concealed the harmful effects of the product from Plaintiff and/or her physician on multiple occasions, and continue to do so to this day.

135.    Defendants carelessly and negligently misrepresented the quality, safety and efficacy of the Bard Hernia Mesh to Plaintiff and/or her physician on multiple occasions, and continue to do so to this day.

136.    Plaintiff was directly impacted by Defendants' carelessness and negligence, in that she has sustained, and will continue to sustain, emotional distress, severe physical injuries, economic losses, and other damages as a direct result of the decision to purchase Bard Hernia Mesh.

137.    Defendants continued to carelessly and negligently misrepresent the quality, safety, efficacy, dangers and contraindications of Bard Hernia Mesh to Plaintiff and/or her physician, after she sustained emotional distress, severe physical injuries, and economic loss.

138.    Defendants continued to carelessly and negligently misrepresent the quality, safety, efficacy, dangers and contraindications of the product to Plaintiff and/or her physician, knowing that doing so would cause her to suffer additional and continued emotional distress, severe physical injuries, and economic loss.

139.    As a proximate result of Defendants' conduct, Plaintiff was injured, sustained severe and permanent pain, suffering, anxiety, depression, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

## COUNT IX: FRAUDULENT CONCEALMENT

140.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

141.    At all material times Defendants knew or should have known Bard Hernia Mesh caused large numbers of complications. Moreover, they knew or should have known that the surgical technique and training of implanting physicians was not the cause of the adverse events associated with these devices; the safety and efficacy of Bard Hernia Mesh had not been proven with respect to, among other things, the product, its components, its performance, and its method of insertion; and that the product was not safe and effective. Defendants continued to represent that it was safe and effective.

142.    Although Defendants knew or should have known about the lack of safety and efficacy of Bard Hernia Mesh, they failed to disclose this information to Plaintiff, her physicians, and the public at large.

143.    At all material times, Defendants had the duty and obligation to disclose to Plaintiff and her physicians the true facts concerning Bard Hernia Mesh, *i.e.*, its dangerous and defective nature, its lack of efficacy for its purported use and lack of safety in normal use, and its likelihood to cause serious consequences to users, including permanent and debilitating injuries. Defendants concealed these material facts before Plaintiff was implanted with Bard Hernia Mesh.

144.    Defendants were under a duty to Plaintiff to disclose and warn her of the defective nature of the product because:

      A.  Defendants were in a superior position to know the product's true quality, safety, and efficacy;

      B.  Defendants knowingly made false claims about the product's safety and quality in documents and marketing materials; and

C. Defendants fraudulently and affirmatively concealed the defective nature of the product from Plaintiff.

145.  The facts Defendants concealed and/or did not disclose to Plaintiff were material facts that a reasonable person would have considered important in deciding whether to purchase and/or use Bard Hernia Mesh.

146.  At all material times, Defendants willfully, intentionally, and maliciously concealed facts from Plaintiff and her physician, with the intent to defraud.

147.  Defendants intentionally concealed and/or failed to disclose the true defective nature of Bard Hernia Mesh so that Plaintiff would request and purchase the product; and her healthcare providers would dispense, prescribe, and recommend the product. Plaintiff justifiably acted or relied upon the concealed and/or non-disclosed facts to her detriment.

148.  At all material times, neither Plaintiff nor her physician was aware of the facts. Had they been so aware, they would not have reasonably relied upon the representations of safety and efficacy and utilized Bard Hernia Mesh. Defendants' failure to disclose this information was a substantial factor in Plaintiff's physician's selection of Bard Hernia Mesh. The failure to disclose also resulted in the provision of incorrect and incomplete information to Plaintiff, as a patient.

149.  As a direct and proximate result of this conduct, Plaintiff was injured.

## COUNT X: NEGLIGENT MISREPRESENTATION

150.  Plaintiff incorporates by reference the allegations in all prior paragraphs.

151.  Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff and the public, that Bard Hernia Mesh had not been adequately

tested and found to be a safe and effective treatment. Defendants' representations were in fact false.

152.    Defendants failed to exercise ordinary care in their representations concerning Bard Hernia Mesh while involved in the manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce of the product, because they negligently misrepresented the product's risk of unreasonable and dangerous adverse side effects.

153.    Defendants breached their duty by representing to Plaintiff, her physician, and the medical community that Bard Hernia Mesh has no serious side effects different from older generations of similar products or procedures.

154.    As a foreseeable, direct, and proximate result of Defendants' negligent misrepresentations, they knew, or had reason to know, that Bard Hernia Mesh had been insufficiently tested, or had not been tested at all; and that the product lacked adequate and accurate warnings, and created a high risk—and/or higher than acceptable or reported and represented risk—of adverse side effects, including pain, graft rejection, graft migration, organ damage, complex seroma, fistula, sinus tract formation, delayed wound closure, infection, sepsis, and death.

