## UNITED STATES DISTRICT COURT
## SOUTHERN DIVISION OF OHIO
## EASTERN DIVISION

IN RE: DAVOL, INC./C.R. BARD,
INC., POLYPROPYLENE HERNIA
MESH PRODUCTS LIABILITY
LITIGATION

Case No.: 2:18-md-2846

CHIEF JUDGE EDMUND A. SARGUS
Magistrate Judge Kimberly A. Jolson

This document relates to:
ALL ACTIONS.

## PLAINTIFF'S ORIGINAL COMPLAINT

1.      Plaintiff CAROL POLKA files this Complaint pursuant to Case Management Order 1 and is to be bound by the rights, protections, and privileges and obligations of that Order.

2.      This products liability action is brought on behalf of the above-named Plaintiff, arising out of the failure of Defendants' hernia mesh products, the Bard Modified Kugel$^{TM}$ Hernia Patch, the Bard Kugel$^{TM}$ Composix mesh, and the Bard Ventrio$^{TM}$ ST mesh (sometimes collectively referred to as the "Bard Hernia Mesh"). As a result, Plaintiff Carol Polka has suffered from, and will continue to suffer from, permanent injuries and significant pain and suffering, emotional distress, and diminished quality of life. Plaintiff respectfully seeks all damages to which she may be legally entitled.

3.      Plaintiff incorporates by reference the live version of the Master Long Form Complaint that is filed in this action.

## I.

## STATEMENT OF PARTIES

4.      Plaintiff is, and was, at all relevant times, a citizen and resident of Frankfort, Will County, Illinois and the United States.

5.      Defendant Davol Inc. ("Davol") is a subsidiary of Defendant C.R. Bard, Inc. ("Bard").  Davol is incorporated in Delaware and has its principal place of business in Rhode Island. All acts and omissions of Bard as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments, and/or ownership. Davol is a medical device company involved in the research, development, testing, manufacture, production, marketing, promotion and/or sale of medical devices.

6.      Defendant Bard is incorporated and based in New Jersey and is the corporate parent/stockholder of Davol. All acts and omissions of Bard as described herein were done by its agents, servants, employees and/or owners, acting in the course and scope of their respective agencies, services, employments, and/or ownership. It is a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices. Bard controls the largest market share of the U.S. hernia mesh market, and participates in the manufacture and distribution of Bard Hernia Mesh.  It also manufactures and supplies Davol with material forming part of Bard Hernia Mesh.

7.      Becton, Dickinson and Company ("BD") is incorporated and based in New Jersey and is the corporate parent/stockholder of Bard. In December 2017, BD completed its acquisition of Bard for approximately $25 billion, and as a result of their merger agreement, Bard is a wholly-owned subsidiary of BD. On information and belief, BD assumed Bard-related hernia product claims under the merger agreement.

8.      Bard was at all material times responsible for the actions of Davol. It exercised control over Davol's functions specific to the oversight and compliance with applicable safety standards relating to and including Bard Hernia Mesh sold in the U.S. In such capacity, Bard

2

committed or allowed to be committed tortious and wrongful acts, including the violation of numerous safety standards relating to manufacturing, quality assurance/control, and conformance with design and manufacturing specifications. Bard's misfeasance and malfeasance caused Plaintiffs to suffer injuries and damages.

9.     Bard and Davol are individually, jointly, and severally liable to Plaintiffs for damages suffered arising from their design, manufacture, marketing, labeling, distribution, sale and placement of Bard Hernia Mesh, effectuated directly and indirectly through their respective agents, servants, employees and/or owners, all acting within the course and scope of their representative agencies, services, employments and/or ownership.

10.     Bard and Davol are vicariously liable for the acts and/or omissions of their employees and/or agents who were at all material times acting on their behalf and within the scope of their employment or agency.

## II.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and all Defendants. The amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendants Davol, Bard, and BD pursuant to O.R.C. § 2307.382 in that Plaintiff's causes of action against Defendants arise from Defendants' transaction of business in this State and/or their commission of tortious acts in this State as described in this Complaint.

13.     Defendants continue to conduct substantial business in the State of Ohio and in this District, distribute Bard hernia mesh in this District, receive substantial compensation and profits

from sales of Bard hernia mesh in this District, and cause material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

14.    As directed by Case Management Order 2, Plaintiff designates Will County, Illinois as the presumptive place of venue for this action.

## III.

## INTRODUCTION TO PLAINTIFF
## AND BACKGROUND FACTS OF HER INJURIES

### A.    THE HERNIA MESH INJURIES

15.    On May 25, 2006, Plaintiff Carol Polka underwent repair of a right inguinal hernia by Erik Swenson, M.D. at Ingalls Memorial Hospital in Harvey, Illinois. A Bard Modified Kugel$^{TM}$ Hernia Patch was implanted for Ms. Polka's hernia repair.

16.    Defendants manufactured, sold, and/or distributed the Bard Modified Kugel$^{TM}$ Hernia Patch to Plaintiff Carol Polka through her doctors, to be used for treatment of hernia repairs.

17.    On February 19, 2009, Plaintiff Carol Polka underwent repair of a recurrent right inguinal hernia by Erik Swenson, M.D. at Ingalls Memorial Hospital in Harvey, Illinois. A Bard Kugel$^{TM}$ Composix mesh was implanted for Ms. Polka's hernia repair.

18.    Defendants manufactured, sold, and/or distributed the Bard Kugel$^{TM}$ Composix mesh to Plaintiff Carol Polka through her doctors, to be used for treatment of hernia repairs.

19.    About one year after the 2009 hernia repair, Plaintiff began having bulging in the hernia area and pain with certain activities that required lifting and carrying, such as certain household chores, carrying groceries, and lifting grandchildren. In addition, Plaintiff began suffering from constipation.

4

20.    About early October 2016, Plaintiff began having severe vomiting and went to the emergency room for treatment.

21.    On October 30, 2016, Plaintiff Carol Polka underwent repair of an incarcerated incisional hernia by Bohdan Iwanetz, M.D. at Ingalls Memorial Hospital in Harvey, Illinois. Upon entering the abdominal cavity, Ms. Polka's surgeon note that there were adhesions to the bowel in a number of places and that the Kugel mesh that had been placed in 2009 was adherent to the small bowel in a number of places. The mesh that was intact to the fascia was left in place and over sewn with Vicryl to keep it smooth, and the loose Kugel pieces were removed.

