UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: DAVOL, INC./C.R. BARD, INC., POLYPROPYLENE HERNIA MESH PRODUCTS LIABILITY LITIGATION

Case No. 2:18-md-2846

JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Kimberly A. Jolson

This document relates to:
*Johns v. CR Bard et al*,
Case No. 2:18-cv-01509

# EVIDENTIARY MOTIONS ORDER NO. 4

## Bard's Motion to Strike Declaration of Joseph Weldon Jensen, D.O.

This matter is before the Court on Defendants Davol Inc. and C.R. Bard, Inc.'s (collectively "Bard") Motion to Strike (ECF No. 75), Plaintiff's Opposition (ECF No. 110) and Bard's Reply (ECF No. 119). For the reasons set forth below, the Court **DENIES** Bard's Motion.

**I.**

Plaintiff Steven Johns' case is the first bellwether trial of the thousands of cases brought against Bard in this multidistrict litigation ("MDL") and is scheduled to commence on September 29, 2020. The Judicial Panel on Multidistrict Litigation described the cases in this MDL as follows:

> All of the actions share common factual questions arising out of allegations that defects in defendants' polypropylene hernia mesh products can lead to complications when implanted in patients, including adhesions, damage to organs, inflammatory and allergic responses, foreign body rejection, migration of the mesh, and infections.

(Transfer Order, MDL 2846 ECF No. 1.)

Ventralight ST is a prescription medical device used for hernia repair and is one of Bard's products at issue in this MDL. The FDA cleared it for use through the 510k process on

July 15, 2010, and later cleared it for use with the Echo positioning system on April 1, 2011. (*See* Bard's Mot. for Summary Judgment at 3, ECF No. 29.) It is a multicomponent device made of a mesh of polypropylene, polyglycolic acid (PGA) fibers, and a bioresorbable coating called Sepra Technology ("ST"). (*Id*.) The bioresorbable coated side of the mesh is placed against organs, such as the bowels, while the uncoated polypropylene side is placed to maximize tissue attachment to support the hernia repair. (*Id*. at 3-4.)

Plaintiff contends that Bard knew the component parts of the mesh were dangerous and unsafe for use in medical devices. (Pl's Opp. to Mot. for Summary Judgment at 1, ECF No. 69.) According to Plaintiff, Bard knew that polypropylene is not suitable for permanent implantation in the human body and that the PGA fibers created an increased inflammatory response. (*Id*.) Most relevant to this action, Plaintiff contends the ST coating on Bard's Ventralight ST devices resorbs too quickly, resulting in bare polypropylene being exposed to internal organs and tissues and increasing the risk of potential complications. (*Id*. at 4-5.)

Plaintiff brings this action to recover for injuries sustained as a result of the implantation of Bard's defective Ventralight ST and asserts claims under Utah law for, *inter alia*, failure to warn, manufacturing defect, and design defect. (*See* Amend. Compl., ECF No. 17.) Plaintiff was diagnosed with a symptomatic ventral hernia within a diastasis recti at the age of 58 in July 2015. (Pl's Opp. to Mot. for Summary Judgment at 9, ECF No. 69.) Plaintiff underwent surgery to repair the hernia and diastasis in August 2015, and Plaintiff's surgeon, Joseph Weldon Jensen, D.O., implanted Plaintiff with Ventralight ST. (*Id*.) Plaintiff's symptoms returned several months later, and he underwent a second surgery in October 2016. (*Id*.) During that surgery, Dr. Jensen observed omental adhesions to the original Ventralight ST and performed "lengthy arthroscopic [sic] lysis of the dense omental adhesions from the prior mesh implant[.]" (*Id*.) Dr. Jensen then

2

removed the original device and implanted another Ventralight ST. (*Id*.) Plaintiff was diagnosed with another hernia within the diastasis recti in April 2019 and underwent a third surgery that month to repair the hernia, but the second Ventralight ST device was not removed. (*Id*.)

Plaintiff contends the omental adhesions discovered in his second surgery were a result of the failure of the ST coating on the Ventralight ST, and that the continued presence of the second Ventralight ST currently inside his body continues to threaten his health and well-being and cause pain. (*Id*. at 10-11.) He claims it is probable he will need additional surgery for either chronic pain or possible complications, such a bowel obstruction or fistulization. (*Id*.)

