# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: DAVOL, INC./C.R. BARD, INC., POLYPROPYLENE HERNIA MESH PRODUCTS LIABILITY LITIGATION | Case No. 2:18-md-2846<br><br>JUDGE EDMUND A. SARGUS, JR.<br>Magistrate Judge Kimberly A. Jolson |

**This document relates to:**
*Johns v. CR Bard et al*,
Case No. 2:18-cv-1509

## EVIDENTIARY MOTIONS ORDER NO. 12

Defendants C.R. Bard, Inc. and Davol, Inc. filed a Motion to Exclude the Opinions and Testimony of Plaintiff Steven Johns's expert Robert W. Johnson (ECF No. 91), John A. Morrison (ECF No. 27), and Kenneth M. Rudo, Ph.D. (ECF No. 28). For the reasons below, Defendants motion addressing Johnson is granted, and the motions addressing Drs. Morrison and Rudo are denied as moot.

## I. Background[1]

This case is the first bellwether trial, selected from thousands of cases in this multidistrict litigation, alleging "that defects in defendants' polypropylene hernia mesh products can lead to complications when implanted in patients, including adhesions." (No. 2:18-md-02846, ECF No. 1 at PageID #1–2.)[2] This includes the Ventralight ST, the device implanted in Plaintiff. The Ventralight ST is a prescription medical device used for hernia repairs. *In re Davol, Inc./C.R. Bard, Inc.*, 2020 WL 5223363, at *1. The Food and Drug Administration cleared it for use through

---

[1] The Court assumes that the parties and other interested readers are familiar with the history of this case. For a more complete factual background, the reader is directed to the Court's summary judgment opinion and order. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-md-2486, 2:18-cv-01509, 2020 WL 5223363, at *1–6 (S. D. Ohio Sept. 1, 2020).

[2] Unless otherwise noted, record citations are to the docket for this case, No. 18-cv-01509.

1

the premarket notification § 510(k) process in 2010 and later cleared it for use with the Echo Positioning System in 2011. It is a multicomponent device made of a mesh, which consists of polypropylene, polyglycolic acid fibers, and a bioresorbable hydrogel barrier called "Sepra Technology" ("ST"). The ST-coated side of the mesh is placed against organs, such as the bowels, while the uncoated polypropylene side is placed against the fascia because the uncoated side maximizes tissue attachment and thus supports the hernia repair. *Id.* at *1–2.

Plaintiff brings this action to recover for injuries sustained as a result of the implantation of Defendants' allegedly defective Ventralight ST device. Plaintiff claims that Defendants knew that polypropylene is unsuitable for permanent implantation in the human body. *Id.* at *4. The crux of Plaintiff's claims is that the ST coating on the Ventralight ST resorbs too quickly. This leads to the exposure of bare polypropylene to internal organs and tissues, increasing the risk of potential complications. Plaintiff alleges that this occurrence led to omental adhesions after his laparoscopic hernia repair surgery in 2015. The following claims remain for trial: design defect, under negligence and strict liability theories; failure to warn, under negligence and strict liability theories; breach of express warranty; breach of implied warranty; breach of implied warranty of merchantability; negligent misrepresentation; and punitive damages. *Id.* at *6–25.

Various evidentiary motions are now ripe for adjudication, including Defendants' motion to exclude the testimony and opinions of Johnson. Johnson is an economist whom Plaintiff tasked with "fram[ing], in economic terms, the financial condition of Davol, Inc. and C.R. Bard, Inc." (ECF No. 91-1 at PageID #6178.) Johnson's opinion was to go to "the area of punitive damages, ability to pay, [and] financial condition." (ECF No. 121-1 at PageID #8308.) To do so, he examined only financial data points regarding Becton, Dickinson, and Company ("BDC"), Defendants' parent company. (ECF No. 91-1 at PageID #6178; ECF No. 91 at PageID #6159.)

## II. Legal Standards

"Neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion *in limine*." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 698, 721 (S.D. Ohio 2016). The practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). "The purpose of a motion *in limine* is to allow a court to rule on issues pertaining to evidence prior to trial to avoid delay and ensure an evenhanded and expedient trial." *In re E.I. du Pont*, 348 F. Supp. 3d at 721 (citing *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)). However, courts are generally reluctant to grant broad exclusions of evidence before trial because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d 1385, 1388 (D. Kan. 1998); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). Unless a party proves that the evidence is clearly inadmissible on all potential grounds—a demanding requirement—"evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846. The denial, in whole or in part, of a motion in limine does not give a party license to admit all evidence contemplated by the motion; it simply means that the Court cannot adjudicate the motion outside of the trial context. *Ind. Ins Co.*, 326 F. Supp. 2d at 846.

