UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: DAVOL, INC./C.R. BARD, INC., POLYPROPYLENE HERNIA MESH PRODUCTS LIABILITY LITIGATION | Case No. 2:18-md-2846<br><br>JUDGE EDMUND A. SARGUS, JR.<br>Magistrate Judge Kimberly A. Jolson |

**This document relates to:**
*Milanesi, et al. v. C.R. Bard, Inc., et al.*
Case No. 2:18-cv-01320

## EVIDENTIARY MOTIONS OPINION & ORDER No. 19

Before the Court are Plaintiffs' Motions to Exclude the Opinions and Testimony of Defense Experts Maureen T.F. Reitman, Sc.D. (ECF No. 84) and Stephen Badylak, D.V.M., Ph.D., M.D. (ECF No. 79), and Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Jimmy Mays Ph.D. (ECF No. 71). For the reasons that follow, Plaintiffs' motion addressing Dr. Reitman, Sc.D. (ECF No. 84) is **GRANTED IN PART, DENIED IN PART, AND DENIED IN PART AS MOOT**; Plaintiffs' motion addressing Dr. Badylak (ECF No. 79) is **GRANTED IN PART AND DENIED IN PART**; and Defendants' motion addressing Dr. Mays (ECF No. 71) is **GRANTED IN PART AND DENIED IN PART**.

I. **Background**[1]

Plaintiffs', Antonio Milanesi and Alicia Morz de Milanesi, case is the second bellwether trial selected from thousands of cases in this multidistrict litigation ("MDL") against Defendants, C.R. Bard, Inc. and Davol, Inc. The Judicial Panel on Multidistrict Litigation described the cases in this MDL as "shar[ing] common factual questions arising out of allegations that defects in

---

[1] For a more complete factual background, the reader is directed to the Court's summary judgment opinion and order. (ECF No. 167.)

1

defendants' polypropylene hernia mesh products can lead to complications when implanted in patients, including adhesions, damage to organs, inflammatory and allergic responses, foreign body rejection, migration of the mesh, and infections." (Case No. 2:18-md-02846, ECF No. 1 at PageID #1–2.)[2]  This includes Defendants' Ventralex Hernia Patch, the device implanted in Mr. Milanesi.

The Ventralex is a prescription medical device used for umbilical and small ventral hernia repairs. (ECF No. 167 at PageID #13610.) The small and medium sizes were cleared through the 510(k) premarket notification process by the Food and Drug Administration ("FDA") in 2002; the Composix Kugel was listed as a predicate device. (*Id.* at PageID #13611.) The large size was cleared via "a no 510(k) rationale based upon the 510(k) for the Composix Kugel product." (*Id.*) The Ventralex has two sides—one of polypropylene mesh and one of permanent expanded polytetrafluoroethylene ("ePTFE"). (*Id.* at PageID #13610.) The polypropylene mesh side faces the abdominal wall, encouraging tissue to grow into the mesh and thus supporting the hernia repair. The ePTFE side faces the intestines and is designed to minimize tissue attachment, such as adhesions, to the intestines and other viscera. The Ventralex also has a monofilament memory coil ring, which was made of polyethylene terephthalate ("PET") when it was implanted in Mr. Antonio. The ring is designed to help the patch "pop open" and then "lay flat" against the abdominal wall after the Ventralex is folded and inserted through the incision site during surgical repair of the hernia. (*Id.*)

Plaintiffs bring this action to recover for injuries sustained as a result of the implantation of Defendants' allegedly defective Ventralex device. Ten years after the implantation of the

---

[2] All docket citations are to the docket in the instant case, Case No. 18-cv-1320, unless otherwise noted.

