## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE: DAVOL, INC./C.R. BARD,
INC., POLYPROPYLENE HERNIA
MESH PRODUCTS LIABILITY
LITIGATION

Case No.:  2:18-md-2846

JUDGE EDMUND A. SARGUS, JR.
**Magistrate Judge Kimberly A. Jolson**

**This document relates to:**
**ALL CASES**

### DEFENDANTS C. R. BARD, INC. AND DAVOL INC.'S REPLY IN SUPPORT OF
### MOTION FOR A DOCKET CONTROL ORDER

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................ 1

I.    Lone Pine Orders Are Utilized Frequently In MDLs Like This ......................................... 4

II.   A Lone Pine Order At This Stage Would Aid In Administration Of This MDL ............... 6

III.  A Small Additional Burden On Current And Future Plaintiffs Is Justified ...................... 12

CONCLUSION ................................................................................................................ 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abrams v. Ciba Specialty Chems. Corp.*,
No. 08-0068-WS-B, 2008 U.S. Dist. LEXIS 86487 (S.D. Ala. Oct. 23, 2008)........................5

*Adkisson v. Jacob Eng'g Grp., Inc.*,
No. 3:13-cv-505-TAV-HBG, 2016 U.S. Dist. LEXIS 99350 (E.D. Tenn. July
29, 2016) .........................................................................................................................4, 5

*Albright v. Upjohn Co.*,
788 F.2d 1217 (6th Cir. 1986) ...........................................................................................11

*Augustine v. Adams*,
88 F. Supp. 2d 1166 (D. Kan. 2000) ..................................................................................11

*In re Avandia Marketing, Sales Practices & Prods. Liab. Litig.*,
687 F. Appx. 210 (3d Cir. Apr. 19, 2017) ............................................................................1

*In re Avandia Marketing, Sales Practices & Prods. Liab. Litig.*,
MDL No. 1871, 2010 WL 4720335 (E.D. Pa. Nov. 15, 2010)............................................12

*In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*,
MDL No. 1699 (N.D. Cal.).....................................................................................................3

*In Re C-8*,
ECF No. 5140 (June 22, 2018) .............................................................................................6

*In re Cook Med., Inc., IVC Filters Mkt'g, Sales Pract. & Prod. Liab. Litig.*,
MDL No. 2570, Oct. 26, 2020...............................................................................................15

*In re Cook Medical, Inc. Pelvic Repair Sys. Prof. Liab. Litig.*,
2018 WL 4698953 (S.D.W. Va. Sept. 28, 2018)..................................................................11

*In re Digitek Prod. Liab. Litig.*,
MDL No. 1968, 264 F.R.D. 249 (S.D.W. Va. 2010).............................................................4

*Doggett v. Perez*,
225 F.R.D. 255 (E.D. Wash. 2004)......................................................................................11

*In Re: Du Pont De Nemours and Company, C-8 Personal Injury Litigation*
(Civil Action No. 2:13-md-2433), CMO No. 24, ECF No. 5140 (June 22,
2018) .....................................................................................................................................4

*In re Fosamax Prods. Liab. Litig.*,
No. 06 MD 1789 (JFK), 2012 U.S. Dist. LEXIS 166734 (S.D.N.Y. Nov. 20,
2012) ........................................................................................................ *passim*

*Freeman v. Wyeth*,
764 F.3d 806 (8th Cir. 2014) ...................................................................11

*Johns v. C. R. Bard, Inc.*,
2:18-md-02846-EAS-KAJ, Evidentiary Motions Order No. 5, ECF No. 310 .......................13

*Johnson v. A. W. Chesterton Co.*,
18 F.3d 1362 (7th Cir. 1994) ...................................................................11

*Roth v. Cabot Oil & Gas Corp.*,
287 F.R.D. 293 (M.D. Pa. 2012) ...............................................................5

*Simeone v. Girard City Bd. of Educ.*,
872 N.E.2d 344 (Ohio Ct. App. 2007) .......................................................5

*Steering Comm. v. Exxon Mobil Corp.*,
461 F.3d 598 (5th 2006) ..........................................................................5

*In re Testosterone Replacement Therapy ("TRT") Products Liability Litigation*,
2018 U.S. Dist. LEXIS 205125 (N.D. Ill. June 11, 2018) .......................14

*In re Vioxx*,
557 F. Supp. 2d at 744 .......................................................................12, 14

*In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*,
MDL No. 2592, 2:19-cv-14669, 2021 U.S. Dist. LEXIS 25296 (E.D. La. Feb.
10, 2021) ...........................................................................................1, 14

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,
MDL No. 2848, No. 18-md-2848, 2022 U.S. Dist. LEXIS 57935 (E.D. Pa.
Mar. 30, 2022) ...................................................................................6, 13

