UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: DAVOL, INC. / C.R. BARD, INC. POLYPROPYLENE HERNIA MESH PRODUCTS LIABILITY LITIGATION | Case No. 2-18-md-2846<br><br>JUDGE EDMUND A. SARGUS, JR.<br>Magistrate Judge Kimberly A. Jolson |

**This document relates to:**
**ALL ACTIONS.**

**PLAINTIFFS' STEERING COMMITTEE'S REPLY IN SUPPORT OF ITS MOTION FOR ENTRY OF A CASE MANAGEMENT ORDER GOVERNING THE FUTURE MANAGEMENT OF CASES AND POTENTIAL REMAND AND RESPONSE REGARDING THE NECESSITY OF A FOURTH BELLWETHER TRIAL**

The Plaintiffs' Steering Committee (PSC) submits this reply in support of its Motion for a Case Management Order Governing the Future Management of Cases and Potential Remand. In addition, pursuant to CMO No. 49, the PSC also submits its response regarding the necessity of the fourth bellwether trial.

For the reasons that follow and those set out in the PSC's Motion and Supporting Memorandum [ECF No. 802], the Court should grant the PSC's Motion and begin formulating a remand plan now (in the form of the PSC's proposed case management order [ECF No. 802-1]).

In addition, as shown below, the Court should opt not to proceed with the fourth bellwether trial and instead utilize that time to focus the parties on bringing this matter to a just and efficient resolution or, in the absence of such a resolution, to begin the remand process.

## I. INTRODUCTION

This MDL encompasses over 21,000 individuals' cases and is growing at a steady pace.[1] The sheer size and age of the MDL, let alone its complexity, compels the conclusion that the roadmap for the next steps should be created *now*. The PSC welcomes the Court's suggestion at the last CMC, which is to focus on resolution for the next several months but do so with a deadline for remand established. The PSC submits that its remand plan—in the form of its proposed CMO—should be that deadline. As demonstrated by the PSC's proposed order, there are numerous moving parts and steps that must be taken to begin the process of filing suggestions of remand (under the PSC's plan, the actual remand process does not start until November of 2024). Going into the MDL's sixth year, the time is now to create that deadline. "[T]he way these cases will end, you

---

[1] According to the Judicial Panel on Multi-District Litigation, this number of cases makes this MDL the third largest pending MDL in the country behind only MDL No. 2885 (*In re: 3M Combat Arms Earplugs Prods. Liab. Litig.*) and MDL No. 2738 (*In re: Johnson & Johnson Talcum Powder Prods. Marketing, Sales Practices and Prods. Liab. Litig.*)

1

will either settle them or disperse them back to the districts from whence they came." 8/17/22 CMC Tr. [ECF No. 659] 14:6–9. Defendants' "plan", on the other hand, is to wait until after the parties spend several weeks of the Court's time and resources pre-trying and trying a case that has many of the same expert witnesses, common science, and the same defenses as in the previous trials, for no net gain. Sifting through Defendants' scattershot approach to their response full of manufactured reasons why this next case is somehow different from the three tried before it, their real strategy becomes clear: delay. Delay resolution discussions, delay remand, delay the just disposition of these actions. Indeed, regardless of the litigation at issue, the truth remains that "[y]ears of delay may appeal to [Defendants], but it is fundamentally unfair in the administration of justice." *See In re: E.I. Du Pont de Nemours and Company C-8 Pers. Injury Litig.,* 2:13-md-02433-EAS-EPD [ECF No. 4624] at PageID 100957 (CMO No. 20 at 17).