155.    As a direct and proximate result of Defendants' conduct, Plaintiff was injured and sustained severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

## COUNT XI: LOSS OF CONSORTIUM

156.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

157.    At the time of the incidents complaint of in Plaintiff's Complaint, Plaintiff was married to Mr. Warren Woods and continues to be married to Mr. Woods.

158.    As a result of the wrongful and negligent acts of Defendants as set forth above, Plaintiff and her husband were caused to suffer loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

## PUNITIVE DAMAGES ALLEGATIONS

159.    Plaintiff incorporates by reference the allegations in all prior paragraphs.

160.    Defendants failed to adequately test and study Bard Hernia Mesh to determine and ensure that the product was safe and effective prior to releasing it for sale for permanent human implantation; and Defendants continued to manufacture and sell the product after obtaining knowledge and information that it was defective and unreasonably unsafe.

161.    Defendants developed, designed and sold the product, and continue to do so, because it has a significantly higher profit margin than safer hernia repair products. Defendants were aware of the probable consequences of implantation of the dangerous and defective Bard Hernia Mesh, including the risk of failure and serious injury, such as that suffered by Plaintiff.

162.    At all material times, Defendants knew or should have known that Bard Hernia Mesh was inherently more dangerous with respect to the risk of foreign body response, allergic reaction, rejection, infection, failure, erosion, pain and suffering, organ perforation, dense adhesions, tumor or cancer formation, loss of life's enjoyment, remedial surgeries and treatments to attempt to cure the conditions related to use of the product, as well as the other severe and personal injuries that are permanent and lasting.

163.    Defendants' misrepresentations include knowingly withholding material information form the medical community and the public, including Plaintiff, concerning the safety and efficacy of the Bard Hernia Mesh, depriving Plaintiff and her implanting physicians of

28

vitally necessary information with which to make a fully informed decision about whether to use the product.

164.    At all material times, Defendants knew and recklessly and/or intentionally disregarded the fact that Bard Hernia Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative methods, products, procedures, and/or treatment.

165.    At all material times, Defendants knew and recklessly and/or intentionally disregarded the fact that Bard Hernia Mesh can cause debilitating and potentially life-threatening side effects with greater frequency than safer alternative products and/or methods of treatment, and recklessly failed to advise the medical community and the general public, including Plaintiff, of those facts.

166.    At all material times, Defendants intentionally misstated and misrepresented data; and continue to misrepresent data so as to minimize the perceived risk of injuries and the rate of complications caused by Bard Hernia Mesh.

167.    Notwithstanding the foregoing and the growing body of knowledge and information regarding the true defective nature of Bard Hernia Mesh, and its increased risk of side effects and serious complications, Defendants continue to aggressively market the product to the medical community and to consumers without disclosing the true risk of such complications.

168.    When Plaintiff was implanted with Bard Hernia Mesh, and since then, Defendants have known the product was defective and unreasonably dangerous. But they continued to manufacture, produce, assemble, market, distribute, and sell the product so as to maximize sales and profits at the expense of the health and safety of the public in a conscious, reckless and/or

intentional disregard of the likely and foreseeable harm caused by Bard Hernia Mesh to members of the public, including Plaintiff.

169. At all material times, Defendants have concealed and/or failed to disclose to the public the serious risks and the potential complications associated with Bard Hernia Mesh, in order to ensure continued and increased sales and profits, to the detriment of the public, including Plaintiff.

170. Defendants' conduct, acts and omissions are of such character and nature so as to entitle Plaintiff to an award of punitive damages in accordance with applicable law. Defendants' conduct shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care raising the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants, individually, jointly, and severally, and in the alternative requests compensatory damages, punitive damages or enhanced compensatory damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendants, individually, jointly and severally, and prays for the following relief in accordance with applicable law and equity:

i. Compensatory damages to Plaintiff for all survival damages she is entitled to by law, including but not limited to, pain and suffering for severe and permanent personal injuries sustained by Plaintiff, permanent impairment, mental pain and suffering, loss of enjoyment of life, health and medical care costs, and economic damages, as well as Plaintiff's loss of consortium damages, together with interest and costs as provided by law;

ii. restitution and disgorgement of profits;

iii. punitive or enhanced compensatory damages;

iv.  reasonable attorneys' fees as provided by law;

v.  costs of these proceedings, including past and future costs of the suit;

vi.  all ascertainable economic damages;

vii.  prejudgment interest on all damages as allowed by law; and

viii. such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Melissa M. Woods hereby demands a trial by jury on all issues so triable.


Respectfully submitted,


*/s/ Lauren E. Godshall*
Betsy Barnes, LA # 19473
Lauren E. Godshall, LA #31465
Paul H. Villalobos, LA #22881
MORRIS BART, LLC
601 Poydras St., 24th Fl.
New Orleans, LA 70130
Phone: (504) 525-8000
Fax: (504) 599-3392
bbarnes@morrisbart.com
lgodshall@morrisbart.com
pvillalobos@morrisbart.com