22.    In her 2016 procedure, a Bard Ventrio$^{TM}$ ST mesh was implanted for Ms. Polka's hernia repair.

23.    Defendants manufactured, sold, and/or distributed the Bard Ventrio$^{TM}$ ST mesh to Plaintiff Carol Polka through her doctors, to be used for treatment of hernia repairs.

24.    Plaintiff continues to experience complications related to the Bard Hernia Mesh and will continue to suffer from them in the future. More specifically, since the 2016 hernia repair, Plaintiff has continued to suffer pain and must be careful to avoid heavy lifting and strenuous activities. Plaintiff's hernia mesh complications cause her pain and suffering, physical impairment, and loss of enjoyment of life.

25.    Defendants were responsible for the research, design, development, testing, manufacture, production, marketing, promotion, distribution and sale of the Bard Hernia Mesh, including warnings and instructions for the product.

26.    Among the intended purposes for which Defendants designed, manufactured and sold the Bard Hernia Mesh was use by surgeons for hernia repair surgeries, the purpose for which the product was implanted in Plaintiff.

27.     Defendants represented to Plaintiff and her physicians that the Bard Hernia Mesh was a safe and effective product for hernia repair.

**IV.**

**INTRODUCTION TO THE DEFENDANTS AND THEIR**
**POLYPROPYLENE SURGICAL MESH**

A.     **THE BARD DEFENDANTS**

28.     A hernia is a condition in which part of the intestine bulges through a weak area in muscles in the abdomen The Bard Defendants promoted, distributed, and sold the Bard Mesh as a product to repair hernias in the population.

29.     At all times material hereto, the Bard Defendants developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold, and otherwise engaged in all activities that are part and parcel of the sale and distribution of polypropylene surgical mesh product, including the Bard Hernia Mesh product at issue in this matter.

30.     By said activities, Bard's polypropylene surgical mesh products, including the Bard Hernia Mesh at issue here, were placed into the stream of commerce throughout the United States, including the State of Ohio.

31.     The Bard Hernia Mesh, as other polypropylene surgical meshes, has been associated with complications including mesh erosion, oxidation, degradation of the mesh, cytotoxicity, mesh migration, mesh shrinkage, infections, pain, tissue reaction to the polypropylene mesh, allergic reactions to the polypropylene mesh, dyspareunia, loss of sexual feeling, organ perforation, the recurrence of urinary problems, the recurrence of hernias, additional surgeries being necessary, loss of testicles and removal of other organs affected by the polypropylene mesh, nerve damage when the nerves wrap around the mesh and become entangled or encased, nerve damage and pain when the nerves wrap around the mesh and the mesh shrinks,

6

mesh folding over or otherwise not holding its shape, mesh adhesion to other organs and tissue causing damage and difficulty removing the entirety of the mesh, excessive inflammation which causes scarring and complications from such scarring which can lead to permanent nerve damage causing debilitating, untreatable chronic pain and even a loss of mobility, *etc*. The Bard Hernia Mesh is also extremely difficult to remove once it has been implanted, meaning many may lose organs or must have severely invasive surgeries for mesh removal. Even then, because the mesh incorporates itself into tissue, complete removal of mesh remnants is difficult, if not impossible.

32.     At all times material to this action the Bard Defendants designed, patented, manufactured, labeled, marketed, sold and distributed polypropylene surgical mesh products. The products by the Bard Defendants were designed primarily for the purposes of treating hernias and pelvic organ prolapse. The Bard Defendants' product at issue in this case was cleared for sale in the U.S. after the Bard Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under section 510(k) of the Food Drug and Cosmetic Act, including, but not limited to, Summary No. K922916. This clearance process does not require the applicant to prove safety or efficacy, only equivalence. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493 116 S.Ct. 2240, 2254 (1996) ("'[t]he 510(k) process is focused on *equivalence*, not safety.' As a result, 'substantial equivalence determinations provide little protection to the public….If the earlier device poses a severe risk or is ineffective, then the later device may also be risky or ineffective.'") (internal and other citations omitted; emphasis by Supreme Court).

33.     The Bard Defendants conducted substantial business in the State of Ohio and in this District, distributing polypropylene surgical mesh products in this District, receiving substantial compensation and profits from sales of polypropylene surgical mesh products in this District, while making material omissions and misrepresentations of fact with regard to the effectiveness, safety,

risks, side effects, contraindications, and complications as to the polypropylene surgical mesh products, so as to subject them to in personam jurisdiction in this District.

34.     The Bard Defendants conducted business in the State of Ohio through sales representatives in the State of Ohio and because the Bard Defendants were engaged in designing, testing, developing, manufacturing, labeling, marketing, distributing, promotion and/or selling, either directly or indirectly, and/or through third parties or related entities, polypropylene surgical mesh products; thus, there exists a sufficient nexus between each Bard Defendant forum contacts and the Plaintiffs' claims to justify assertion of jurisdiction in Ohio.

35.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has in personam jurisdiction over the Bard Defendants, because they are present in the State of Ohio such that requiring an appearance does not offend traditional notices of fair play and substantial justice.

36.     The Bard Defendants are subject to personal jurisdiction in this district as they systematically and continually conduct business in this district, and conduct business throughout the United States, including Ohio.

**B.    THE INSIDIOUS NATURE OF POLYPROPYLENE SURGICAL MESH PRODUCTS**

37.     Polypropylene ("PP") surgical mesh products, regardless of their brand name or which company manufactures them or where they are placed in the body, are made of PP. The only difference in them will be certain additives, such as stabilizers, antioxidants, lubricants, and/or colorants, which all combined may comprise only about 1-3% of the finished product. The vast majority of the product is a PP resin. PP is a polymer made from the monomer propylene, which was introduced in the 1950s. Propylene monomer is $C_3H_6$, a component of natural gas. Propylene monomer is polymerized in a chemical reactor into PP in the form of flakes, chips, or pellets. A

8

monomer is the repeating chemical unit joined together to make a polymer. PP is generally formed by an additional reaction of the monomer propylene into polymers. PP surgical mesh manufacturers use a PP homopolymer for their products.