## II.

Dr. Jensen, Plaintiff's implanting and explanting surgeon, was deposed in this litigation on June 12, 2019. According to Bard, Dr. Jensen's deposition testimony established that Plaintiff's failure to warn claims fail as a matter of law because:

> Dr. Jensen did not recall reading Ventralight ST's Instructions for Use; as of August 2015, he was aware of the risk of injuries and complications Plaintiff alleges to have suffered as result of his Ventralight ST implant; and he chose to use the Ventralight ST with Mr. Johns twice because "it's as good as I have seen, as good as what I've been able to use."

(Bard's Mot. to Strike at 1, ECF No. 75.) On February 3, 2020, Bard moved for summary judgment on all of Plaintiff's claims, including Plaintiff's failure to warn claims. On February 21, 2020, Plaintiff filed his opposition brief to Bard's motion for summary judgment, which relies on and attaches as an exhibit a February 19, 2020 declaration submitted by Dr. Jensen (the "Jensen Declaration"). (*See* Ex. R, ECF No. 69-18.)

Bard has moved pursuant to Federal Rules of Civil Procedure 16(f)(1)(C), 56(c), and 56(h) to strike the Jensen Declaration. Bard argues the declaration is an improper "sham declaration" that directly contradicts Dr. Jensen's deposition testimony, and was submitted by Plaintiff in an effort to create an issue of fact in opposition to Bard's motion for summary judgment two months

3

after the close of discovery and nine months after Dr. Jensen's deposition. Bard contends that Plaintiff's counsel "approached Dr. Jensen *ex parte*, showed him a handful of Bard internal confidential documents without context or explanation, a snippet of one witness's deposition testimony, and then made certain 'representations' to him about what that cherry-picked evidence meant." (Mot. to Strike at i.) Bard further argues that Plaintiff "improperly influenced Dr. Jensen's testimony, has prevented any cross-examination of the statements in his post-discovery declaration arising from that improper influence, and has taken no steps to preserve the confidentiality of the records shown to Dr. Jensen." (*Id*. at 4.) Bard also contends that the Jensen Declaration is "nothing more than hearsay and speculation." (*Id*. at 3.)

Plaintiff opposes, arguing Bard's motion to strike is procedurally improper and that the "sham declaration" rule does not apply to the Jensen Declaration because Dr. Jensen is not a party to this action. Plaintiff further contends that the declaration does not directly contradict Dr. Jensen's deposition testimony and is not an attempt to create a sham issue of fact. According to Plaintiff, Dr. Jensen prepared his declaration in good faith and in response to information that was not available to him until after his deposition. Plaintiff argues the declaration is timely and sets out facts that are admissible, and that Dr. Jensen signed an acknowledgement agreeing to be bound by the Protective Order and to not disclose any of the confidential information he reviewed. Finally, Plaintiff contends Bard is not prejudiced by the declaration and will have the opportunity to cross-examine Dr. Jensen at trial. (*See* Pl.'s Opp. to Mot. to Strike, ECF No. 110.)

### III.

Under the "sham affidavit" rule, "'[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.'" *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 976 (6th Cir.

4

2019) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). "If the affidavit directly contradicts prior sworn testimony, it should be stricken 'unless the party opposing summary judgment provides a persuasive justification for the contradiction.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). "But if no direct contradiction exists, the district court should not strike or disregard th[e] affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Reich*, 945 F.3d at 976 (internal quotations omitted).

Plaintiff contends the sham affidavit rule does not apply to the Jensen Declaration. Plaintiff designated Dr. Jensen as a "non-retained expert witness" in December 2019, and represents that Plaintiff's counsel "did not approach Dr. Jensen to discuss the contents of any internal documents until after Plaintiff designated Dr. Jensen as an expert, and preserved his right to potentially call Dr. Jensen as a specialized witness at his trial." (Pl.'s Opp. at 4.) According to Plaintiff, the sham affidavit rule "applies to affidavits or declarations of *parties*, and Defendants cite no case where the Sixth Circuit has extended the rule to non-retained experts or disinterested witnesses, as other Circuits have done." (*Id*. at 9) (emphasis in original).