Evidentiary rulings are made subject to the district court's sound discretion, *Frye v. CSX Trans., Inc.*, 933 F.3d 591, 598 (6th Cir. 2019), including the admissibility of expert testimony, *United States v. Dunnican*, 961 F.3d 859, 875 (6th Cir. 2020). The Supreme Court has described a district court's obligation to determine the admissibility of expert testimony as one of

"gatekeeping," ensuring that "any and all scientific testimony evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 597 (1993); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 143, 141 (1999) (holding that the district court serves a gatekeeping function for non-scientific expert testimony). This role, however, is not intended to supplant the adversary system or the role of the jury. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008). Arguments regarding the weight to be given to any testimony or opinions of an expert witness are properly left to the jury. *Id*. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The burden is on the party proffering the expert testimony to demonstrate by a preponderance of proof that the opinions of their experts are admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) ("The Court [in *Daubert*] explained that Rule 702 displays a liberal thrust with the general approach.").

### III. Analysis

Plaintiff argues that Johnson's expert report and testimony are inadmissible. Expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

4

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In this circuit, "[t]he Rule 702 analysis proceeds in three" steps: (1) the expert witness must be qualified to give their opinion, (2) the opinion must be relevant, and (3) the opinion must be reliable. *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). Expert testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) (quoting *United States v. Cunningham*, 679 F.3d 355, 379–80 (6th Cir. 2012)); Fed. R. Evid. 702(a); *see also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful."). The Court proceeds immediately to step two because Johnson's opinion is irrelevant to whether punitive damages are appropriate in this case and in what amount.

Under Utah law, punitive damages may be awarded only if compensatory or general damages are awarded and if it is established by clear and convincing evidence that the defendant's acts or omissions "are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B-8-201(1)(a). "In assessing the amount of punitive damages to be awarded, the trier of fact must consider seven factors, one of which is the relative wealth of the defendant." *Bennett v. Huish*, 155 P.3d 917, 929 (Utah Ct. App. 2007).[3]

Evidence of BDC's financial condition is irrelevant to Defendants' relative wealth. Federal courts sitting in diversity must follow the decisions of the state's highest court or, in the absence

---

[3] "Evidence of a party's wealth or financial condition shall be admissible only after a finding of liability for punitive damages has been made." Utah Code Ann. § 78B-8-201(2). This is consistent with the Court's previous determination that evidence of Defendants' financial condition will be admissible in a second, non-liability phase of trial. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-cv-01509, 2:18-md-2846, 2020 WL 6605576, at *2 (S.D. Ohio Sept. 11, 2020).

5

of such decisions, try to predict how the state's highest court would rule on the issue by turning to state lower court decisions and other persuasive authority. *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020). Although the Utah Supreme Court has not addressed this issue, the Utah Court of Appeals has in one case. In *VanDyke v. Mountain Coin Machine Distributors, Inc.*, the Utah Court of Appeals concluded that the trial court erred when it considered the net worth of the Defendants' parent corporation. 758 P.2d 962, 966 (Utah Ct. App. 1988) (reducing the punitive damages award based on this issue and that the award was "disproportionate to the actual damage award").[4] Like BDC, the parent corporation was not a party and was involved in the events upon which the lawsuit was based. The appellate court's approach is consistent with the bulk of persuasive authority demonstrating that courts applying the relative-wealth factor for punitive damages, under either federal or state law, have found evidence of the parent corporation's financial condition irrelevant to the subsidiary's ability to pay punitive damages.[5] When courts have considered the wealth of a parent company, the parent corporation was typically a named party or was involved in the events giving rise to the lawsuit. *E.g.*, *Campus Sweater & Sportswear Co. v. M. B. Kahn. Const. Co.*, 515 F. Supp. 64, 71–74, 107–08 (D.S.C. 1979), *aff'd*, 644 F.3d 877 (4th Cir. 1981) (unpublished table mem.) (South Carolina state-law claims). The refusal of courts