Ventralex, Mr. Milanesi underwent surgery to repair what appeared to be a recurrent hernia but was revealed to be a bowel erosion with a fistula and adhesions, which required a bowel resection. (*Id.* at PageID #13611–13.) Shortly thereafter, Mr. Milanesi suffered a high-grade post-operative small bowel obstruction that required emergency surgery. (*Id.* at PageID #13613)

The crux of Plaintiffs' claims is that Defendants knew of the risks presented by the Ventralex device but marketed and sold the device despite these risks and without appropriate warnings. Plaintiffs point to three specific issues with the Ventralex: (1) polypropylene resin oxidatively degrades *in vivo*, (2) the ePTFE layer contracts more quickly than the polypropylene, which in combination with the too-weak memory coil ring causes the device to fold or buckle or "potato chip," leading to the exposure of the bare polypropylene to the bowel, and (3) the ePTFE layer is prone to infection. (*Id.* at PageID #13613–14.) After summary judgment, the following claims remain for trial: defective design (strict liability), failure to warn (strict liability), negligence, gross negligence, negligent misrepresentation, fraud and fraudulent misrepresentation, fraudulent concealment, loss of consortium, and punitive damages. (*Id.* at PageID #13616–37.)

The parties have filed their dispositive and *Daubert* motions, and the motions are now ripe for adjudication, including the present motions.

## II. Legal Standard

"Neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion *in limine*." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 698, 721 (S.D. Ohio 2016). The practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). "The purpose of a motion *in limine* is to allow a court to rule on issues pertaining to evidence prior to trial to avoid delay and ensure an

evenhanded and expedient trial." *In re E.I. du Pont*, 348 F. Supp. 3d at 721 (citing *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)). However, courts are generally reluctant to grant broad exclusions of evidence before trial because courts are "almost always better situated during the actual trial to assess the value and utility of evidence." *Jackson v. Cnty. of San Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. July 5, 2016) (quoting *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218 (D. Kan. 2007)); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975) ("A better practice is to deal with questions of admissibility of evidence as they arise."). Unless a party proves that the evidence is clearly inadmissible on all potential grounds—a demanding requirement—"evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *In re E.I. du Pont*, 348 F. Supp. 3d at 721 (quoting *Ind. Ins. Co.*, 326 F. Supp. 2d at 846). The denial, in whole or in part, of a motion in limine does not give a party license to admit all evidence contemplated by the motion; it simply means that the Court cannot adjudicate the motion outside of the trial context. *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

The burden is on the party offering the expert opinions and testimony to demonstrate "by a preponderance of proof" that the expert evidence is admissible. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Any doubts regarding the admissibility of an expert's testimony should be resolved in favor of admissibility. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) ("The Court [in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993),] explained that Rule 702 displays a 'liberal thrust' with the 'general approach of relaxing the traditional barriers to "opinion" testimony.'" (quoting *Daubert*, 509 U.S. at 588)); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").

### III. Analysis

The district court's role in assessing expert testimony is a "gatekeeping" one, "screening expert testimony" so that only admissible expert testimony is submitted to the jury; its role is not to weigh the expert testimony or determine its truth. *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). Expert testimony, testimony given by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education," is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In this circuit, "[t]he Rule 702 analysis proceeds in three stages." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702.).

First, an expert witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "[T]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). "[T]he only thing a court

5

should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth. The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981). A party's expert need only meet the "'minimal qualifications' requirement—not one who could teach a graduate seminar on the subject." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014) (quoting *Mannino*, 650 F.2d at 851); *see also Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 446 (6th Cir. 2012) ("An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact.").

Second, expert testimony must be relevant. Expert testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208 (6th Cir. 2015) (quoting *United States v. Freeman*, 730 F.3d 590, 599–600 (6th Cir. 2013)); Fed. R. Evid. 702(a). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 702[02], p. 702–18 (1988)). "This requirement has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 592). This is a case-specific inquiry. *See Madej*, 951 F.3d at 370 ("Whether an opinion 'relates to an issue in the case' or helps a jury answer a 'specific question' depends on the claims before the court.").

Third, expert testimony must be reliable. Rule 702 provides the following general standards to assess reliability: whether "the testimony is based on sufficient facts or data," whether

6

"the testimony is the product of reliable principles and methods," and whether "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d). To evaluate reliability of principles and methods, courts consider "'testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community,'" though these "factors 'are not dispositive in every case' and should be applied only 'where they are reasonable measures of the reliability of expert testimony.'" *In re Scrap Metal*, 527 F.3d at 529 (citations omitted); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (describing these factors as "flexible" (quoting *Daubert*, 509 U.S. at 594)). The objective of the reliability requirement is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The parties move for the exclusion of expert testimony from the following experts: Maureen T.F. Reitman, Sc.D., Stephen Badylak, D.V.M., Ph.D., M.D., and Jimmy Mays, Ph.D.