**Other Authorities**

https://www.fda.gov/medical-devices/implants-and-prosthetics/hernia-surgical-
mesh-implants ........................................................................................14

https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actio
ns_Pending-Jun-15-2022.pdf ....................................................................7

Nora Freeman Engstrom & Amos Espeland, Lone Pine *Orders: A Critical
Examination and Empirical Analysis*, 168 U. PA. L. REV. ONLINE 91 (2020)..........1, 14, 15

Nora Freeman Engstrom, *The Lessons of* Lone Pine, 129 Yale L. J. 2 (2019)........................1, 15

## INTRODUCTION

Plaintiffs' response is laden with hyperbole characterizing *Lone Pine* orders as "rare" and reserved for "extraordinary" circumstances because they are recognized as "unfair" to plaintiffs. According to Plaintiffs, such an order is  appropriate only if a narrow set of criteria are met.  This *Goldilocks* approach of describing what is "just right" before a *Lone Pine* order should be entered can be boiled down to a single purported precept:  an order can only be entered if the plaintiffs' leadership agrees to it.  This is not what the caselaw requires, as demonstrated in the *Fosamax* litigation where a *Lone Pine* order was entered over the vigorous opposition from the plaintiffs' leadership in that MDL, which offered nearly identical arguments.  *In re Fosamax Prods. Liab. Litig.*, No. 06 MD 1789 (JFK), 2012 U.S. Dist. LEXIS 166734 (S.D.N.Y. Nov. 20, 2012).

If Plaintiffs' positions were correct, then such orders would not be "common" and routinely lauded as the preferred mechanism for identifying and culling nonmeritorious cases from litigations just like this—a mature MDL concerning thousands of cases over alleged physical injuries from prescription medical products.  *See In re Avandia Marketing, Sales Practices & Prods. Liab. Litig.*, 687 F. Appx. 210, 214 (3d Cir. Apr. 19, 2017); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2:19-cv-14669, 2021 U.S. Dist. LEXIS 25296, at *7-*8 (E.D. La. Feb. 10, 2021).  Many commentators agree. *See* Nora Freeman Engstrom, *The Lessons of* Lone Pine, 129 Yale L. J. 2, 16 (2019) ("Federal courts describe *Lone Pine* orders as a 'common trial management technique,' 'routine,' and a tool being used [w]ith increasing frequency.'" (citations omitted)); *see also* Nora Freeman Engstrom & Amos Espeland, Lone Pine *Orders: A Critical Examination and Empirical Analysis*, 168 U. PA. L. REV. ONLINE 91, 97 (2020), [Ex. 1 to Mot.]. The Court is well-equipped to evaluate whether an order requiring that plaintiffs provide some *bona fides* at this stage would advance the litigation as a whole.  Likewise, once the need for such

an order has been established, the precise details can be adjusted to balance the burden on plaintiffs with the value to the litigation.

The reality is that identifying and culling cases without any proof of symptomatic physical injury or required surgical intervention, that are time-barred, that are duplicates, or that otherwise do not belong in this MDL will have significant benefits to the course of the litigation.  Whether the percentage of pending cases affected ends up being 15%, 20%, 25%, or something higher— approximately 2550, 3400, and 4250, respectively, of the pending cases alone—it would still have a major impact.[1]  It is implausible to suggest that the threshold for entering an order is higher.  It is also not the case that existing orders address the current problem or that any burden on plaintiffs beyond filing an *unverified* Short Form Complaint ("SFC") and serving an *unverified* Plaintiff Profile Form ("PPF") is too much.[2]  The point of a *Lone Pine* order is to benefit the litigation as a whole even if it imposes someburden on number plaintiffs.  At great cost, Bard has already produced more than 15 million pages and had dozens of its current or former employees (including 30(b)(6) depositions) deposed in the nearly four years of this MDL.  All of that generic discovery, in addition to the generic experts developed and named by the PSC, is available for the benefit of the plaintiffs on whom an order would impose a relatively small burden.  These plaintiffs also benefit from the knowledge gained from two completed bellwether trials and numerous rulings in

---

[1]  As a preliminary matter and consistent with Fed. R. Evid. 408, Bard understood before filing that the PSC would not agree to the entry of any *Lone Pine* order or any order imposing additional requirements on all plaintiffs at this time.  As this motion was not brought pursuant to Fed. R. Civ. P. 37 or 41, there was no obligation to confer formally before filing it.  *See* Opp. at 1 n.1.  Similarly, even if Fed. R. Evid. 408 limited the arguments that could be made in a motion like this, nothing in Bard's motion made improper use of any demands or statement in the context of settlement discussions.  *See* Opp. at 3.  Instead, Plaintiffs' response is predicated on a number of statements and representations that seem to have derived from communications and efforts subject to Fed. R. Evid. 408 and/or agreed confidentiality. *See*, *e.g.*, Opp. at 12, 13 n. 10, 14.  Rather than get into a mudslinging contest about these issues, Bard certainly would provide additional information as needed by the Court in a form that would not implicate such concerns.