As the Court pointed out at the last CMC, moving forward with the fourth bellwether case would create months of delay with no advancement. *See* 1/10/24 CMC Tr. [ECF No. 815] at 23:22–24. The prudent path forward is to cancel the fourth bellwether trial and take advantage of the extra time to see if remand can be avoided. If remand cannot be avoided, the plan will already be in place for a smooth transition into the next phase of this litigation. There is nothing lost by removing the fourth bellwether trial from the schedule because there was nothing to be gained from it in the first place. In fact, for years, the parties operated under the construct of a three-bellwether trial schedule that they agreed was appropriate and fair. The Court later suggested to line up a fourth case in the event it was needed. After three bellwether trials, testing all three buckets, a fourth case is not needed to provide any more guidance to the parties. As shown below, notwithstanding Defendants' attempts to make *Bryan* seem more valuable than it actually is, it adds nothing. Without a fourth bellwether trial, the parties have simply reverted back to the original plan—three

2

highly instructive bellwether trials. If Defendants want more data points as they seem to be suggesting with their argument to keep the next trial on the Court's docket, they will certainly get that from the remand plan the PSC has proposed.

## II. ARGUMENT

### A. THE TIME FOR A PLAN IS NOW

According to Defendants' plan, it is only after the conclusion of the fourth bellwether case that the parties would be in "a better position" to *evaluate* the landscape *and then* determine next steps. *See* Response at 2. This is no plan at all. Indeed, if the Defendants have their way, the only position the parties will be in is the exact same position they are in now, but 6 months down the road, with no material advancements achieved. Even if the fourth bellwether trial were to go forward, which the PSC submits it should not, an order should be entered now establishing concrete deadlines and a measured approach to begin the remand process. Otherwise, the parties will be starting 2025—the MDL's seventh year—with no end in sight.

Defendants claim the PSC's plan is "premature," but the PSC's plan is just in time, and should be expected. A look back at the course of this MDL is instructive:

- Before the Covid-19 Pandemic, the Court had asked the settlement teams to come to Columbus as a sort of "meet and greet" with settlement counsel to start the process of mediation. 1/13/20 CMC Tr. [ECF No. 304] at 85:18–25.

- The Pandemic thwarted the in-person meeting, and the parties tried the first bellwether case—a defense pick—20 months later.

- After the first bellwether case, the negotiation teams had multiple meetings, but to no avail.

3

- In the first meeting after the second bellwether trial concluded, the Court held an in-person conference and had a discussion with the parties about the path forward. Regarding bellwether trials, the Court was clear: "we try two more of these *maximum* . . . ." 8/17/22 CMC Tr. [ECF No. 659] at 13:9–10. The Court added "at a certain point, you've gleaned all you can from the trials." *Id.* at 13:24–14:2.

- Almost exactly a year later, leading up to the third bellwether trial, speaking of a drop-dead date for remand, the Court previewed that it would give the parties "three, four months after the last trial . . . ." 8/29/23 CMC Tr. [ECF No. 779] at 5:6–17.

The PSC's proposal of beginning remand in November of 2024 is two to three months *after* the Court's *drop-dead date*. This is neither premature nor unreasonable as Defendants suggest.

Not only is the PSC's plan in accordance with the Court's proposed timing, it is also appropriate given the overall makeup of the MDL's cases and the trial packages that the PSC has put together thus far. Having tried all 3 buckets (both coating types in the ventral space and an inguinal all-polypropylene case), the framework has been built for every product in this 21-product MDL. Trial packages are complete for the Ventralight ST, the Ventralex Patch, and the PerFix Plug, which together account for almost *half of the MDL cases*. *See* Figure 1 below (taken from a PPF survey done in September 2023 with 15,500 PPFs turned in at the time of the survey). With the expert reports, expert depositions, and briefing almost complete for the 3DMax case, the 3DMax has a near complete trial package.[2] Therefore, more than half the cases in this MDL have

---

[2] There are four deposition notices of corporate employees involved in the 3DMax design and development that are the subject of Defendants' Motion to Quash [ECF No. 816]. As discussed in the PSC's response [ECF No. 821], which it incorporates here by reference, those depositions can be held in abeyance if the 3DMax is not part of the remand plan. Those four depositions would need to be complete to solidify the trial package of the 3DMax.