38. Historically, hernias were repaired in techniques called "tissue repair" without the use of any meshes. However, there were 2-3% of hernia cases that were particularly difficult to repair and required more than a tissue repair. Polypropylene was introduced in the 1950s in the U.S., but had a difficult time becoming accepted as it had a history of infections associated with foreign bodies. However, it has made inroads in the last 20 years as a panacea for easy, quick hernia repairs with a promised lower recurrence rate than other hernia repair methods.

39. But the promise of PP hernia mesh has not actually materialized. In addition to the other complications that occur, it turns out that the recurrence rate among all techniques is about the same. Further, this promise of the quick hernia fix with PP mesh that so many doctors have assumed has resulted in widespread pain with or without recurrence in up to 78% of patients who have had a PP surgical mesh hernia repair. Generally accepted figures are that 4-10% of patients who have a PP surgical mesh hernia repair are left with life-changing pain and suffering.

40. Moreover, the method of failure is the same regardless of where the PP surgical mesh is placed in the body. The meshes are all made of PP monofilament fibers. Thus, the chemical, physical, and surface characteristics are the same. Significantly, while the manufacturers describe PP as "inert," it is actually anything but as their internal records and testing demonstrate, as well as the basic principles of chemistry. A polymer, or any other substance, is referred to in the field of chemistry as "inert" if it will not chemically react with *any* other substance. Oxidation, also referred to as oxidative degradation as it relates to PP, is the chemical reaction whereby

oxygen in the air, or any other chemical substance that contains oxygen in its molecular structure, will chemically react with PP. If PP can undergo the chemical reaction of oxidation, PP is not inert.

41.     **All forms of PP are susceptible to a chemical reaction referred to as oxidation (oxidative degradation). In fact, PP is reported to have the highest tendency for oxidative degradation when compared with other common commodity polymers.** In other words, Defendants and other PP surgical mesh manufacturers could hardly have chosen a poorer design for their products. Making matters worse, they have known about this high susceptibility for oxidation inherent in PP since they introduced their first PP products. Indeed, the scientific community has extensively investigated the mechanisms of thermal and oxidative PP degradation since the 1960s, and the field of polymer science was well-aware of this issue at the time these products were first introduced in the 1950s.

42.     Polypropylene also develops and promotes toxicity once it is placed in the human body as the cells in the human body attack it as a foreign substance, promoting foreign body response. PP will exhibit autooxidation in the presence of a reactive oxygen species ("ROS"). ROSs are chemical compounds containing oxygen that are secreted by inflammatory cells while these cells are adhering to an implanted biomaterial, such as PP surgical mesh. Simply put, the overall explanation of oxidative degradation is that ROS will react with PP, including that which comprises the mesh which is in Plaintiff. This reaction results in long polypropylene chains that are broken into shorter chain segments that have oxygen species attached. This has been known for decades in the industry.

43.     At least one Polypropylene Material Data Safety Sheet (MSDS) notes: "Prohibited Uses: Applications involving permanent implantation into the body." Yet, each of these meshes designed, manufactured, and marketed by Defendants are intended for just that purpose without

this warning given to doctors and surgeons.[1] This is just one warning, among many others, that is not given that should be.

44.     Bard's current supplier of its raw PP, Lyondell Basell, includes on every MSDS for each polypropylene it sells to the U.S. market for healthcare products the following prohibition on such usage:

The product(s) may not be used in:
(i) U.S. FDA Class III Medical Devices; Health Canada Class IV Medical Devices; European Class III Medical Devices;
(ii) applications involving permanent implantation into the body;
(iii) life-sustaining medical applications.

45.     One would think that this would be sufficient notice to mesh manufacturers to not use PP as the primary component of their mesh, which is intended for permanent implantation in humans. But as it turns out, evidence shows that manufacturers will go to great lengths to maintain their supply of PP despite these warnings and prohibitions on use in order to continue using it while knowing full well that it is harmful to people. Despite this knowledge, these manufacturers put profit over people without warning doctors or the patients who suffer.[2]

46.     These warnings provide notice to the Defendants of the risks and the need to conduct additional testing to ensure the safety of their products, to conduct root cause analyses and

---

[1] Bard has even had a polypropylene source refuse to continue supplying it to Bard for the purpose of permanent implantation in humans based on this MSDS warning, but Bard simply found other suppliers to continue manufacturing toxic, dangerous, defective polypropylene surgical meshes for permanent implantation in humans without warning doctors, patients, the government, or the public about such prohibitions on its use. *See In re. C.R. Bard, Inc. Pelvic Repair Systems Product Liability Litigation*, 2014 WL 1660386, * 1 (S.D. W.Va. 2014).

[2] Bard was found to have hidden the MSDS sheet it received from its supplier of PP from the company that extrudes the pellets of PP into the monofilament used to make the PP surgical mesh. *See, e.g., In re. Bard, Inc. MDL No. 2187, Pelvic Repair System Products Liability Litigation (Cisson v. C.R. Bard, Inc.)*, 810 F.3d 913, 917-917 (4th Cir. 2016) (the MSDS there was for PP and not limited to just PP used for pelvic organ prolapse PP surgical mesh; it applied to all PP which was prohibited for uses whereby it would be permanently implanted in humans; the jury awarded Cisson punitive damages which were upheld on appeal).

11

testing of failures to better understand them and improve the product, to provide honest disclosures of the risks of their products with doctors so they can pass them along to patients, and to have full disclosure to the FDA and other governments about the true nature of their products. Moreover, these warnings acknowledge the primary problem with using PP as the basis of their surgical mesh products because the process in the body that causes the oxidative degradation also causes chronic inflammation in the tissues in the body resulting in scarring and severe, permanent complications such as those suffered by Plaintiff, among many others internationally. Further, when the polypropylene surgical mesh is sterilized by either of two processes, the polypropylene plastic mesh is heated and is thereby weakened and begins to degrade even before it is placed in the human body. Ultimately, this degradation causes embrittlement of the polymer which will then result in micro-crack formation, crack propagation or growth, and ultimate PP polymer fracture and fragmentation (flaking or chipping).