Plaintiff is correct that the "genesis of the sham affidavit doctrine" in the Sixth Circuit was a case involving a plaintiff who filed an affidavit that that directly contradicted her own prior deposition testimony. *France*, 836 F.3d at 623 (citing *Reid*, 790 F.2d at 459-60). The Sixth Circuit has, however, applied the sham affidavit rule beyond a party's own affidavit. *See France*, 836 F.3d at 622-23 (applying rule to affidavit of deceased defendant offered by plaintiff to defeat summary judgment motions by other defendants and noting plaintiffs "point to no case limiting the doctrine to *Reid*'s circumstances"); *Pogue v. Nw. Mut. Life Ins. Co.*, No. 18-5291, 2019 WL 1376032, at *4 (6th Cir. Feb. 7, 2019) (applying rule to declaration of plaintiff's physcian); *Peck*

5

*v. Bridgeport Machines, Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) (applying rule to affidavit submitted by plaintiff's expert).

This Court, however, need not decide whether the sham affidavit rule applies to "non-retained experts or disinterested witnesses," as Plaintiff suggests, because the rule is not applicable to the facts before the Court. The Jensen Declaration does not "directly contradict" Dr. Jensen's deposition testimony, nor is it an attempt to create a sham issue of fact.

### A. Direct Contradiction

A district court considering a post-deposition affidavit at summary judgment must first determine whether the affidavit "directly contradicts" the affiant's prior testimony. *Aerel*, 448 F.3d at 908. The Sixth Circuit's precedents suggests "'a relatively narrow definition of contradiction.'" *Reich*, 945 F.3d at 976 (quoting *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006)). The sham affidavit rule is not intended to "prevent[] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit" because "the deponent is under no obligation to volunteer information not fairly sought by the questioner[.]" *Aerel*, 448 F.3d at 907. "Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage." *Id*.

Thus, "[i]f the affidavit merely supplements previous deposition testimony and 'reveal[s] information that was not fully explored during the testimony,' there is no reason why the court should not consider it." *Hobart Corp. v. Dayton Power and Light Co.*, No. 3:13-cv-115, 2016 WL 11495690, at *2 (S.D. Ohio Sept. 1, 2016) (quoting *Aerel*, 448 F.3d at 909).

Bard contends the Jensen Declaration contradicts Dr. Jensen's deposition testimony on several points. First, Bard contends the Jensen Declaration contradicts Dr. Jensen's testimony

6

regarding training he received from Bard and his decision to use Ventralight ST with Plaintiff.

The Jensen Declaration states:

> 6. A key part of my decision to use Ventralight ST in Mr. Johns (as well as many of my other patients) was the surgeon training I received from Bard/Davol. I have seen Bard/Davol internal records indicating that I received surgeon training about Ventralight ST (and other Bard/Davol hernia products) in Portland, Oregon, on May 16, 2011, and that the materials for the training I attended included a "Sell Sheet" for Ventralight ST.
>
> 7. The Ventralight ST Sell Sheet (or brochure) from 2011 that I reviewed indicates that the resorption period for the ST hydrogel in Ventralight ST is up to thirty days . . .

(Jensen Decl. at ¶¶ 6-7, ECF No. 69-18.)

Bard contends these paragraphs are inconsistent with Dr. Jensen's testimony. According to Bard, "Dr. Jensen testified that he did not remember ever attending a Bard training session." (Reply at 8.) Bard argues that "[a] training session that Dr. Jensen cannot remember could hardly have been a 'key part of [his] decision to use Ventralight ST.'" (Mot. to Strike at 8.) "Nor," Bard contends, "can a brochure allegedly provided at the event form any basis for his decision for the same reason, but also because he testified that he relied on his own experience and independent research, over and above any brochures or other materials provided by manufacturers; he 'always make[s] an independent decision.'" (Reply at 8.)

This Court disagrees that Paragraphs 6 and 7 of the Jensen Declaration directly contradict Dr. Jensen's deposition testimony. Dr. Jensen testified that he educates himself about different products that are available by, among other things, attending mini conferences. (Jensen Depo. at 24:14-17, ECF No. 75-2.) When asked about his attendance at manufacturers' training sessions, Dr. Jensen testified:

> Q. Have you ever attended a training session put on by Bard or Davol?
> A. Maybe.

7

> Q. Do you feel like you've attended at least some manufacturers' training sessions?
> A. Yes, several.
> Q. You just don't recall if you went to a Bard?
> A. I don't know if I went to a Bard - -
> Q. Okay.
> A. - - conference.