---

[4] Neither side identifies any Utah precedent on this issue.
[5] *E.g.*, *Borrell v. Bloomburg Univ.*, 207 F. Supp. 3d 454, 502 (M.D. Pa. 2016) ("I am, however, mindful that, although sometimes relevant to a punitive damages assessment, a parent company's assets should not be admitted into evidence absent the naming of that parent company as a party."); *In re Welding Fume Prods. Liab. Litig.*, No. 1:03–CV–17000, 2010 WL 7699456, at *49 (N.D. Ohio June 4, 2010) ("[T]he relevant financial data must be specific to the defendant, not its parent."); *St. Croix Renaissance Grp., LLLP v. St. Croix Alumina, LLC*, No. 04-67, 2010 WL 4723897, at *2 (D.V.I. Nov. 18, 2010) ("[T]he wealth of a parent corporation is irrelevant to the jury's assessment of the appropriateness of punitive damages." (citing *Herman v. Hess Oil*, 379 F. Supp. 1268, 1276 (D.V.I. 1974), *aff'd*, 524 F.2d 767, 772 (3d Cir.1975)); *United States v. Magnesium Corp. of Am.*, No. 2:01–CV–00040 DB, 2006 WL 1699608, at *2–3 (D. Utah June 14, 2006) (collecting cases and applying the Resource Conservation and Recovery Act of 1976); *see also McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 975 (4th Cir. 2020) (concluding that parent company's financials were relevant to defendant's ability to abate a nuisance when defendant admitted parent's involvement was necessary to do so but excluding that evidence as to the amount of punitive damages). *But see Jones v. Jim Walter Homes, Inc.*, 930 F.2d 23, at *5 (4th Cir. 1991) (unpublished table decision).

to consider the wealth of a parent company solely to assess a defendant subsidiary's ability to pay punitive damages reflects a reluctance to in effect pierce the corporate veil when that issue has not been litigated or when the parent is not a named party.[6]

Plaintiff offers no countervailing arguments or authorities that would satisfy his burden to show that Johnson's opinions are relevant to Defendants' ability to pay punitive damages. Plaintiff explains that BDC will ultimately be responsible for paying any damages (ECF No. 121 at PageID #8294), which Defendants do not dispute. However, Plaintiff does not marshal any legal authority that shows that the sole fact that a parent corporation will foot the bill for a subsidiary's liabilities is relevant to the appropriateness of punitive damages against the subsidiary when the parent is not a named party, when the parent did not participate in the conduct giving rise to this action, or when the parties have not litigated whether the corporate veil has been pierced. In addition, Defendants did not waive their ability to challenge whether evidence of BDC's financial condition was admissible when Defense counsel notified Plaintiff's counsel that BDC would be responsible financially for Defendants' liability. (ECF No. 121-3 at PageID #8372.)

On a different note, the Court is unable to assess whether Defendants may be impeached if their representatives were to testify that a punitive damages award would result in financial ruin of C.R. Bard, Inc. and/or Davol, Inc. In analogous contexts, courts have admitted otherwise inadmissible evidence when a defendant has "suggest[ed] to the jury he will be financially ruined by a large punitive damages award," such as an indemnification agreement. *Grassilli v. Barr*, 48

---

[6] *In re Welding*, 2010 WL 7699456, at *49; *St. Croix*, 2010 WL 4723897, at *2 ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (quoting *Bestfoods*, 524 U.S. at 61)); *Magnesium Corp.*, 2006 WL 1699608, at *3 (discussing the impact of *Bestfoods* on the appropriateness of considering the wealth of a parent corporation in relation to a subsidiary's ability to pay punitive damages); *see also Bender v. Darden Rests. Inc.*, 26 F. App'x 726, 727 n.3 (9th Cir. 2002) (concluding that the parent and subsidiary were "essentially the *same business*" "in every way but corporate name"); *Dangerfield v. Star Editorial, Inc.*, 97 F.3d 1458, *3–4 (9th Cir. 1996) (unpublished table decision) (excluding evidence of parent company's wealth because the alter ego issue was not litigated).

7

Cal. Rptr. 3d 715, 740–41 (Cal. Ct. App. 2006) (addressing indemnification statutes). In a way, BDC has informally agreed to indemnify Defendants. If this trial proceeds to a second phase of litigation addressing punitive damages *and* Defendants' corporative representatives testify that punitive damages would result in Defendants' financial ruin, Plaintiff must seek permission from the Court to impeach Defendants with evidence of BDC's financial status in light of BDC's intent to pay Defendants' liabilities.

### IV. Conclusion

For these reasons, Defendants' motion (ECF No. 91) is **GRANTED**. Defendants' motions addressing Drs. Morrison and Rudo (ECF Nos. 27 & 28) are **DENIED AS MOOT** because Counsel represented to the Court that Plaintiff withdrew Drs. Morrison and Rudo, therefore the motions to do not require resolution.

**IT IS SO ORDERED.**


**6/28/2021**                                         **s/ Edmund A Sargus, JR.**
**DATE**                                                **EDMUND A. SARGUS, JR.**
                                                         **UNITED STATES DISTRICT JUDGE**