**A. Maureen T.F. Reitman, Sc.D.**

Plaintiffs challenge the admissibility of opinions and testimony from Dr. Maureen T.F. Reitman, Sc.D. (ECF No. 84.) They raised nearly identical arguments regarding Dr. Reitman's qualifications and the reliability of her methods in the first bellwether of this MDL, *Johns v. C.R. Bard, Inc.* (*Compare id.* with Case No. 2:18-cv-1509, ECF No. 114.) Therefore, the Court follows its Evidentiary Motions Order ("EMO") No. 8 addressing the admissibility of Dr. Reitman's opinions. (Case No. 2:18-cv-1509, ECF No. 425.) Dr. Reitman's opinions are relevant and reliable, and "Dr. Reitman is qualified to offer her

7

opinions and testimony with the exception of three opinions: (1) that no action of Defendants in relation to product development caused Plaintiff's injuries, (2) that the [Ventralex or any of its component parts are] not defective, and (3) that Defendants' conduct was reasonable." (*Id.* at PageID #22497–22505.)

Initially, Plaintiffs argued that Dr. Reitman did not disclose sufficient facts and data related to her methodology. (ECF No. 84 at PageID #5870–75; ECF No. 134 at PageID #11443–46.) In subsequent briefing, however, Plaintiffs noted that they would "withdraw their *Daubert* arguments on the grounds that these data are missing" and requested a second deposition of Dr. Reitman. (ECF No. 147 at PageID #11963; ECF No. 151 at PageID #12232.) The Court permitted a second deposition. (ECF No. 162.) Because Plaintiffs withdrew these arguments, the Court does not address them further.

Plaintiffs also challenge Dr. Reitman's opinions related to the adequacy of Defendants' manufacturing process of the Ventralex. (ECF No. 84 at PageID #5875.) Summary judgment was granted on Defendants' manufacturing defect claim. (ECF No. 167 at PageID #13617–20.) Thus, Plaintiffs' motion on this issue is moot.

Accordingly, Plaintiffs' motion (ECF No. 84) is **GRANTED IN PART, DENIED IN PART, AND DENIED IN PART AS MOOT**.

### B. Stephen Badylak, D.V.M., Ph.D., M.D.

Plaintiffs argue that Dr. Badylak's opinions on Material Safety Data Sheets ("MSDS"), case-specific risk/benefit analysis or overall safety of polypropylene mesh devices, case-specific causation, and Instructions for Use ("IFU") should be excluded. (ECF No. 79 at PageID #4855.) The briefing in this case is essentially identical to the briefing in *Johns*. (*Compare* ECF No. 79 *with* Case No. 2:18-cv-1509, ECF No. 96.)

8

Accordingly, the Court reiterates its decision in *Johns*. No expert, including Dr. Badylak, may offer MSDS opinions as to what the MSDS means because the MSDS is only admissible as evidence of notice. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, --- F. Supp. 3d ----, Nos. 2:18-md-2846, 2:18-cv-1509, 2021 WL 2643110, at *4 (S.D. Ohio June 28, 2021) (EMO No. 13); *see also In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, Nos. 2:18-md-2846, 2:18-cv-01509, 2021 WL 3617152, at *3 (S.D. Ohio Aug. 16, 2021) (EMO No. 15). Dr. Badylak does not offer case-specific opinions falling with the ambit of Plaintiffs' *Daubert* motions, and he is qualified to offer general opinions and on the overall safety and efficacy of the Ventralex. *In re Davol, Inc./C.R. Bard, Inc.*, 2021 WL 2643110, at *4–5 (EMO No. 13). Finally, Dr. Badylak is unqualified to offer his IFU opinions. *Id.* at *5–6. Therefore, Plaintiffs' motion (ECF No. 79) is **GRANTED IN PART AND DENIED IN PART**.