[2]  Of pending cases, only ten have served Plaintiff Fact Sheets or had any case-specific discovery.

connection with them.  The entry of an order that would greatly assist in the course of this litigation should notbe avoided simply by claiming that any additional burden on plaintiffs is too much.

Contrary to Plaintiffs' contentions, Bard receives limited information from the unverified SFCs and PPFs that each plaintiff is required to provide pursuant to CMOs.  Those orders were entered when this litigation was much smaller and the patterns of plaintiffs filing product-in-place cases, cases with merely incidental interventions, duplicate cases, and time-barred cases were not yet apparent.  Currently, there is no mechanism in place for efficient challenges to any of these shortcomings.  The result is that nonmeritorious cases and cases that do not belong in this MDL are generally allowed to sit around for years.

That Plaintiffs oppose providing basic information relating to product identification and injury and any certification from counsel that the required investigation was done before filing a case is telling.  If plaintiffs had this information handy—as they should—and their counsel had investigated whether they were bringing a time-barred, duplicate, or settled case—and they should have—then there would be little-to-no burden in complying with Bard's Proposed Case Management Order.  Instead, Plaintiffs appear resistant to the idea that there should have been anycommunication between counsel and client as part of due diligence before filing.

This resistance is symptomatic of the problem in an MDL created based largely on lawyer advertising (which continues to this day) and "case finder" services without any triggering event like a recall or an adverse medical study.  Taking simple steps to differentiate between the "cases that ought to be tried and separates out the cases that ought not to be tried" will go a long way to advance this litigation as a whole.  *See In re Fosamax*, 2012 U.S. Dist. LEXIS 166734, at *8 (quoting transcript from *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, MDL No. 1699 (N.D. Cal.)).

## I.    *Lone Pine* Orders Are Utilized Frequently In MDLs Like This

Bard cited a dozen decisions where MDL courts (plus others from coordinated state proceedings) have entered *Lone Pine* orders in mature litigations similar to this one.  These decisions, taken as a whole, reveal a trend in favor of MDL judges entering *Lone Pine* orders in mature MDLs with large numbers of cases that could benefit from greater knowledge about and control over the inventory.  It also has been recognized in law review articles cited by both sides. *See supra* at 2.

In opposing the entry of such an order here, Plaintiffs have generally cited non-MDL decisions with small numbers of plaintiffs and older MDL decisions.  For instance, Plaintiffs cite only one MDL decision from the last ten years that was not addressed in Bard's motion:  this Court's decision in C-8 litigation, which concerned a request for an order as to "approximately 33 newly-filed cases."  *In Re: Du Pont De Nemours and Company, C-8 Personal Injury Litigation* (Civil Action No. 2:13-md-2433), CMO No. 24, ECF No. 5140 (June 22, 2018), at 1.  In denying the requested relief, the Court expressly noted that the plaintiffs were required to serve a Plaintiff Fact Sheet ("PFS") within 45 days and the defendant had another 45 days to identify statute of limitations and class definition challenges.  *Id.* at 8.  The plaintiff-signed PFS in *C-8* provided far more information than the lawyer-signed PPF here and Bard has no ability in a non-bellwether case to bring an early challenge to threshold issue like statute of limitations.

Plaintiffs also rely heavily on an older MDL decision, *In re Digitek Prod. Liab. Litig.*, MDL No. 1968, 264 F.R.D. 249 (S.D.W. Va. 2010).  That decision is also readily distinguishable because of the number of pending cases (about 1000), the age of the MDL (less than 17 months from the JPML consolidation order and 11 months from the Master Complaint), and that requests for admissions were served and answered in a "substantial number of cases."  *Id.* at 253.  The cases cited in *C-8* and *Digitek* are also instructive.  *Adkisson v. Jacob Eng'g Grp., Inc.*, No. 3:13-cv-

505-TAV-HBG, 2016 U.S. Dist. LEXIS 99350 (E.D. Tenn. July 29, 2016), involved 71 plaintiffs in a non-MDL proceeding.[3]  The small number of plaintiffs and the fact that the only discovery at that point had been the service of plaintiffs' initial disclosures weighed heavily against an order. *Id.* at \*16 ("Courts are generally more inclined to issue *Lone Pine* orders in cases involving hundreds or more plaintiffs and/or defendants.").  *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598 (5th 2006), affirmed the denial of a class certification petition, not a decision on a *Lone Pine* order.  The *Lone Pine* order was discussed favorable.  *Id.* at 604 n.2.  Notably, it required "that individual plaintiffs each produce, depending on the type of injury alleged, either an affidavit from a qualified treating or other physician, or an affidavit from a qualified real estate appraiser or other real estate expert."  *Id.*

Without belaboring all the purported distinctions between each case cited by the parties, it is apparent that *Lone Pine* orders in recent MDLs involving large numbers of product liability plaintiffs are indeed common.  Plaintiffs did not dispute that Bard's characterization that this MDL is of an age, size, and maturity that makes is typical of the MDLs where *Lone Pine* orders have been entered.  The only decisions denying *Lone Pine* that Plaintiffs have cited are distinctly different according to these parameters.