4

products at issue with complete trial packages, ready for remand, with a solid framework to build on for the remaining products in the MDL.[3] The parties have gleaned all they can at this point.



FIGURE 1 (above).

The time for the plan is now. The PSC welcomes the Court's suggestion of focusing on mediation during the time the parties and the Court would have otherwise focused on the fourth bellwether trial, but a roadmap should be put in place to ensure that all parties are operating with a set deadline. As the Court has repeatedly stressed, every lawyer needs a deadline as "nothing happens without deadlines". *See, e.g,* 1/10/24 CMC Tr. [ECF No 815] at 23:6–8. Waiting to impose a deadline will only delay justice for the thousands of plaintiffs who have been waiting for years.

---

[3] The PSC has never advocated for closure of the MDL and would suggest that discovery continue for the remaining products.

## B. THREE BELLWETHER TRIALS WAS THE ORIGINAL PLAN

Defendants cite principles of fairness throughout their brief. However, Defendants neglect to mention that they thought the three-bellwether plan was fair from the beginning as *they negotiated it* with the PSC. Case Management Order No. 10, which was negotiated by the parties and approved by the Court, states that "the Court will select three of the Bellwether Trial Pool cases for the bellwether trials." CMO No. 10 [ECF No. 62] at 2. For years, the parties operated under the construct that there would be three bellwether trials. *See, e.g.,* 11/15/18 CMC [ECF No. 59] at 22:8–13 (discussing the need to have extra cases for the purpose of replacement if one of the *three* cases resolves or drops out). Defendants' counsel acknowledged the parties' plan at the CMC discussing CMO No. 10: "And then it will be three cases for trial." *Id. a*t 15:7–11. Several months later, Defendants again expressed understanding of the plan when consenting to *Lexecon* waivers "And for the *three trials* that are scheduled, the defense waives as well." 3/6/19 CMC Tr. [ECF No. 113] at 8:7–14. It was not until the Court suggested it (in January of 2020), that a fourth bellwether case was contemplated by anyone as necessary and what the parties had agreed upon. And even then, a fourth trial was not a foregone conclusion, "we may have results at the end of three, we may not." 1/13/20 CMC Tr. [ECF No. 304] at 64:17–19.

As contemplated by CMO No. 25 [ECF No. 318], entered on January 24, 2020, the first three trials were supposed to be tried in rapid succession in the Summer of 2020 with a fourth bellwether trial "TBD" for an undecided date in the then-distant future. The time between the third and the fourth bellwether trials was meant to be a time to assess the need for a fourth bellwether trial. *See* 1/13/20 CMC Tr. [ECF No. 304] at 64:17–19. Then the Pandemic hit. Apparently, the original plan under which both sides operated for years—from the MDL's inception—had been abandoned by Defendants. But just as the Court suggested the fourth bellwether trial, so too can

6

the Court suggest its cancellation. The parties have the results from the first three and, as discussed below, nothing new will be learned from trying the fourth bellwether case. It is time to move to the next phase.

### C. NOTHING WILL BE GAINED FROM TRYING THE FOURTH BELLWETHER

Despite Defendants' attempts to create value where none exists in the fourth bellwether case by manufacturing *Bryan*'s supposed distinctions, a closer look reveals that *Bryan* is really just more of the same. The similarities to *Stinson* are striking, which makes sense seeing as *Bryan* falls into the same "bucket" as *Stinson*: an all-polypropylene device meant for inguinal hernia repairs. This is a testament to the representativeness that the PSC was so careful to analyze in its picks. The charts below assess the facts of the *Bryan* case and compare them to the three prior cases. The comparisons illustrate that nothing new will be learned from the fourth bellwether:

| Device Characteristic | Same as Any Other Case? |
|---|---|
| All Polypropylene | Same as *Stinson* |
| Inguinal Implantation | Same as *Stinson* |
| Three-Dimensional Structure | Same as *Stinson* |
| Polypropylene is Marlex | Same as *Johns* and *Stinson* |
| Heavyweight Mesh | Same as *Milanesi* and *Stinson* |
| Small Pore | Same as *Milanesi* and *Stinson* |