47.     Still further, a host of chemicals are used in the manufacture of polypropylene surgical mesh, coatings are placed on it, and there are a multitude of other toxic substances in, on, and released by the polypropylene surgical mesh. Some of these coatings, such as antioxidants, are attempts to address the oxidation degradation Defendants know will occur, but they can never stop the process entirely. It will, at best, only slow the process, and in some cases perhaps buy Defendants some time before the patient begins to suffer the inevitable consequences of having a product-- that was never supposed to be there--permanently implanted in her body. But the antioxidants, if they do not cause additional reactions themselves, will eventually be depleted and consumed by the ROS, and the oxidation will progress.

48.     The FDA's literature discloses that erosion of mesh through tissue is the most common mesh-related complication from surgeries using mesh. The Bard Defendants have had

12

numerous lawsuits against them for their various polypropylene surgical mesh products where parties are injured in the same way as described by this Plaintiff herein. The Bard Defendants have also admitted in a court hearing that there are thousands of complaints of injuries concerning its polypropylene surgical mesh products.

49.     The excessive and uncontrollable inflammatory property of polypropylene is not well known to the doctors using these polypropylene surgical meshes and is not disclosed by the manufacturers through effective warnings. This excessive and uncontrollable inflammatory property of polypropylene can cause scarring that damages nerves permanently, resulting in chronic, debilitating pain, resulting in permanent disability among patients. In addition, pain such as this can be such that mobility is impacted to the point of being lost entirely.

50.     At all times relevant hereto, all Defendants knew of the defective nature of their polypropylene surgical mesh products and their labeling as herein set forth. Yet, Defendants continued to design, manufacture, market, distribute, and sell their products so as to maximize sales and profits at the expense of the general public's health, and safety. Defendants acted in conscious disregard of the foreseeable harm caused by this product without properly warning the FDA, the public, or the medical community of the numerous side effects, complications, and contraindications of the polypropylene surgical mesh. Defendants' conduct has exhibited, and continues to exhibit, such an entire want of care as to establish that their actions were a result of ill will, recklessness, gross negligence, or willful, wanton, and intentional disregard of the Plaintiff's individual rights, health and well-being. Consequently, punitive damages are appropriate.

51.     Despite the known dangers of using PP mesh, wide-spread knowledge of the complications associated with PP surgical mesh has been kept from the vast majority of implanting

surgeons, their patients, and the public. This is due to many factors: the inadequate warnings given to doctors regarding the products' actual risks; the lack of adequate reporting requirements in this country for complications from these products; the cozy relationships that salespersons have with doctors; the fact that when patients experience serious complications they go to specialists rather than the general surgeons who implanted the mesh, leaving the implanting doctors ignorant of the actual rate of complications; the fact that surgeons are not chemists or biocompatibility experts and simply do not have the independent knowledge to understand how polypropylene products will oxidize and degrade in the human body, create an uncontrolled inflammatory or foreign body response, and create permanent scar tissue on nerves, all resulting in life-altering consequences for patients.

52.     But the truth about PP surgical mesh products is beginning to see the light, and governments as well as some doctors are asking sharp questions. Indeed, New Zealand is so concerned about the rate of PP surgical mesh complications that in 2015 its Health Select Committee began reviewing the issue of complications associated with the use of PP meshes in humans, a matter that concerned its surgeons. In the United States, the State of Washington has in recent years spent more on complications from mesh than on hernia repairs and has begun looking to PP surgical mesh manufacturers for restitution. California is said to be doing likewise.

C.     <u>THE FDA AND HERNIA MESH RECALLS (OR THE LACK THEREOF)</u>

53.     As demonstrated above, the FDA has historically been quick to approve untested PP hernia mesh products, which benefits medical device manufacturers and hurts the public. When a mesh product is then shown to be defective, severely injuring thousands or tens of thousands nationwide and even worldwide, the FDA is slow to take any action. The manufacturers of PP

hernia mesh know of the life-threatening complications their products can cause, but they don't warn the public or surgeons.

54.     Every year there are over 100,000 PP hernia meshes implanted in the United States. Many of the most dangerous PP hernia meshes remain on the market and have not been recalled by the FDA. Bowel obstructions and severe infections are common complications related to PP hernia mesh.

55.     What causes complications can vary depending on the hernia mesh product, with PP being the most problematic for the reasons explained above--the tremendous susceptibility to oxidation and the chronic inflammatory or foreign body response that sets off a chain of miserable, life-altering reactions in the human body. As also noted, the PP used in the hernia mesh products at issue here is the same as that used to make many types of pelvic mesh and bladder slings. This is also why manufacturers of these polypropylene surgical mesh products–regardless of where in the body they are inserted–rely on each other's products as predicate devices that are substantially equivalent and do so largely regardless of where in the body the mesh is to be inserted.

56.     At least one Polypropylene Material Data Safety Sheet (MSDS) notes: "Prohibited Uses: Applications involving permanent implantation into the body."  However, manufacturers of these hernia products, including all Defendants named in this lawsuit, continue to use polypropylene. The MSDS used by Bard's current suppliers have similar warnings and prohibitions on the use of PP in medical devices intended for permanent implantation in the human body.

57.     Polypropylene hernia mesh frequently causes life-threating complications. Polypropylene hernia mesh can erode through the bowel, requiring additional surgeries, weeks of hospitalization, partial bowel removal, colostomies, and more. The polypropylene surgical mesh

failure frequently causes patients to experience a systemic infection and chronic inflammatory response such as a foreign body reaction.

58.     The polypropylene surgical mesh manufactured by the Defendants are made of woven polypropylene, which is a cheap plastic that degrades and erodes through tissue once implanted. The woven design of the mesh creates small pores or holes throughout the mesh. Nerves grow into these pores and attach to the mesh soon after the implant. As the mesh erodes and moves within the body, it pulls and stretches the nerves attached to it. The nerve stretching causes debilitating pain that is essentially untreatable. Opioids are not effective for treating nerve pain; neither are nerve blocks.