(Jensen Depo. at 24:22-25:7.) Paragraph 6 does not directly contradict this testimony. Although Dr. Jensen could not recall at his deposition whether he had attended a Bard conference, he also testified that he had attended several manufacturers' training sessions, and that he had "maybe" attended one hosted by Bard. As the declaration explains, Dr. Jensen's recollection was refreshed after the deposition by Bard's internal documents showing Dr. Jensen did in fact attend at least one Bard training session at a conference in May 2011 and that product materials were provided at that session. (*See* Jensen Decl. at ¶¶ 6-7.)

Dr. Jensen also testified that he was "sure" that he received product brochures and/or technique guides from Bard or Davol:

> Q. Okay. Do you know if you have ever received from Bard or Davol a technique guide?
> A. I'm sure that I have because they come with every mesh.
> Q. How about product brochures?
> A. I'm sure that I have. I don't know for sure that I have. I'm sure that I have, if that made sense. They pass them out all the time.
> Q. But that's your experience with sales reps in general?
> A. Yes.
> Q. And it's happened so many times you can't recall specific instances?
> A. Correct.

(Jensen Depo. at 25:22-26:10.) Nevertheless, Bard contends "Plaintiff's attempt to establish that Dr. Jensen reviewed this brochure or relied on it any fashion is inconsistent with" the following testimony:

> Q. When a manufacturer provides you with materials, like a

8

> technique guide or a brochure, you still would use your independent medical judgment whether or not to use a product, right?
> A. Correct.
> Q. You mentioned you look at articles, you have mini conferences. Would you put more weight on those sources of information – and your own experience, you also mentioned that. Would you rely on those sources of information more than anything that was given to you by a manufacturer?
> A. Yes.
> Q . . . Ultimately, whatever manufacturer may present to you, you feel it's your duty as a medical doctor to make an independent decision on whether or not a product is safe and effective to use?
> A. Yes. I always make an independent decision.

(Jensen Depo. at 26:11-27:6.) Bard's arguments are not well-taken.

Dr. Jensen did not testify that he *never* relies on manufacturers' trainings, product brochures, or technique guides. In fact, Dr. Jensen testified that he relies on hernia mesh manufacturers to provide him with accurate information about the risks and benefits of their devices, including the Ventralight ST mesh, (Jensen Depo. at 105:20-24), and to share with him information regarding adverse events associated with a hernia mesh. (*Id*. at 106:10-14.) Dr. Jensen also testified that he expects Bard to provide accurate information about the device and instructions for use, (*id*. at 106:4-8), and that it is important that Bard publish truthful, up-to-date, and accurate information about the Ventralight ST that does not understate the risks or overstate the benefits. (*Id*. at 106:16-107:13.)

Dr. Jensen was simply was not asked whether manufacturers' trainings or materials play any role in his decisions to use certain products, or how much weight he would give those materials in reaching his decisions. Instead, Bard's questioning focused on the ultimate issue of whether Dr. Jensen would rely more on articles, his own experience, and conferences (which, as discussed above, he said may have included Bard conferences) than what he received from manufacturers, and whether he makes independent decisions to use certain products. The Jensen Declaration fills in the gaps left open during Dr. Jensen's deposition and supplements, rather

9

than directly contradicts, Dr. Jensen's testimony on this point. *See Aerel*, 448 F.3d at 907.

Second, Bard contends the Jensen Declaration contradicts Dr. Jensen's testimony regarding Instructions for Use ("IFUs") for the Ventralight ST. The Jensen Declaration states:

> 7. The Ventralight ST Sell Sheet (or brochure) from 2011 that I reviewed indicates that the resorption period for the ST hydrogel in Ventralight ST is up to thirty days. I have reviewed the Ventralight ST IFU from that time period which likewise references that the resorption period for the ST hydrogel in Ventralight ST is up to thirty days. While I do not have an independent memory of reviewing the Ventralight ST IFU back when I first began using it almost nine years ago in 2011, it is my pattern and practice to review product IFUs before my first use of the product and I am confident that I would not have departed from that pattern and practice with respect to Ventralight ST.

(Jensen Decl. at ¶ 7.) These statements do not directly contradict Dr. Jensen's testimony. Dr. Jensen testified as follows:

> Q. Do you in your practice typically read the IFU's prior to using product?
> A. I might read them sometimes.
> Q. Do you recall if you read the Ventralight ST IFU's before --
> A. I don't recall.
> Q. -- before 2015?