### C. Jimmy Mays Ph.D.

Defendants move to exclude the opinions and testimony of Dr. Jimmy Mays, Ph.D. (ECF No. 71.) Defendants argue that Dr. Mays's polypropylene degradation opinions are irrelevant because he does not connect polypropylene degradation to this case; his polypropylene degradation opinions are unreliable; his state-of-mind opinions are improper; and his ePTFE and PET opinions are unsupported and unlinked to Mr. Milanesi's case. (*Id.* at PageID #3568–80.) The Court's previous *Daubert* opinion in *Johns* addressing Dr. Mays's opinions encompasses all but the first and last arguments. Dr. Mays's opinions are reliable, but he cannot offer state-of-mind opinions or provide a factual history unless he applies his expertise to contextualize, analyze, and interpret the

9

history, or he relies on the record to reach an admissible expert opinion. *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Mesh Prods. Liab. Litig.*, --- F. Supp. 3d ----, Nos. 2:18-cv-1509, 2:18-md-2846, 2021 WL 2646797, at *3–8 (S.D. Ohio June 28, 2021) (EMO No. 10). Of his previously unaddressed opinions, Dr. Mays's degradation-related opinions of ePTFE and PET are mostly relevant and reliable, as are his polypropylene degradation opinions.

Dr. Mays's ePTFE and PET opinions are relevant insofar as these opinions help explain how the Ventralex was capable of causing the types of injuries that Mr. Milanesi claims. Dr. Mays opines that ePTFE is not inert *in vivo*, leading to fragmented, detached layers. (ECF No. 71-1 at PageID #3620.) He also explains that ePTFE and PET degrade *in vivo*. (*Id.* at PageID#3620–25.) As has been explained in this MDL, "general causation evidence in this case demonstrates that the [Ventralex] is capable of 'caus[ing] the type of injury that a plaintiff alleges' and specific causation evidence shows that the [Ventralex] caused harm to Plaintiff." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Mesh Prods. Liab. Litig.*, Nos. 2:18-cv-1509, 2:18-md-2846, 2021 WL 2643114, at *3 (S.D. Ohio June 28, 2021) (quoting *Madej*, 951 F.3d at 369) (EMO No. 11). Plaintiffs' theory of injury includes that the Ventralex buckled due to ePTFE contracting more so than polypropylene and due to the lack of rigidity in the PET memory recoil ring. (*See* ECF No. 63-1 at PageID #1093; 1098–99.) Degradation of the ePTFE and PET is thus relevant to the extent it shows general causation consistent with the aforementioned theory of injury.

Dr. Mays's ePTFE and PET opinions are also reliable. In his report, he relies on a variety of scientific articles, which he is qualified to do as a polymer biomaterials

10

scientist. (ECF No. 71-1 at PageID #3584–88, 3619–22.) Defendants argue that Dr. Mays qualifies his opinion by using words like "might" and "have concern." (ECF No. 71 at PageID #3577.) The Court rejected this argument in *Johns*. *In re Davol, Inc./C.R. Bard, Inc.*, 2021 WL 2646797, at *3–8 (EMO No. 10). Defendants also argue that Dr. Mays's opinion that PET degrades should be excluded as unreliable because he could not state whether material was mishandled during Defendants' PET production, which he opines causes degradation and acetaldehyde as a by-product, or whether acetaldehyde was actually present in Ventralex devices. (ECF No. 71 at PageID #3577–78.) This is insufficient to render his entire opinion unreliable because Dr. Mays provides general causation opinions; his opinions need only show that PET is capable of degradation under certain circumstances. Defendants' concerns are more suitably resolved on cross-examination.

Dr. Mays's polypropylene degradation opinions are relevant to this case. Plaintiffs' theory of injury is two-fold—the Ventralex buckled, and polypropylene was exposed to Mr. Milanesi's bowel, causing his injuries. Dr. Krpata opines that the Ventralex specifically caused Mr. Milanesi's injuries by buckling, and Dr. Mays's general causation opinions explain how the Ventralex, specifically the polypropylene in the Ventralex, was capable of causing those injuries.

Dr. Krpata opines that "the [Ventralex] device does not perform as intended, and instead encounters a buckling effect, thereby exposing bare polypropylene to the bowel. Bare polypropylene cannot be exposed directly to the bowel, as devastating adverse reactions can occur such as erosion into the viscera, infection, fistula, sepsis, and even death." (ECF No. 63-1 at PageID #1097.) He concludes that this was the cause of Mr.