It is also not the case that a large-scale settlement *vel non* is the key determinant in whether a *Lone Pine* will be issued.  Clearly, this Court's decision in *C-8*—an MDL made up of opt outs from a prior class action settlement—came on the heels of a "global settlement" that resolved

---

[3]  The non-MDL cases relied upon by Plaintiffs, in addition to typically being in very different postures (e.g., at the initial scheduling conference phase), involved relatively few plaintiffs and, thus, entirely different calculi.  For instance, *Roth v. Cabot Oil & Gas Corp.*, 287 F.R.D. 293 (M.D. Pa. 2012), involved 2 plaintiffs, *Abrams v. Ciba Specialty Chems. Corp., No.* 08-0068-WS-B, 2008 U.S. Dist. LEXIS 86487 (S.D. Ala. Oct. 23, 2008), involved 271 plaintiffs, and *Simeone v. Girard City Bd. of Educ.,* 872 N.E.2d 344 (Ohio Ct. App. 2007), involved an appeal of a case with "thirteen students, their parents, and four teachers."  These smaller, non-MDL cases say little about the issues before the Court here.

"3,500-plus cases" and left only "approximately 33 newly-filed cases." *In Re C-8*, ECF No. 5140 (June 22, 2018), at 1. By contrast, the *Fosamax* decision discussed at length followed no large-scale settlement.[4] The same is true of the *Zostavax* MDL decision earlier this year. *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, MDL No. 2848, No. 18-md-2848, 2022 U.S. Dist. LEXIS 57935 (E.D. Pa. Mar. 30, 2022). Despite Plaintiffs' efforts to distinguish it, the reasoning from *Fosamax* is on all fours here:

> The Court can discern no rationale for requiring parties to have reached a settlement – or be on the brink of settlement – before considering a *Lone Pine* order. Indeed, the primary purpose of *Lone Pine* orders is to eliminate meritless claims, which is at best tangentially related to the status of settlement negotiations.

*In re Fosamax*, 2012 U.S. Dist. LEXIS 166734, at *8. There is no plausible argument, and Plaintiffs have not attempted to make one, why identifying and weeding out "meritless claims" should have to wait for a large-scale settlement, especially in an MDL of this size.

## II.    A *Lone Pine* Order At This Stage Would Aid In Administration Of This MDL

In its motion, Bard laid out seven issues that are present in "a considerable number" of the pending cases. Mot. at 10 (identifying "1) the plaintiff is suing over a Bard device that is still in-place; 2) the plaintiff is suing over an incidental finding discovered during an unrelated procedure; 3) the plaintiff is suing over an alleged injury that produced no physical symptoms; 4) the plaintiff is suing over a device not made by Bard or otherwise outside of the scope of this MDL; 5) the plaintiff's claims are plainly barred by applicable statutes of limitations and/or repose; 6) the plaintiff has multiple cases arising out of the same operative facts pending in this MDL; and 7) the

---

[4] The *Fosamax* posture was also remarkably similar to where we are in this MDL, albeit with less time passing here. "First, during its six years in this Court, this MDL has comprised some 1,000 cases. During targeted discovery, Merck produced over 11 million pages of documents and submitted 24 company witnesses to deposition. Additionally, the parties have conducted extensive fact discovery on the 12 cases that were selected for trial." *In re Fosamax*, 2012 U.S. Dist. LEXIS 166734, at *6. This MDL has far more cases and a larger document production, but a similar number of company witnesses deposed and bellwether pool. While the *Fosamax* MDL had completed four trials at the time the *Lone Pine* order was issued, the two completed trials here were long, hard-fought, and concerned the two most-prevalent devices at issue in the litigation.

plaintiff's claims have been resolved in other litigation or are subject to a prior dismissal with prejudice.").