| Injuries Claimed | Same as Any Other Case? |
|---|---|
| Chronic Groin Pain | Same as *Stinson* |
| Testicular Problems | Same as *Stinson* |
| Orchiectomy Risk with Second Revision | Same as *Stinson* |
| Nerve Injury/ Nerve Involvement | Same as *Stinson* |

| Characteristics of Plaintiff | Same as Any Other Case? |
|---|---|
| Prior Chronic Back Pain | Same as *Stinson* |
| Manual Laborers | Same as *Stinson* |
| Missed Work for Extended Periods of Time Due to Injuries | Same as *Stinson* |
| Previously Missed Work Due to Unrelated Injuries | Same as *Stinson* |
| Prior Worker's Comp Claim | Same as *Stinson* |

Not only are the facts eerily similar to a case already tried (namely *Stinson),* the applicable state's law in *Bryan*—Florida—was applied in the second bellwether trial (*Milanesi*). Again, just more of the same. So too will be the line-up of experts: except for the pathology experts, all experts will have appeared in at least one of the prior trials, but most will have testified in all three prior trials.

Defendants' attempt at establishing any meaningful distinctions falls flat. As the Court pointed out at the last CMC, lawyers "can always find distinctions, whether it's with precedent or whether it's with fact. I mean there is always a difference."  1/10/24 CMC Tr. [ECF No. 815] at 18:4–7. Defendants' counsel were no exception to the rule when they posited the differences which they argue mandate the need for a fourth bellwether trial. Indeed, in the face of all the above similarities, Defendants cobbled together some facts they claim make *Bryan* "not just another case like *Stinson*". Their claims fail under scrutiny:

- Some of the Mesh Remains inside *Bryan*:  Defendants claim that the surgeon testified to removing the entire implant in *Stinson*. *See* Response at 7.  This is simply contrary to the facts. As presented at trial in *Stinson,* Dr. Radke, the explanting surgeon in *Stinson,* testified that bits and pieces of "residual mesh" could remain in Mr. Stinson. 9/26/19 Radke Dep., [*Stinson* ECF No. 379–7] at PageID 14484.  Plaintiff's experts testified to residual mesh remaining in Mr. Stinson as well. *See* 10/25/2023 *Stinson* Tr. Transcript [*Stinson* ECF No.

8

398] at 1418:22–14919:5;10/26/2023 *Stinson* Tr. Transcript, [*Stinson* ECF No. 399] at 1635:8–23; 1687:5–10.

- Laparoscopic versus Open Repair:  Defendants now have made an issue out of the approach to implantation. While the approach in *Stinson* is different than *Bryan,* this nuanced distinction is lost on the jury. It was also never argued in any forceful way in *Stinson* that the surgical approach made a difference. In fact, both Plaintiff's surgeon expert and Defendants' surgeon expert in *Stinson* testified to using an open approach when repairing inguinal hernias. *See* 10/25/2023 *Stinson* Tr. Transcript [*Stinson* ECF No. 398] at 1540:20–1505:1; 10/31/2023 *Stinson* Tr. Transcript [*Stinson* ECF No. 401] at 2038–39. Defendants bringing this "distinction" up now—and even creating a new sub-bucket at one point in their brief—speaks to their desperation to keep *Bryan* on the schedule to ensure that forward progress is delayed. It is also worth noting that the *Johns* case involved a laparoscopic approach (albeit in a ventral hernia case), so this too is not so unique as to require this Court to try a fourth bellwether trial.

- Mesh has Prevented *Bryan* from Having a Normal Sex Life:  In *Stinson*, the damage to the couple's relationship was explored, s*ee* 10/30/2023 *Stinson* Tr. Transcript [*Stinson* ECF No. 400] at 1768, although there was no consortium claim, just as there is no consortium claim in *Bryan.*  In *Milanesi*, there was a consortium claim, so lack of intimacy (albeit not in the sexual form), was explored in that trial as well.