59.     It is well-established that removal of PP surgical mesh is a very complicated, painful procedure that will not always (if ever) get the patient back to a pain-free, mobile life. The patient is frequently left with two bad options–keeping the degrading, toxic mesh in the body where further damage is done to nerves and organs or trying to remove the mesh where damage will also be done and pain will remain. Even when removal of the mesh is attempted, some of the mesh is always left given that its degradation releases PP at the molecular level into surrounding tissue. Thus, the chronic inflammatory process is virtually impossible to stop, so the damage continues. Neither doctors nor patients are warned of how often removal of mesh is necessary and how complicated removal is after the mesh has begun to degrade and the chronic inflammatory process has begun.

60.     The scientific evidence shows that the polypropylene material from which the products here are made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the products. The products can become infected via bacterial contamination and cause chronic inflammation. Biomechanical

issues include shrinkage, contracting, creeping, and deforming of the mesh. The Defendants knew or should have known that, yet they continued to promote the products as safe and effective, even as no long-term trials had been conducted to assure safety and efficacy. Moreover, Defendants should have warned the medical community of these side effects, risks, and complications, but they did not fully, accurately, and honestly disclose all of the side effects, risks, and complications associated with and inherent in their polypropylene surgical mesh products, including the product inserted in Plaintiff.

61.     After years of the implantation of the mesh products manufactured by the Bard Defendants, thousands of Plaintiffs have come forward to sue them as well as other polypropylene surgical mesh product manufacturers, which Bard has admitted in a court hearing.

62.     Contrary to Defendants' representations to the FDA, to the medical community, and to the patients themselves, Defendants' polypropylene surgical mesh products have high failure, injury, and complication rates; fail to perform as intended; require frequent and often debilitating repeat operations, and have caused severe and irreversible injuries, conditions and damage to plaintiffs like Carol Polka.

## THE FDA'S 510(k) CLEARANCE PROCESS

63.     The "510(k) clearance process" refers to Section 510(k) of the Medical Device Amendments of 1976 (MDA) of the Federal Food, Drug and Cosmetic Act. Under this process, manufacturers are only required to notify the FDA at least 90 days before they market a device claimed to be "substantially equivalent" to a device the FDA had approved for sale before 1976, when the MDA was enacted.

64.     No clinical testing is required under this process.

65.     Subsequent amendments to the MDA allowed for 510(k) clearance of products deemed "substantially equivalent" to post-MDA, 510(k)-cleared devices.

66.     Therefore, devices deemed "substantially equivalent" to devices previously deemed "substantially equivalent" to devices that the FDA had approved for sale before 1976 could be sold to patients in 90 days without clinical testing.

67.     Clearance for sale under the 510(k) process does not equate to FDA approval of the cleared device.

68.     In 2012, at the FDA's request, the National Institute of Health (NIH) conducted a thorough review of the 510(k) process, coming to the following conclusion:

> **The 510(k) clearance process is not intended to evaluate the safety and effectiveness of medical devices with some exceptions. The 510(k) process cannot be transformed into a pre-market evaluation of safety and effectiveness so long as the standard for clearance is substantial equivalence to any previously cleared device.**

69.     The NIH explained: "The assessment of substantial equivalence does not require an independent demonstration that the new device provides a 'reasonable assurance of safety and effectiveness.'" Further, the NIH pointed out that the classification of predicate devices approved for sale before the 1976 MDA "did not include any evaluation of the safety and effectiveness of individual medical devices . . . . Thus it is common for devices to be cleared through the 510(k) program by being found substantially equivalent to devices that were never individually evaluated for safety and effectiveness, either through the original device classification program or through the 510(k) process."

70.     Defendants cleared the Bard Hernia Mesh and its related components under the 510(k) Premarket Notification. Under Section 510(k), it did not undergo clinical study to gain FDA

approval. Instead, it was supposed to demonstrate substantial equivalence to a predicate medical device.

## ESTOPPEL AND TOLLING OF STATUTE OF LIMITATIONS

71.     Defendants are estopped from relying on any statutes of limitations or repose by virtue of their acts of fraudulent concealment, which include intentional concealment from Plaintiff and the general public of the defective nature of the Bard Hernia Mesh while continually marketing the product.

72.     Given Defendants' affirmative actions of concealment by failing to disclose the known, but non-public information about the defects—information over which Defendants had exclusive control—and because Plaintiffs could not reasonably have known the Bard Hernia Mesh was defective, Defendants are estopped from relying on any statutes of limitations that might otherwise be applicable to the claims asserted in this Complaint.

## V.

## CLAIMS AGAINST DEFENDANTS

73.     The Defendants are each responsible for their acts and omissions that proximately caused Plaintiff's injuries as more fully set forth herein.

## A.     COUNT I – STRICT LIABILITY AGAINST ALL DEFENDANTS: DEFECTIVE DESIGN

74.     Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

75.     The polypropylene surgical mesh designed by Defendants is defective in its design; is unreasonably dangerous as designed; reached Plaintiff without substantial change in its condition from the time of its original sale to the facility; and was the producing cause of Plaintiff's permanent and debilitating injuries and resulting damages.

19

76.     The defects that are unreasonably dangerous as designed include, but are not limited to:

a.  The PP chosen by Defendants for their surgical mesh products is not inert, as it is highly susceptible to oxidation or oxidative degradation resulting in chemical, physical, and surface characteristics changes.

b.  The polypropylene material is toxic in the human body, not inert, and therefore reacts to human tissues and/or other naturally occurring human bodily contents adversely affecting patient health including, but not limited to, creating excessive inflammation that causes internal scarring and nerve damage leading to other complications such as permanent loss of mobility and permanent, untreatable pain.

c.  The polypropylene surgical mesh harbors infections that adversely affect human tissues and patient health.

d.  The polypropylene surgical mesh products migrate from the location of their implantation, adversely affecting tissues and patient health.

e.  The polypropylene surgical mesh material abrades tissues, adversely affecting patient health.

f.  The polypropylene surgical mesh products regularly fail to perform the purpose of their implantation such that the patient requires removal of the device, or as much of it as possible after erosion, degradation, etc., and repeated treatment and surgery.

g.  The polypropylene surgical mesh products regularly cause significant injury to patients such that the polypropylene surgical mesh products must be removed, resulting in additional surgeries.

h.  The polypropylene surgical mesh products become embedded in human tissue over time such that if they require removal owing to its various defects, the removal causes damage to the organs and tissues, sometimes requiring removal of organs, and adversely affecting patient health.