(Jensen Depo. at 33:4-10.) After being shown the Ventralight ST IFU, Dr. Jensen testified:

> Q. Do you recall ever seeing this document before?
> A. No. I'm sure I've seen it but I don't recall at the moment reading it.
> Q. And you don't know whether it was before or after –
> A. No.
> Q. -- Mr. Johns' August 2015 surgery?
> A. I'm sorry. No.

(Jensen Depo. at 33:20-34:3.) And as discussed above, Dr. Jensen also testified that he was sure he had seen technique guides and product brochures from Bard. (*Id.* at 25:22-26:10.)

The Jensen Declaration does not now contend that Dr. Jensen unequivocally remembers reviewing the IFU on a specific day or time—such a statement would directly contradict his deposition testimony. Instead, the statement in Paragraph 7 that Dr. Jensen does not have "an independent memory of reviewing the Ventralight ST IFU" back when he first began using the

10

product nine years ago in 2011 is consistent with his deposition testimony. The additional statements that it is Dr. Jensen's "pattern and practice to review product IFUs before [his] first use of the product" and that he is "confident that [he] would not have departed from that pattern and practice with respect to Ventralight ST" supplement his deposition testimony that he was sure he had seen the Ventralight ST IFU before, and provides the Court with additional information at the crucial summary judgment stage. *See Aerel*, 448 F.3d at 907.

Finally, Bard contends that the last paragraph of the Jensen Declaration contradicts Dr. Jensen's testimony. That paragraph states:

> 14. No one from Bard or Davol ever informed me that the ST hydrogel barrier could be resorbed within seven days. I did not know that fact from any source independent of Bard or Davol. Had I known that the ST hydrogel barrier could be resorbed within seven days or anything substantially less than thirty days, I would not have used the Ventralight ST in Steven Johns.

(Jensen Decl. at ¶ 14.) Bard contends that Plaintiff's counsel examined Dr. Jensen extensively about the ST coating, and that "[w]hen asked if it would have been significant to him to know that the ST coating had a *seven-day resorption period*, he responded '*[n]ot necessarily*' because 'I don't remember the research about the time frame of neoperitonealization [regrowth of the peritoneum covering abdominal organs].'" (Mot. to Strike at 9-10) (emphasis in original). Bard contends that Dr. Jensen's statement that he would not have used the Ventralight ST had he known the coating might resorb after "substantially less than thirty days" is Plaintiff's attempt to revise Dr. Jensen's testimony. (*Id.* at 10.)

Based on Dr. Jensen's full testimony on the resorption of the ST coating, this Court disagrees. Dr. Jensen testified as follows:

> Q. Had Bard or Davol informed you that the Hydrogel coating would absorb within seven days, would that have been important information for you to know about the Ventralight ST -- product?
> A. Yes.

11

> Q. Had Bard or Davol informed you that the Hydrogel coating would absorb within seven days, would that have impacted your decision to use the Ventralight ST in Mr. Johns' hernia repair surgeries?
> A. Not necessarily. It depends on the time frame. I don't remember the research about the time frame of neoperitonealization.
>
> Q. Well, if the Hydrogel coating was reabsorbed prior to the --
> A. Do you know that to be the case?
>
> Q. I'm asking you a hypothetical.
> A. Hypothetically, if there was a big gap or something, yeah, I need to know that. You're just saying seven days, what if it's neoperitonealizing. I don't remember the time frame. If it's neoperitonealizing in three days and it disappears in seven days, then I wouldn't say that. But if there was an overlap the other way, then yes, it would be relevant and I'd want to know that.
>
> Q. I'm just making sure the record is clear. When you say if it's the other way, you're meaning -- You're saying that if the Hydrogel coating was reabsorbed before the reperitonealization of the mesh, you'd want to know that?
> A. Yes.
>
> Q. That would be significant?
> A. That would be significant.

(Jensen Depo. at 120:21-122:9) (objections omitted).

    Dr. Jensen did not testify that the timing of the resorption of the ST coating was insignificant and would not impact his decision to use the device at all. Quite the opposite. Dr. Jensen testified that it "would be significant" and he would want to know if the ST coating resorbed before reperitonealization. (*Id*. at 121:13-122:9.) While Dr. Jensen initially responded "not necessarily" when asked if learning the hydrogel coating would absorb within seven days would have impacted his decision to use with Ventralight ST in Plaintiff, the very next thing he said was that "[i]t depends on the time frame." (*Id*. at 121:4-10.) Though Dr. Jensen could not remember the exact timing of reperitonealization, he explained that he would need to know "if there was a big gap or something" between when the ST coating resorbed and reperitonealization. (*Id*. at 121:13-24) Dr. Jensen also testified it would be important information

12

for him to know if the hydrogel coating resorbed within seven days. (*Id*. at 120:21-121:3.)