Milanesi's injuries. (*Id.* at PageID #1108.) Dr. Krpata states that Mr. Milanesi's Ventralex folded, forming "a firm nidus that has resulted in erosion of that nidus into the bowel." (*Id.* at PageID #1109.) Dr Krpata explains that the buckling and exposure of polypropylene can lead to adhesions and niduses that erode into the bowel. (*Id.* at PageID #1093.)

Dr. Krpata's deposition supports this. In response to questioning from defense counsel whether Dr. Krpata's opinion was "that an ePTFE edge is what ultimately led to the erosion and fistula here," Dr. Krpata said "[t]hat is one of my concerns here in the fistula formation, that if the edges of the mesh had firmed, folded, that that led to the fistula formation." (ECF No. 63-2 at PageID #1221, p. 319.) Counsel continued, "[t]he other possibility is it was the polypropylene side, correct?" (*Id.*) Dr. Krpata answered that "[w]hile that is a possibility, I feel that it's more likely that it eroded into a firm ePTFE edge." (*Id.*) But Dr. Krpata clarified this statement. In response to the question, "[w]hat is the likely answer for . . . why the fistula developed? Was it polypropylene against bowel or was it an ePTFE edge against bowel," he responded: "I think it's the construct of the two together, but I think that the ePTFE does play a role in that." (*Id.* at pp. 319–20.) The weight of this statement is an issue for the jury. Accordingly, is a Dr. Krpata's specific causation opinions encompass polypropylene, meaning Dr. Mays's polypropylene degradation opinions are relevant.

Defendants argue that Plaintiffs do not sufficiently connect Dr. Mays's polypropylene degradation opinions to Mr. Milanesi's injuries. (ECF No. 71 at PageID #3568.) True, Dr. Krpata in his specific causation analysis did not reference degradation. However, his specific causation opinion is that polypropylene exposure at least in part caused the injuries. As Defendants explain, Dr. Mays's opinion is that all polypropylene

12

degrades and causes injury. (ECF No. 71 at PageID #3569.) Specifically, he opines that polypropylene is not suitable for permanent implantation because it degrades. (ECF No.71-1 at PageID #3591.) Nothing in Dr. Krpata's opinion forecloses this explanation for why polypropylene exposure is problematic. Moreover, no expert need to supply every link in the chain of Plaintiff's theory of the case for his opinion to be relevant. *In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2327, 2016 WL 4536456, at *2–3 (S.D.W. Va. Aug. 30, 2016) ("A single expert need not provide all the pieces of the puzzle for their testimony to be useful to the jury in determining the ultimate issues in the case."). Defendants' challenges to Dr. Mays's opinions are again best resolved on cross-examination, though this time of Dr. Krpata.

Importantly, concluding Dr. Mays's polypropylene degradation opinions are admissible is consistent with this Court's reasoning in its *Daubert* opinion addressing Dr. Babensee in *Johns*. There, Defendants argued that Dr. Babensee's polypropylene degradation opinions were irrelevant because "none of Plaintiff's experts or treating physicians has opined that Plaintiff suffered any injury because of . . . any purported degradation of that mesh." *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Mesh Prods. Liab. Litig.*, Nos. 2:18-cv-1509, 2:18-md-2846, 2020 WL 6605542, at *20 (S.D. Ohio Sept. 1, 2020) (EMO No. 5). But Dr. Babensee's opinions were relevant "in light of Dr. Grischkan's opinions that Plaintiff's adhesions were caused by exposure to bare polypropylene due to failure of the ST coating." *Id.* at *21. The Court explained, "[t]here is no rule that a single expert is required or that one expert cannot rely on another's opinion. To the extent Bard believes that Plaintiff cannot prove specific causation, they can argue that at trial." *Id.* (citations omitted). The same holds here.

13

For these reasons, Defendants' motion (ECF No. 71) is **GRANTED IN PART and DENIED IN PART**.

IV. Conclusion

Accordingly, Plaintiffs' motion addressing Dr. Reitman, Sc.D. (ECF No. 84) is **GRANTED IN PART, DENIED IN PART, AND DENIED IN PART AS MOOT** and motion addressing Dr. Badylak (ECF No. 79) is **GRANTED IN PART AND DENIED IN PART,** and Defendants' motion addressing Dr. Mays (ECF No. 71) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

**10/22/2022**                                   **s/Edmund A. Sargus, Jr.**
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                     **UNITED STATES DISTRICT JUDGE**