While Plaintiffs argue generally that these issues are not terribly important (to them) and that they have a strong case against Bard—notwithstanding the results of the two bellwether trials—their only specific response is to the first of these issues. Plaintiffs assert that an analysis showed that "approximately 400 of these approximately 6,000 cases were within *an agreeable definition* of PiP [product-in-place]." Opp. at 14 (emphasis added). Even if Bard did not dispute this characterization—and it does[5]—this would suggest that approximately 1,132 of the 16,979 pending case as of June 15, 2022,[6] involve a plaintiff suing over a device that is in place without any subsequent surgical intervention. This is hardly an insignificant number or consistent with the PSC's promise at the start of the litigation. Mot. at 5-6; CMC Tr., Sept. 5, 2018, ECF No. 13, at 42:8-11. Bard and the Court certainly expected that, for any given plaintiff whose case would be filed, "it's either explanted or [there is] a reason that it can't be explanted." *Id*. at 42:12-13. There is no reason to believe that anywhere near all of the more than 1100 pending cases with a product in place without any subsequent surgical intervention—according to Plaintiffs' decidedly lowball estimate—have "a reason that it can't be explanted."

That estimate also does not account for those plaintiffs whose only surgical interventions have been for reasons unrelated to any complication connected to the implanted device, such as another hernia in the same general area as the one for which the Bard device was placed. These cases are apparently outside of the PSC's "agreeable definition" of a product-in-place case but are clearly within the categories of issues that Bard identified in its motion. So too are the cases, like

---

[5] As noted above, the analysis of a sample of cases and discussions of the parties were in the context of possible resolution and, thus, covered by Fed. R. Evid. 408. Bard will not reveal details on the analysis or discussions in a public forum, even to correct Plaintiffs' mischaracterizations.

[6] https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_Actions_Pending-Jun-15-2022.pdf

*Johns*, where the alleged complications associated with a removed device were asymptomatic. Based on more than one sampling exercise, not just the one referenced by Plaintiffs, Bard maintains that these cases collectively—those not suing over an alleged complication that was ever symptomatic or led to a surgical intervention—make up more than one-third of the pending cases. That would equate to more than 5600 cases at present.[7]

This total does not include the cases covered by the last four issues identified in Bard's motion, including time-barred cases.  While Plaintiffs contend that the "discovery rule" will apply to some number of cases that would otherwise be time-barred, Bard's statement about the number of cases with four or more years from the date of an *explant* procedure (or other surgical intervention related to complications) until the initial of litigation does not implicate the "discovery rule."  Some plaintiffs may be able to establish that their claims did not accrue based on *pre-explant* symptoms or diagnoses, but the date of explant of a medical device is typically the *latest* date by which claims will have accured.

Similarly, a number of cases with more than a decade from implant until initiation of litigation will clearly implicate applicable statutes of repose.  Plaintiffs do not say otherwise.  Nor do they dispute that there are collectively hundreds of cases with no claims as to MDL devices, settled/dismissed claims, and/or claims that fully duplicate other pending cases.  While it is true that some of these plaintiffs will dismiss their cases upon Bard's request, many do not and Bard has been forced to pursue individual motions to dismiss.  The issue, though, is that it is not efficient or beneficial for the overall litigation to let thousands of meritless cases linger, while Bard can only seek dismissal of a small subset of them on a one-by-one basis.

---

[7]  Bard maintains that the thousands of cases that are affected by these issues, even under Plaintiffs' apparent view, is more than enough to see that a *Lone Pine* order would meet a significant need. If it is important to the Court to have a reliable estimate of the prevalence of the seven issues raised in Bard's motion, however, then it would certainly be possible for the parties to engage in a Court-supervising survey of a representative sample of cases.

As Bard said in its motion, the "identification and culling would help to 'boost efficiency' for the MDL by 'ensur[ing] that only plaintiffs with meritorious cases are compensated' in the event of a settlement or 'ensur[ing] that the home districts receive only viable cases' in the event of remand." Mot. at 9 (quoting *In re Fosamax*, 2012 U.S. Dist. LEXIS 166734, at *7); *see also* Mot. at 20 ("In addition to providing the parties with a true picture of potentially meritorious cases, the remaining cases may be worked up on their merits, in the fashion the Court deems appropriate, without the waste inherent patently non-meritorious cases."). Plaintiffs did not respond to this and, indeed, it is hard to imagine a legitimate rationale for keeping hundreds or thousands of meritless cases around for expensive discovery and even trials. The benefit to the Court, the plaintiffs with potentially meritorious cases, and Bard from identifying and culling those cases, though, should be manifest.

Plaintiffs also contend that the specific provisions in Bard's Proposed Case Management Order are confusing or not the most efficient way to accomplish the goals of a *Lone Pine* order, but that does not mean there is no need for such an order. The precise parameters of a *Lone Pine* order could be worked out through negotiation of the parties or the input of the Court, as occurred with the CMOs governing PPFs and PFSs.

The former are required for all cases, but they only provide limited information, signed by the lawyer not the plaintiff, and attach only specific records in the plaintiff's possession. The more extensive PFS, signed by the plaintiff, has thus far been produced in less than 0.1% of all cases. The other greater than 99.9% of cases have not been the subject of individualized discovery, like interrogatories, requests for admission, or depositions, and are not in position for Bard to challenge whether they have a compensable injury, whether are time-barred, or almost any other substantive issue. As such, unlike the relatively few cases Plaintiffs cited that denied *Lone Pine* orders, the

existing orders do not provide nearly what a *Lone Pine* order would provide.