- Mesh Has Prevented *Bryan* from Maintaining Employment:  Defendants are wrong again. In *Stinson,* there was a significant amount of testimony surrounding Mr. Stinson's inability to work as a result of his injuries. Mr. Stinson's inability to work and its contribution to his pain and suffering was at the forefront of his testimony at trial.  *See* 10/30/2023 *Stinson* Tr.

9

Transcript [Stinson ECF No. 400] at 1769:20–23; 1777:6–15; and 1778:9–15. To claim that this has not been tested is, to put it simply, incorrect.

- Mr. Bryan's Injuries are "Influenced by Litigation Considerations": A significant amount of real estate in Defendants' Response is dedicated to discussing the unfounded allegation that Mr. Bryan only sought medical treatment because he retained counsel. First, this is pure speculation, not based on any fact, and, based upon this Court's prior similar rulings, will most likely be held inadmissible. Second, this unfounded accusation is certainly nothing new in the *Bryan* case. Defendants have not once, but twice, accused a bellwether plaintiff of seeing doctors because he was involved in litigation. During Mr. Stinson's July 28, 2023 deposition, Defendants asked whether Mr. Stinson was seeing doctors more frequently because of the approaching trial date. 7/28/23 Stinson Dep., [*Stinson* ECF No. 282-1] at 169:25–171:7. Similar issues arose during the *Milanesi* trial. On the first day of that trial, plaintiff's counsel objected to a slide in Defendants' opening presentation that contained a purported "medical chronology timeline" under the heading "Medical Chronology." *See* 3/21/22 *Milanesi* Tr. Transcript [*Milanesi* ECF No. 392] at 204:5–13. The slide, however, referenced more than just dates relevant to the plaintiff's medical care. *See id.* It also listed the date when the plaintiff retained counsel and the date when the plaintiff filed his lawsuit. *See id.* Plaintiff's counsel explained that the slide was highly prejudicial because it implied that the plaintiff's medical decisions were affected by the lawsuit. *Id.* at 204:11–13. The Court ordered Defendants to remove the heading "Relevant Medical Chronology" from the slide. 3/21/22 *Milanesi* Tr. Transcript [*Milanesi* ECF No. 392] at 208:16–20. And the Court explained that the parties' arguments cannot be based on speculation. *Id.* at 209:24–210:3. Aside from its almost certain inadmissibility,

10

Defendants' claimed difference that separates *Bryan* from any other case previously tried is just a tactic that Defendants have attempted to use against two previous bellwether plaintiffs. Accordingly, this argument also fails.

- *Bryan's* Implanter "Did Not Rely on the IFU": Defendants believe they are entitled to summary judgment and claim that the implanter in *Bryan,* Dr. Caban, did not rely on the IFU or any information from Bard about the 3DMax. *See* Response at 7. First, Defendants are wrong on their interpretation of the law. Defendants' argument overlooks the fact that a product's IFU is just one of various channels of communication between Defendants and physicians—and that Defendants' duty to warn is not limited to warnings included in the IFU. Defendants promoted the 3DMax through marketing and promotional materials and sales representative trainings and visits, among other methods. Defendants, however, have promoted the 3DMax using incomplete and misleading information. For example, Bard failed to disclose in a Sell Sheet the risk of chronic pain, including testicular pain, orchialgia, dysejaculation, or spermatic cord involvement. Dr. Caban testified, Defendants' representatives visited him once a month and would try to promote their products. These communications between Defendants' sales representatives and Dr. Caban are intertwined with the content of the product's IFU. A product's IFU serves as the central hub for critical safety information about a device. Even Defendants' expert Kimberly Trautman recognizes, the IFU has influence beyond the IFU itself and shapes what sales representatives discuss with doctors and the content of promotional materials. *See, e.g.,* Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment [*Bryan* ECF No. 85] at 15–20. Second, the allegation that an implanter did not rely on the IFU or information from the company is Defendants' top defense against any plaintiff's failure to

11

warn claim. Defendants made this same claim about the implanter in *Stinson*, Dr. Tan. *See, e.g., Stinson* ECF No. 89. There is nothing new here.