i.  The polypropylene surgical mesh products are defective in shape, composition, weight, chemical, material, physical properties, pore size, mechanical properties, biomechanical properties, elasticity, and/or are inappropriately engineered.

j.  The polypropylene surgical mesh products erode into other organs, tissue, muscle, nerves, and bone, adversely affecting tissues and patient health.

k.  The Defendants knew or should have known about the potential risk of infections, allergic reactions, bowel damage, nerve damage, and other internal injuries, as well as polypropylene's toxicity when placed in the human body, but withheld this information from patients and doctors.

l.   Defendants failed to design a non-toxic surgical mesh which does not: migrate; erode; degrade; cause allergic reactions; adhere to other tissues and organs; contract; shift; shrink; fragment; creep from its original placement; fold over; otherwise fail to stay in place; allow nerves to become entrapped or entangled in it; result in complications causing loss of organs, such as testicles; become difficult, if not impossible, to fully remove, causing further nerve and organ damage or loss; cause serious, chronic infections; make patients more susceptible to chronic and excessive inflammation which causes scarring and complications from such scarring leading to the loss of mobility and permanent disability; make patients more susceptible to chronic infections; cytotoxicity; cause fever; cause abdominal pain; cause rashes; cause gastrointestinal disorders and discomfort; result in seroma; result in fistula; cause autoimmune disorders; cause neurological conditions; cause headaches; cause join aches and pain; cause abnormal sweating; result in meshoma; cause bowel obstruction; cause chronic foreign body reactions; cause chronic inflammatory responses; cause permanent scarring; cause permanent, untreatable pain; require additional, future corrective surgeries; cause loss of mobility, loss of sexual function, loss of sexual feeling, and loss of fertility; potentially require difficult future surgeries that could be unsuccessful and result in permanent pain and injury; cause dermatological problems from the polypropylene surgical mesh; and/or cause liver problems or damage from the polypropylene mesh.

77.   Defendants also failed to adequately research the polypropylene surgical mesh and its impact on the human body when inserted permanently in the body and/or ignored studies demonstrating the consistent, negative, and serious adverse effects of permanent insertion in the human body all the while representing these polypropylene surgical meshes as inert, safe, and effective to the government, doctors, and the public. The truth is, as Bard has recently admitted in Court, there are thousands of complaints made for adverse events, reactions, and complications from polypropylene surgical mesh. The truth is that both Defendants know that the primary mechanism of failure is the oxidative degradation inherent in PP, which cannot be stopped and which has devastating consequences to patients.

78.   Defendants failed to properly investigate reports of problems after the polypropylene surgical mesh was introduced and to replace it with a safer alternative design.

79.     Safer alternative designs existed at the time this polypropylene surgical mesh was designed and manufactured by Defendants, which in reasonable probability would have prevented or significantly reduced the risk of Plaintiff's personal injury without substantially impairing the product's utility and which was economically and technologically feasible by the application of existing or reasonably achievable scientific knowledge at the time the polypropylene surgical mesh left the Defendants' control.

80.     Such safer alternative designs may include, but are not limited to:

a. selection of a material that is truly inert, is not susceptible to oxidative degradation or oxidation, is natural, and safe for permanent implantation in humans, which does not result in infections; to chronic, excessive, uncontrolled inflammation that leads to internal scarring affecting organs and nerves and leading to other complications such as chronic, untreatable pain, and loss of mobility, and other signs of rejection;

b. selection of a material that does not erode, degrade, or adhere to surrounding tissue, organs, and bone;

c. selection of a material that does not shrink or contract;

d. selection of a material and manner of attachment that does not result in migrations, stretching, shifting, or movement of the mesh from the intended location;

e. altering the pore size in the mesh to prevent nerves from embedding, attaching, or becoming entangled in the mesh;

f. alter the weight and density of the mesh; and/or,

g. other designs such as the use of tissue repair techniques to repair hernias, using biologic mesh, the use of polyvinylidene fluoride (PDVF) or expanded polytetrafluoroethylene (ePTFE), among other designs.

81.     Plaintiffs are also entitled to punitive damages because the Bard Defendants' conduct was wanton, grossly reckless, grossly negligent, and/or in conscious disregard of Plaintiff's rights, health, and safety. The evidence in this case proves that Defendants put profits over safety, ignored obvious warnings and prohibitions on the use of PP in this application, and even went so far as to hide that information from suppliers.

B.     COUNT II – STRICT LIABILITY AGAINST ALL DEFENDANTS: FAILURE TO WARN

82.     Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

83.     A manufacturer of a product generally has a duty to inform users of potential harm associated with the use of its product. In the case of medical devices, the manufacturer has a duty to fully, accurately, and honestly inform doctors and the medical community of side effects, risks, and complications associated with the product. In this case, every Defendant breached that duty with regard to fully informing the medical community and the public, including Plaintiff, about the side effects, risks, and complications associated with its polypropylene surgical mesh. None of Plaintiff's doctors or medical personnel attempting to treat him had the information they needed to recognize, diagnose, treat, mitigate, or resolve the many side effects and complications Plaintiff experienced after having the polypropylene surgical mesh inserted in him.

84.     The polypropylene surgical mesh designed, manufactured, marketed, and sold by Defendants caused Plaintiff's injuries, damages, and or losses because Defendants' failed to provide adequate warnings, including but not limited to the following:

    a.     that the Bard polypropylene surgical mesh was at risk of causing oxidation; migration; erosion; degradation; allergic reactions; adhering to other tissues organs; contracting; shifting; shrinking; fragmenting; creeping from its original placement; folding over; otherwise failing to stay in place; allowing nerves to become entrapped or entangled in it; resulting in complications causing loss of organs; being difficult, if not impossible, to fully remove, further nerve and organ damage or loss; serious, chronic infections; cytotoxicity; fever; abdominal pain; rashes; gastrointestinal disorders and discomfort; seroma; fistula; autoimmune disorders; neurological conditions; headaches; join aches and pain; abnormal sweating; meshoma; bowel obstruction; making patients more susceptible to chronic inflammation; making patients more susceptible to chronic infections; causing chronic foreign body reactions; causing chronic inflammatory responses; causing permanent scarring from the surgeries; causing excessive inflammation that causes scarring and complications from such scarring such as loss of mobility and permanent chronic pain which is untreatable; causing permanent, untreatable pain; requiring additional, future corrective surgeries; loss of mobility; loss of sexual