Bard claims that Dr. Jensen's testimony on this subject was based on "a series of foundationless hypothetical questions, asking him to assume that the rate or resorption of the coating of the Ventralight ST was insufficient for reperitonealization" and that Dr. Jensen confirmed "he had no basis for believing Plaintiff's hypothetical questions to be true or that he had any reason to be concerned about the Ventralight ST." (Reply at 9-10.)

But these questions were not foundationless or hypothetical in light of the documents Dr. Jensen reviewed and discussed in his declaration. (*See* Jensen Decl. at ¶¶ 5-13.) According to the declaration, Dr. Jensen did not have an opportunity to review those documents before or during his deposition. (*Id*. at ¶ 5.) The Jensen Declaration explains that Dr. Jensen has since reviewed Bard's internal documents that discuss the resorption rate of the hydrogel coating acquired by Bard and for Ventralight ST and whether it sufficient to allow for reperitonealization. Although Dr. Jensen did not have the benefit of reviewing these documents prior to or during his deposition, he still testified that he would want to know and it "would be significant" if the ST coating resorbed before reperitonealization. Now having reviewed those documents, Dr. Jensen's statements in the declaration are consistent with his testimony and further clarifies that, according to Dr. Jensen, he did not know that the ST coating could be resorbed within seven days before reperitonealization, that Bard had never informed him of that fact, and that had he known that, he would not have used the Ventralight ST in Plaintiff. (*Id*. at ¶ 14.) The Jensen Declaration supplements, rather than directly contradicts, Dr. Jensen's deposition testimony on this point.

### B. Attempt to Create Sham Issue of Fact

Because the Jensen Declaration does not directly contradict Dr. Jensen's testimony, this

13

Court will not strike or disregard the declaration unless it "constitutes an attempt to create a sham fact issue." *Aerel*, 448 F.3d at 908 (internal quotations omitted). The Sixth Circuit has set forth the following non-exhaustive factors for courts to consider in determining whether a declaration attempts to create a sham fact issue:

> [W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Aerel*, 448 F.3d at 909. As to the first factor, "'a party who is cross-examined but nevertheless offers unequivocal testimony, only to be contradicted by a later affidavit, has indeed tried to create a sham fact issue.'" *Miller v. Food Concepts International, LP*, No. 2:13-cv-00124, 2017 WL 1163850, at *7 (S.D. Ohio Mar. 29, 2017) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 593 (6th Cir. 2009)).

The Court finds that the Jensen Declaration is not an attempt to create a sham issue of fact. While Dr. Jensen was cross-examined by Bard's counsel at his deposition, his testimony was far from "unequivocal." Dr. Jensen often answered he was unsure or could not recall the answer to counsel's questions. The Jensen Declaration explains that since his deposition, Dr. Jensen has reviewed documents that he did not have an opportunity to review before his deposition and that were not made available to him during his deposition. (Jensen Decl. at ¶ 5.) Plaintiff's counsel represents that Bard produced documents relating to Dr. Jensen's attendance at a Bard training session in 2011 and the associated materials in July and September 2019, after Dr. Jensen's June 2019 deposition. (*See* Pl.'s Opp. at 16.) Some of the other documents relating to the timing of the resorption rate of the ST coating likewise were not produced until July and September 2019, and Plaintiff's counsel represents that they had not yet had a chance to review

14

and analyze the other documents at the time of the deposition for various reasons. (*Id*. at 16-17.)[1]
As discussed above, the Jensen Declaration purports to further explain and clarify Dr. Jensen's testimony, and fills in the gaps in that testimony based on additional evidence to which Dr. Jensen previously did not have access. The Court therefore declines to strike the Jensen Declaration under the sham affidavit doctrine.

### C. Hearsay and Personal Knowledge Requirement

Bard argues that even if the Court declines to strike the Jensen Declaration under the sham affidavit doctrine, it should still be stricken because it is based on hearsay and speculation, and not based on Dr. Jensen's personal knowledge. (Mot. at 11-14.)