Specifically, while the PPF requires production of "all medical records in your possession, custody, or conrol (including any medical records in your attorney's possession) related to the claims and/or alleged injuries in this case, the Proposed Case Management Order would require a plaintiff to obtain and produce "[m]edical record(s) or other documentation establishing that the Plaintiff was implanted with one of the 24 Bard hernia mesh devices at issue in the MDL." *Compare* ECF. No. 57 at 11, *with* Ex. 3 to Mot. at 1-2.

The Proposed Case Management Order would also require a declaration from a "qualified physician or other medical expert" that addresses two subjects not covered in the PPF: 1) "Whether the expert believes to a reasonable degress of medical certainty that the above-referenced Bard hernia mesh device(s) caused Plaintiff to suffer a symptomatic physical injury, and if so, the precise nature of that injury and the factual and medical/scientific basis for the expert's opinion" and 2) "The date, at least by month and year, when the expert believes to a reasonable degree of medical certainty that Plaintiff first developed the syptomatic physical injury/injuries casued by the above-referenced Bard hernia mesh device." Ex. 3 to Mot. at 2. In addition, the three areas for the certification of counsel—an allegation of compensable injury from an MDL device, the existence of a prior duplicate lawsuit, and statutes of limitation and repose—are not addressed by the attorney's signature on the PPF or the SFC. Ex. 3 to Mot. at 2-3. Thus, the Proposed Case Management Order would provide significant useful information to Bard and the Court beyond what is provided in the SFC and PPF.

Existing orders also do not provide sufficient tools to administer the litigation as a whole. As Judge Goodwin, the judge in *In re Digitek*, wrote in connection with a later MDL: "A [court's] willingness to resort to sanctions in the event of noncompliance can ensure that that the engine

remains in tune, resulting in better administration of the vehicle of multidistrict litigation." *In re Cook Medical, Inc. Pelvic Repair Sys. Prof. Liab. Litig.*, 2018 WL 4698953, at *2 (S.D.W. Va. Sept. 28, 2018) (citing *Freeman v. Wyeth*, 764 F.3d 806, 810 (8th Cir. 2014) ("The MDL judge must be given 'greater discretion' to create and enforce deadlines in order to administrate the litigation effectively. This necessarily includes the power to dismiss cases where litigants do not follow the court's orders.")).

As it currently stands, the vast majority of plaintiffs have no incentive to self-police in terms of dismissing time-barred cases or cases without a compensable injury, even though a lawyer should assess these issues before filing a case and periodically while it is pending. *See Albright v. Upjohn Co.*, 788 F.2d 1217, 1219-21 (6th Cir. 1986) (reversing district court's denial of Rule 11 sanctions against plaintiff's attorney for "insufficient" pre-filing investigation that would have revealed a lack of evidence that defendant was not manufacturer of allegedly defective antibiotic taken by plaintiff); *Johnson v. A. W. Chesterton Co.*, 18 F.3d 1362, 1365 (7th Cir. 1994) (finding that sanctions were properly imposed on plaintiffs' attorney for failing to make reasonable pre-filing investigation that would have revealed claim was barred by statute of limitations); *Doggett v. Perez*, 225 F.R.D. 255, 257 (E.D. Wash. 2004) (imposing sanctions under Rule 11 where "John Doggett's claims were legally frivolous when filed because they were clearly time-barred"); *Augustine v. Adams*, 88 F. Supp. 2d 1166, 1173-74 (D. Kan. 2000) (sanctioning attorney under Rule 11 for filing complaint where he should have realized that plaintiff's claims were barred by res judicata, collateral estoppel, and state statute of limitations, because his position was not warranted by existing law or nonfrivolous argument). Requiring an attorney certification and production of product identification and injury/causation records at this stage would create just such an incentive and give Bard and the Court the tools to cull out cases that do not belong and

devote additional resources to the rest. *See* Ex. 3 to Mot. at 3-4.

### III. A Small Additional Burden On Current And Future Plaintiffs Is Justified

Lacking strong arguments on the general use of *Lone Pine* orders in MDLs like this or the need for one here given the present circumstances, Plaintiffs devote much of their response to the idea that imposing any additional burden on individual non-bellwether plaintiffs would be unfair. For these roughly 16,970 plaintiffs, however, the MDL has already bestowed significant benefits in terms of access to generic discovery and the common work product and knowledge of the PSC, as well as the guidance from dozens of rulings from the Court. In turn, they have been required to complete the template SFC and serve a relatively short PPF, neither of which are signed by the plaintiff herself or himself (except for authorizations attached to the PPF). Noncompliance with these requirements typically results in additional time to cure with only a handful of dismissals in roughly three-and-a-half years since the requirements were put in place. By contrast, there has been a huge burden on Bard in terms of generic discovery in addition to having to serve a Defense Profile Form ("DPF") in response to each PPF. In this context, complaints about imposing a burden on the average non-bellwether plaintiff are implausible.