Defendants' final attempt at distinguishing *Bryan* from the other three essentially amounts to an admission that all prior cases' theories had merit[4] as there was something "uncertain" about the device at issue in each of the cases. *See* Response at 7–8. Of course, during the pendency of each of those cases, Defendants claimed that whatever device was at issue was "state of the art" and the "most widely used devices in the world." Now, when Defendants try to find differences in *Bryan* for purposes of delay, they throw each device under the bus and proclaim that the 3DMax is different. The "3DMax is the top laparoscopic hernia repair product in the United States." Response at 8. As the Court likely remembers, this is the same argument they have made in every single one of these cases: for example, and most recently, in *Stinson*, the jury heard repeatedly from Defendants how PerFix was the most popular inguinal hernia mesh device ever with more than 6 million having been sold. Again, more of the same.

As demonstrated above, there is nothing new to learn in *Bryan* that has not been explored in one of the first three Bellwether cases tried. If Defendants want more data points, they should sign on to the PSC's remand plan. The fourth bellwether trial will only create delay. It should

---

[4] Amongst other false quotes assigned to the PSC, none of which have a citation, the most audacious of all is Defendants' claim that the PSC stated in public fora that *Johns* "involved minimal effort from the plaintiff's counsel." *See* Response at 9. Not only is this unprofessional and offensive, but it is also 100 percent false. As this Court is painfully aware, the *Johns* trial was a hard-fought battle in which the PSC put on several weeks' worth of liability evidence demonstrating Defendants' egregious conduct associated with their marketing of the Ventralight ST.

therefore be cancelled so that the Court and the parties can make better use of their time crafting the end game to this MDL.[5]

### D. DEFENDANTS' CASE FILING ARGUMENT MISSES THE MARK

While over half of Defendants' response was used to sling mud at the PSC, and the Plaintiffs' Bar generally, the PSC will not waste the Court's time dignifying every insult with a response. However, one of Defendants' irrelevant arguments cannot be ignored: case filings. In making their case for delay, Defendants use "the pattern of case filings" as justification to "stay the course". *See, e.g.,* Response at 2. Defendants tout that *Bryan* will "send a message once and for all". *Id.* at 9. Defendants go on to make the bold assertion that this litigation "presents a clear relationship between how the trials have gone and the rate of case filings". *Id.* at 8. And that filings have slowed down "since Bard started trying cases and getting good results." Aside from the fact that a losing record is not a good result, Defendants' argument here is beyond the pale. Both directly and through the Special Master, beginning just before the *Johns* trial and beyond, Defendants represented that slowing filings would promote resolution, and the Plaintiffs' Bar acted accordingly. Defendants' counsel repeatedly offered the carrot of a global settlement but only if the case filings slowed to only those cases that had to be filed because of statute of limitation concerns. Accepting these representations as good faith requests and as true, Plaintiffs' leadership utilized extraordinary efforts to effectively reduce the rate of filings in this MDL so that settlement

---

[5] In a footnote, Defendants reference "Plaintiff's Proposal for Settlement to Defendants" made pursuant to FLA. STAT. § 768.79 as evidence that the PSC believes *Bryan* is a "low value case". *See* Response at 11 n.3. Defendants' footnote is improper and violates Florida law. If Defendants had consulted a Florida lawyer, they would know that refusing the PSC's offer entitles the Plaintiff to attorneys' fees in the event that the Plaintiff obtains a judgment that is at least 25 percent more than the amount of the offer. *See* FLA. STAT. § 768.79(6)(b). Based on Defendants' recalcitrant attitude thus far, the PSC knew Defendants would never accept the Plaintiff's offer (and they did not). If anything, this further illustrates the PSC's point that these cases need to be remanded given Defendants' refusal to settle what it calls a "low value case".