function; loss of sexual feeling; loss of fertility; requiring difficult future surgeries that could be unsuccessful and result in permanent pain and injury; dermatological problems from the polypropylene surgical mesh; and/or liver problems or damage from the polypropylene mesh;

b.    accompany the product with information accurately reflecting the nature, extent, symptoms, scope, or severity of such side effects;

c.    provide intended consumers and health care professionals with adequate, complete and proper use instructions that accurately and fully identify all contraindications to usage of the Bard Hernia Mesh about which Bard knew or should have known;

d.    adequately report the results of testing regarding the safety and adverse events reported for the Bard Hernia Mesh and all substantially equivalent polypropylene surgical mesh products as that term is defined and used in 510(k) Summaries submitted to the FDA;

e.    comply with its post-manufacturing duty to warn the FDA, the public, including Plaintiff, and the medical community, which arose when each Defendant knew, or with reasonable care should have known, that individuals such as Plaintiff were being harmed and experiencing complications;

f.    of migration; erosion; oxidation; degradation; allergic reactions; adhering to other tissues organs; contracting; shifting; shrinkage; fragmentation; creeping from its original placement; folding over; otherwise failing to stay in place; allowing nerves to become entrapped or entangled in it; complications causing loss of organs; being difficult, if not impossible, to remove fully, causing further nerve and organ damage or loss; causing serious, chronic infections; fever; abdominal pain; rashes; gastrointestinal disorders and discomfort; seroma; fistula; autoimmune disorders; neurological conditions; headaches; joint aches and pain; abnormal sweating; meshoma; bowel obstruction; making patients more susceptible to chronic inflammation; making patients more susceptible to chronic infections; cytotoxicity; causing chronic foreign body reactions; causing chronic inflammatory responses; causing permanent scarring from the surgeries; causing excessive inflammation that causes scarring and complications from such scarring such as permanent chronic pain which is untreatable and which can lead to loss of mobility; causing permanent, untreatable pain; requiring additional, future corrective surgeries; loss of mobility; loss of sexual function; loss of sexual feeling; loss of fertility; potentially requiring difficult future surgeries that could be unsuccessful and result in permanent pain and injury; dermatological problems from the polypropylene surgical mesh; and/or liver problems or damage from the polypropylene mesh.

85.    The Bard Defendants knew or should have known that users of the Bard Hernia Mesh to repair hernias could suffer foreseeable injuries as a result of these failures. The Bard Defendants have known about these problems for years–in part because it knew that PP should

24

never be used in this application (something it has tried to hide from its suppliers and extruders) and there is no way to stop the oxidative degradation inherent in PP–and failed to timely recall these polypropylene surgical mesh devices before they would reach consumers and patients such as Plaintiff. The Bard Defendants failed to follow the testing protocol standards published by the International Organization for Standardization ("ISO"). They did not warn doctors, patients, the government, or the public of these risks, adverse events, and complications.

86.     Had Plaintiff and her doctors been fully, adequately, and honestly warned of the nature and extent of the side effects, complications, and risks inherent in these polypropylene surgical meshes, she would have chosen alternative devices.

87.     Plaintiff will show that the damages suffered were the result of Defendants' flagrant disregard of the safety of the end users of its polypropylene mesh products that were used for hernia surgeries.

88.     At the time of Plaintiff's surgery to repair he hernia, Defendants expressly represented that their polypropylene surgical mesh products were safe, despite mounting evidence to the contrary.

89.     Plaintiff did not receive a safe and effective product that was placed into her via surgery, but instead suffered a life-altering and permanent personal injury and damage because of the use of the Defendants' defectively designed and insufficiently warned about polypropylene surgical mesh products.

90.     Defendants knew about these perils, but their acts and omissions demonstrate that they simply did not care. Plaintiff seeks punitive damages based on Defendants' gross negligence.

C.    **COUNT III – NEGLIGENCE AGAINST ALL DEFENDANTS: DEFECTIVE DESIGN**

91.    Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

92.    Strict product liability looks at the product itself to determine whether it is effective. *Reed v. C.R. Bard, Inc.*, 2015 WL 11110600, at *4 (E.D. Tex. 2015) (other citations omitted). As set forth above, the polypropylene surgical mesh products designed by Defendants are inherently defective.

93.    Negligence, however, looks at the act of the manufacturers and determines whether they exercised ordinary care in the design and production of their products. *Reed*, 2015 WL 11110600, at *4 (other citations omitted). Just as there is strict liability here based on a defective design, there is negligence here on that same basis when looking to the lack of ordinary care exercised by the Bard Defendants.

94.    A manufacturer has a duty to design a safe product. *Reed*, 2015 WL 11110600, at *4 (other citations omitted). Here, as set forth above in more detail than is required, the polypropylene surgical mesh is not a reasonably safe product given the plethora of side effects, risks, and complications associated with and inherent in its usage. Defendants, knowing the history of risks, side effects, and complications from polypropylene surgical mesh, did not exercise reasonable care in designing the Bard Hernia Mesh. Thus, the Defendants have breached their duties to design a safe product. Further, the defective nature of the design of this product proximately caused Plaintiff's injuries.

95.    Defendants knew about these perils, but their acts and omissions demonstrate that they simply did not care. Plaintiff seeks punitive damages based on Defendants' gross negligence.

26

**D.**    **C**OUNT **IV – N**EGLIGENCE AGAINST **A**LL **D**EFENDANTS**: F**AILURE TO **W**ARN

96.    Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

97.    Where a manufacturer fails to properly warn of the dangerous propensities of its product, that may render an otherwise non-defective product unreasonably dangerous. *Reed*, 2015 WL 11110600, at \*4 (other citations omitted).

98.    As set forth above, the polypropylene surgical mesh product placed in Plaintiff was unreasonably dangerous, defective, and not reasonably safe for its intended or reasonably foreseeable purposes because it did not have correct, adequate and complete warnings to adequately explain and warn of the risks, side effects, and complications of the product. The Bard Defendants did not properly warn the medical community, Plaintiff, or the public at large of the enormous list of risks, side effects, and complications that may arise from the use of their polypropylene surgical mesh products.