Federal Rule of Civil Procedure 56(c)(4) requires that a declaration used to oppose summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Hearsay evidence in an affidavit generally cannot be considered on a motion for summary judgment. *Bluegrass Dutch Trust Morehead, LLC v. Rowan County Fiscal Court*, 734 Fed. App'x 322, 327 (6th Cir. 2018) (citing *Daily Press, Inc. v United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)); *see also Wiley v. United States*, 20 F.3d 222 (6th Cir. 1994). Only inadmissible portions, rather than the entire affidavit, must be disregarded. *See Johnson v. Donahoe*, 642 F. App'x 599, 602 (6th Cir. 2016) ("However, a court "should use a scalpel, not a butcher knife,' in striking inadmissible portions of an affidavit.") (quoting *Upshaw v. Ford*

---

[1] Bard contends Plaintiff knew Bard was producing documents on a rolling basis, and that any production delays still do not explain Plaintiff's disclosure of the Jensen Declaration months after the close of discovery and after Bard moved for summary judgment. Plaintiff contends it did not approach Dr. Jensen to discuss Bard's internal documents until after he designated Dr. Jensen as a "non-retained expert witness" in December 2019 and preserved his right to potentially call Dr. Jensen as a specialized witness. Both parties place blame on the other side and offer competing explanations for various delays and timing issues giving rise to the instant Motion to Strike. Neither narrative changes the disposition of the issues addressed herein.

*Motor Co.*, 576 F.3d 576, 593 (6th Cir.2009)).

Bard contends the Jensen Declaration "is a series of inadmissible hearsay statements, offered for the truth of the matters stated therein and untested by discovery" and that Dr. Jensen's statements "are not based on personal knowledge, but on Plaintiff's counsel's own slanted interpretation of a handful of isolated documents." (Mot. to Strike at 11-12.) For example, Bard objects to the following statements:

> 11. It was represented to me that, in the deposition of former Davol President Daniel LaFever, LaFever testified that Genzyme told Davol's Vice President of Research & Development, Roger Darois, that they had changed the ST formulation to double the resorption time from seven days to fourteen days and that this doubling of resorption time was important because, per what Mr. Darois told Mr. LaFever, seven days was insufficient time to allow for reperitonealization. It was represented to me that the due diligence period shortly thereafter began for the license deal in which Bard/Davol was to acquire the rights to use the ST hydrogel technology.

(Jensen. Decl. at ¶ 11.) Bard also objects to other portions of the Jensen Declaration that refer to representations of the record or summarize the contents of Bard's internal documents reviewed by Dr. Jensen, such as the following:

> 8. I have reviewed an October 13, 2003, powerpoint from Bard/Davol called "Sepramesh Genzyme Biosurgical". It was represented to me by Mr. Johns' counsel that, at that point, Bard/Davol considered Genzyme's Sepramesh a competitor product to its composite meshes containing ePTFE. In that powerpoint, Bard/Davol criticizes Sepramesh on the basis that the hydrogel barrier is resorbed within seven days, which according to the powerpoint, is not long enough to prevent adhesion formation.

(Jensen Decl. at ¶ 8; *see also* ¶¶ 9-10, 12-13.) Bard further contends that the Jensen Declaration does not create an issue of fact because these statements are inadmissible and because the declaration ignores other documents and evidence in the record refuting Plaintiff's theory regarding the ST coating. (Mot. to Strike at 12-13.)

While Bard's arguments may have merit, the Court finds Bard's objections will be best

16

addressed in this Court's decision on the merits of Bard's motion for summary judgment. The Court will determine the admissibility of the statements in the Jensen Declaration in light of how Plaintiff uses that evidence to oppose summary judgment, and whether there is a genuine issue of material fact based on the admissible portions of the declaration and all of the other evidence in the record submitted by both parties.

## IV.

For the reasons set forth above, the Court **DENIES** Bard's Motion.

**IT IS SO ORDERED.**

**6/08/2020**　　　　　　　　　　　　　*s*/**Edmund A. Sargus, Jr.**
**DATE**　　　　　　　　　　　　　　　**EDMUND A. SARGUS, JR.**
　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**


**6/08/2020**　　　　　　　　　　　　　*s*/**Kimberly A. Jolson**
**DATE**　　　　　　　　　　　　　　　**KIMBERLY A. JOLSON**
　　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**