The litigation is also quite different than it was when the PPF requirements were set, both in terms of the number of cases and the increasing frequencies of PIP cases, apparently time-barred cases, duplicates, etc. At this stage in the litigation, the production of materials relating to product identification, injury, and causation should impose little additional burden because an order would "merely ask[] them to produce information they should already have." *In re Fosamax*, 2012 U.S. Dist. LEXIS 166734, at *6 (citation omitted); *see also In re Avandia Marketing, Sales Practices & Prods. Liab. Litig.*, MDL No. 1871, 2010 WL 4720335 (E.D. Pa. Nov. 15, 2010) (requiring production of "information which plaintiffs and their counsel should have possessed before filing their claims"); *In re Vioxx*, 557 F. Supp. 2d at 744 ("[I]t is not too much to ask a Plaintiff to provide

some kind of evidence to support their claim that Vioxx caused them personal injury. . . . Surely if Plaintiffs' counsel believe that such claims have merit, they must have some basis for that belief[.]").

Plaintiffs offer no substantive counter-argument. Instead, they quibble with what "compensable injury" is, but both Bard's motion and Proposed Management Order specified categories of information to identify plaintiffs with no surgical intervention, plaintiffs with only incidental surgical interventions, and plaintiffs whose alleged injuries produced no symptoms or limits. *See* Mot. at 6-9; Ex. 3 to Mot. at 1-2. The *Johns* case was instructive on these issues, as the Court excluded plaintiff's surgery expert from opining on causation in relation to alleged present and future injuries with a device in place without any surgical intervention and the jury rendered a defense verdict on claims related to the prior device, which was removed for reasons unrelated to the asymptomatic omental adhesions for which the *Johns* plaintiff was suing. *See Johns v. C. R. Bard, Inc.*, 2:18-md-02846-EAS-KAJ, Evidentiary Motions Order No. 5, ECF No. 310, at 23-28 ("Based on the evidence before this Court, Dr. Grischkan's opinions regarding Plaintiff's current pain are based on speculation rather than a valid methodology. . . . Dr. Grischkan's opinion regarding the need for future surgeries is likewise based on pure speculation.").

Numerous courts have required similar productions concerning medical diagnosis and causation. *See, e.g., In re Zostavax*, 2022 U.S. Dist. LEXIS 57935, at *5 & *7 ("[A court] may impose a *Lone Pine* order so as to "require plaintiffs to furnish specific evidence like proof of a medical diagnosis, with the goal of winnowing non-compliant cases from the MDL"; "It is now time for plaintiffs to come forward with the Laboratory Reports or other documentation Merck requests to enable the court to weed out non-meritorious claims and move along these 1,700 or

more cases toward a final resolution."); *In re Xarelto*, 2021 U.S. Dist. LEXIS 25296, at *8-*9 (noting that plaintiffs transferred into MDL were required to produce a Rule 26(a)(2)-compliant expert report on medical causation); *In re Testosterone Replacement Therapy ("TRT") Products Liability Litigation*, MDL No. 2545, Master Docket Case No. 1:14-cv-01748, 2018 U.S. Dist. LEXIS 205125, at *421-*425 (N.D. Ill. June 11, 2018) (requiring each remaining and new plaintiff to produce all medical and pharmacy records, and an expert report within 90 days); *In re Vioxx Prods. Liab. Litig.*, MDL NO. 1657, 557 F. Supp. 2d 741, 742-43, 744-45 (E.D. La. 2008) (denying motion to suspend *Lone Pine* order requiring plaintiffs to produce expert report confirming injury and "showing . . . some kind of scientific basis that Vioxx could cause the alleged injury"). Plaintiffs' argument that such orders *only* occur when there is a narrowly defined injury associated with the subject of the litigation and that no such injury exists here falls flat.

Indeed, as Bard's motion noted, the Proposed Case Management Order's provisions related to injury and causation are modeled on orders in the *Physiomesh* hernia mesh proceedings (drafted by members of the PSC; Opp. at 17). Mot. at 6 n.1. Yet, every surgeon to testify in the bellwether trials thus far has agreed that all permanent synthetic hernia meshes have the same range of potential complications.[8] The lack of "signature" injuries with Bard's hernia devices—indeed, lack of increased risk of any injury for the devices in the bellwether trials—is not a reason to excuse plaintiffs from producing documents on product identification, injury, and causation that are the most common *Lone Pine* provisions. Engstom & Espeland at 105 (three-quarters of reviewed orders required expert proof on injury and causation).