13

talks would have a chance to mature. Hindsight shows that, despite the successful efforts of the leadership to slow down case filings in the MDL during the settlement talks, no substantial progress was made on the settlement front. The fact that Defendants would now use reduced case filings during this period to further their argument is not only improper—it also is inequitable. To the extent filings have decreased over time (and it was not a result of Defendants' deceptive tactics), decreased case filings in a mature litigation such as this, is both expected and common. Nevertheless, as the below chart demonstrates, while there have been periodic variations, case filings have maintained a steady upward growth rate since these cases were centralized:



As discussed above, there are now more than 21,000 cases in this MDL and there have been three bellwether cases tried. The number of cases filed in this MDL has exceeded the PSC's expectations and predictions given to this Court at the beginning of the MDL that there would be "several thousand" in the MDL but that "this MDL could be as large as 10,000 cases, and I don't think that's an unrealistic expectation." *See* 10/10/18 Case Information Day Tr. [ECF No. 29] at 96:15–98:9. The prediction that the MDL "could be as large as 10,000 cases" was well before any of the three bellwether trials had been tried. The steady progression of case filings over the duration

14

of this MDL undermines Defendants' argument that the fourth bellwether trial will have any meaningful impact on when and how cases get filed in the MDL.

Further, this Court should look to what was done in *In re: Kugel Mesh Hernia Repair Patch Litig.*, MDL No. 1842, as the facts of bellwether and settlement in that prior Bard hernia mesh MDL contradict the arguments presently made by Defendants in this MDL. In that MDL, there were only two bellwethers tried. Though that MDL was much smaller than the present MDL (approximately 2,600 cases), it settled for $184 million after those first two bellwether trials were tried with one plaintiff verdict and one defense verdict. *See* 10/10/18 Case Information Day Tr. [ECF No. 29] at 98:12–99:7, 120:19–125:3.

Because these products are still on the market and continue to injure patients daily, the PSC anticipates that the filing rates will remain steady unless and until Defendants participate in resolution. *See* Court's Order Denying Defendants' Motion for a *Lone Pine* Order Without Prejudice [ECF No. 637] (noting that *Lone Pine* orders have historically been issued to assist in administration of settlements, "and there is currently no such settlement administration in this MDL."). The only "message" that needs to be sent is the one that a date-certain remand will surely deliver.

## III. CONCLUSION

For the foregoing reasons, the PSC respectfully requests the Court grant the PSC's Motion and enter the PSC's Proposed Case Management Order Governing the Future Management of Cases and Remand. The PSC also respectfully requests that the Court cancel the fourth bellwether trial and order the principals to focus on a path toward resolution.

Dated: January 31, 2024                          Respectfully submitted,

/s/ David J. Butler
David J. Butler (0068455)
***Plaintiffs' Liaison Counsel***
TAFT STETTINIUS & HOLLISTER LLP
41 South High Street, Suite 1800
Columbus, OH 43215-4213
Tel: (614) 221-2838
Fax: (614) 221-2007
Email: dbutler@taftlaw.com

Timothy M. O'Brien
***Plaintiffs' Co-Lead Counsel***
Florida Bar No. 055565
LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.
316 South Baylen St., Ste. 600
Pensacola, FL 32502
Tel: (850) 435-7084
Fax: (850) 436-6084
Email: tobrien@levinlaw.com

Kelsey L. Stokes
***Plaintiffs' Co-Lead Counsel***
Texas Bar No. 24083912
FLEMING, NOLEN & JEZ, L.L.P.
2800 Post Oak Blvd., Suite 6000
Houston, TX 77056-6109
Tel: (713) 621-7944
Fax: (713) 621-9638
Email: kelsey_stokes@fleming-law.com

**Attorneys for Plaintiffs**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2024, I electronically filed the foregoing with the Clerk of Court using the Court's CM/ECF system.

/s/ David J. Butler
*Plaintiffs' Liaison Counsel*