99.    Neither Plaintiff nor her doctors would have used this product in the treatment of her hernia had they known of the full extent and nature of the risks, side effects, and complications, which Defendants concealed from the FDA and medical community.

100.    Plaintiff's injuries and damages were proximately caused by Defendants' failure to warn.

101.    As a result of Defendants' failure to warn Plaintiff and her doctors, Plaintiff has suffered and will continue to suffer permanent pain and suffering, disfigurement, emotional distress, loss of enjoyment of life, as well as other general non-economic damages, in addition to past and future special damages in the form of medical expenses and other costs associated with

the care and treatment of these injuries, wage loss or loss of earning capacity, or other economic loss.

102.    Plaintiff is also entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, grossly negligent, and/or in conscious disregard of Plaintiff's rights, health, and safety. In essence, Defendants knew of these risks, which the evidence in this case increasingly proves beyond any doubt, but acted or failed to act in a manner demonstrating they just did not care.

## VI.

## DAMAGES

103.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth fully herein.

104.    As a proximate and/or producing result of Defendants' conduct, Plaintiff suffered, sustained and incurred, and in reasonable medical probability will continue to suffer, sustain and incur the following injuries and damages, among others:

   a.  physical pain sustained in the past and, in reasonable probability, that will be sustained in the future;

   b.  mental anguish sustained in the past and, in reasonable probability, that will be sustained in the future;

   c.  disfigurement sustained in the past and, in reasonable probability, that will be sustained in the future;

   d.  physical impairment sustained in the past and, in reasonable probability, that will be sustained in the future;

   e.  medical care and treatment and related expenses sustained in the past and, in reasonable probability, that will be sustained in the future;

105.    Plaintiff seeks actual and punitive damages to be awarded by the jury in an amount more than the minimum jurisdictional limits of this Court.

## VII.

## EXEMPLARY DAMAGES

106.     Plaintiff incorporates by reference the foregoing paragraphs as if set forth fully herein.

107.     The Plaintiff's resulting damages, injuries and losses were caused by the gross negligence, fraud, and/or malice of the Defendants. The conduct of Defendants constitutes gross negligence, fraud, and/or malice as those terms are understood under applicable law in that it constituted conscious indifference to the rights and welfare of persons affected by it. As a result, Plaintiff seeks to recover exemplary damages from Defendants as a result of their gross negligence, fraud, deceit, and/or malice. Plaintiffs intend to show that the factors the jury may consider in determining the amount of exemplary damages which should be awarded include:

    a.  the nature of the wrong committed by Defendants;
    b.  the character of Defendants' conduct;
    c.  the degree of culpability of Defendants;
    d.  the situation and sensibilities of the parties concerned; and
    e.  the extent to which Defendants' conduct offends a public sense of justice and propriety.

108.     In this case, not only did Defendants design, manufacture, market, and sell defective polypropylene surgical mesh, they have known that their polypropylene mesh was defectively designed and causing patients untold harm, pain, suffering, and scarring for decades. They have known for decades that PP should not be permanently implanted into patients. Bard has hidden this information from suppliers in order to keep the supply rolling in. Defendants know that patients continue to suffer, and they know that an entirely new design is required to adequately address the defectively designed polypropylene surgical mesh because oxidative degradation cannot be stopped. Defendants did not make doctors, the FDA, the public at large, or Plaintiff aware of the full nature and extent of the side effects, risks, and complications of the polypropylene

surgical mesh. Defendants let doctors, the FDA, the public at large, and users of their product believe that the products were safe when, in fact, patients continued to suffer the side effects, risks, and complications about which no one was warned. Defendants continue to show a callous and reckless disregard for consumers of their products.

109.    Notwithstanding their actual knowledge of the defects present in their polypropylene surgical mesh and the risk of serious injury and death inherent in the foreseeable use of their mesh, Defendants failed to correct the defects and eliminate the potential risks, side effects, and complications to individuals using their product, including Plaintiff.

110.    Defendants further failed to otherwise notify or warn Plaintiff, the FDA, the medical community, or Plaintiff's doctors of the known risks, side effects, complications and dangers inherent in the use of their polypropylene surgical mesh.

111.    As a direct and proximate result of the Defendants' conduct, Plaintiff and her doctors used the polypropylene surgical mesh, unaware of the risks and dangers, until it caused enormous personal injury to Plaintiff. Defendants' conduct was despicable and was in conscious disregard for the rights and safety of others including, but not limited to, Plaintiff, which justifies an award of exemplary damages in this case.

## VIII.

## GROSS NEGLIGENCE

112.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth fully herein.

113.    Plaintiff would further show that the clear and convincing evidence in this case establishes that Defendants acted with gross negligence in that when viewed objectively from the standpoint of these Defendants at the time of the occurrence, there was an extreme danger of risk

considering the probability and magnitude of potential harm to others as the evidence in this case already shows, and of which Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiff. Bard has even admitted in open court that there have been thousands of complaints concerning adverse events, complications, and reactions to its polypropylene surgical mesh (regardless of where it is placed; that is, regardless of whether it is transvaginal or pelvic or hernia). Therefore, punitive damages are sought and should be assessed against Defendants.

## IX.

## JURY DEMAND

114.    Plaintiff hereby demands a jury trial on all issues.

## X.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, for actual and punitive damages, costs and attorney fees, pre- and post-judgment interest, and for such other relief as is warranted in this matter.

Respectfully submitted,


/s/ *Bradley L. Leger*
**BRADLEY L. LEGER**
SDTX Bar No.: 38360
Texas Bar No.: 24039899
bleger@lkclawfirm.com
**JAMES R. KETCHUM**
SDTX Bar No.: 2726793
Texas Bar No.: 24038996
jketchum@lkclawfirm.com
**RODNEY K. CASTILLE**
SDTX Bar No.: 8282
Texas Bar No.: 03984300
rcastille@lkclawfirm.com

31

**LEGER KETCHUM & COHOON, PLLC**
10077 Grogan's Mill Road, Suite 325
The Woodlands, Texas 77380
T: 832.764.7200
F: 832.764.7211

**ATTORNEYS FOR PLAINTIFF**
**CAROL POLKA**