Plaintiffs' argument about a burden in providing the attorney certification described in the

---

[8] This is consonant with the FDA's publicly stated position: https://www.fda.gov/medical-devices/implants-and-prosthetics/hernia-surgical-mesh-implants. As the Court is aware, 23 of the 24 Bard devices at issue in this MDL have not been subject to any safety-related recall or adverse FDA order.

Proposed Case Management Order helps elucidate why an order is needed in the first place. As described in the Engstrom article cited by Plaintiffs:

> In the mass-tort realm, the sheer volume of claimants, all seeking representation more or less simultaneously (often in response to the same stimuli and sometimes call facing the same statute of limitations), may overwhelm a PI lawyer's capacity to perform requisite checks. At the same time, as compared to the "typical" PI lawyer, a mass-tort lawyer's incentive to screen is also much reduced. Generally, accepting a new client poses a degree of risk and entails a nontrivial investment, creating a powerful incentive for attorneys to represent only those with meritorious claims. ***By contrast, once the mass tort is in full swing, costs are essentially fixed, while rewards depend largely on claim volume—meaning, bluntly, the more the merrier.***

Engstrom at 31 (emphasis and italics added); *see also* Engstrom & Espeland at 99 ("[T]here's an uncomfortable fact about mass tort litigation that makes *Lone Pine* orders—and their capacity to wash away noncolorable claims—particularly attractive. That fact is that, for a slew of reasons, certain mass tort suits are susceptible to being contaminated by, or even overrun with, the inclusion of plaintiffs who do not have a legitimate claim for relief."). In this context, certifications from counsel about the basic pre-suit inquiries identified in the Proposed Management Order make quite a bit of sense. It should be simple for counsel who engaged in such inquiries to so certify.

It is also not "unprecedented" to require such certifications. *See* Opp. at 17, 18, 19 & 21. The *Cook IVC* orders that Bard attached to its motion did just that. *See* CMO No. 28, *In re Cook Med., Inc., IVC Filters Mkt'g, Sales Pract. & Prod. Liab. Litig*., MDL No. 2570, Oct. 26, 2020 (Exhibit 6 to Mot.); CMO No. 30, *In re Cook Med., Inc., IVC Filters Mkt'g, Sales Pract. & Prod. Liab. Litig*., MDL No. 2570, Mar. 29, 2022 (Exhibit 7 to Mot.); Mot. at 12. Plaintiffs did not dispute that imposing such requirements is within the authority granted district courts under Fed. R. Civ. P. 16, consistent with attorney obligations under Fed. R. Civ. P. 11, and tied to the heightened concerns for MDL courts. Instead, they suggest that it would not have been possible for counsel actually to talk to a client before filing a lawsuit on his or her behalf in an effort to

- 15 -

make the case was not time barred, the client had not already brought suit, the client had not already resolved the same claims or had them dismissed, or other basics.  If not all counsel with pending cases can attest to having had such conversations with each of their clients pre-suit, then it seems unlikely that Bard and the Court would have assurance that a plaintiff whose suit was brought three years ago (and signed some authorizations for the PPF shortly thereafter) still intends to proceed with her or his suit.  The burden on a plaintiff and case counsel to submit basic materials and a simple certification is amply justified by the benefit to the litigation as a whole.

**CONCLUSION**

The time has come to enter a comprehensive *Lone Pine* order to facilitate the long-term success and efficient administration of this MDL.  Nothing in Plaintiffs' response counsels against this.  Nor is there any reason to delay an order until more cases are pending or the PSC ends its opposition.  Bard requests that the Court enter the Proposed Case Management Order attached to Bard's motion or a negotiated order designed to achieve the same objectives.

DATED:  June 17, 2022                    Respectfully submitted,

*/s/ Eric L. Alexander*

Michael K. Brown
REED SMITH LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA  90071-1514
Telephone: (213) 457-8000
mkbrown@reedsmith.com

Eric L. Alexander
REED SMITH LLP
1301 K St., NW
Suite 1000-East Tower
Washington, D.C. 20005
Telephone: (202) 414-9200
ealexander@reedsmith.com

Lori G. Cohen
GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
(678) 553-2385
cohenl@gtlaw.com

*Co-Lead Counsel for Defendants C. R. Bard, Inc. and Davol Inc.*

William D. Kloss, Jr.
Vorys Sater Seymour and Pease
52 East Gay Street
Columbus, OH 43215
(614) 464-6202
wdklossjr@vorys.com
hageigel@vorys.com
akminer@vorys.com

*Liaison counsel for Defendants C. R. Bard, Inc. and Davol Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 17, 2022, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system, which will send a notice of this electronic filing to all

counsel of record.

*/s/ Eric L. Alexander* _____
Eric L. Alexander
